U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**



**United States Bankruptcy Judge**

**Signed August 09, 2010**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CORNERSTONE E&P COMPANY, L.P, *et. al.*, | § | CASE NO. 09-35228-BJH-11 |
| | § | |
| Debtors. | § | |
| | § | |
| BAKER HUGHES OILFIELD OPERATIONS, INC., *et. al.*, | § | |
| | § | |
| Plaintiffs | § | Adversary No. 09-3447-bjh (consolidated with proceedings numbered 09-3448, 09-3450, 09-3452, and 09-3457) |
| vs. | § | |
| | § | |
| UNION BANK OF CALIFORNIA, N.A. N/K/A UNION BANK, N.A., *et. al.* | § | |
| | § | |
| Defendants | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are: (i) defendant Union Bank of California, N.A. n/k/a Union Bank,

N.A.'s ("Union Bank's") Motion for Summary Judgment and Brief in Support (the "Union Bank

Memorandum Opinion and Order

Motion"); (ii) plaintiffs Baker Hughes Oilfield Operations, Inc. ("Baker Hughes"), Schlumberger Technology Corporation, Simons Petroleum, Inc., Texas CES, Inc. ("Texas CES"), T.K. Stanley, Inc. ("Stanley"), Pumpco Energy Services, Inc., I.E. Miller Services, Inc. ("Miller"), Bridgeport Tank Trucks, LLC, and Select Energy Services, LLC d/b/a Tejas Oilfield Services's (collectively, the "Baker Hughes Plaintiffs") Motion for Partial Summary Judgment and Brief in Support (the "Baker Hughes Motion"); (iii) plaintiffs Awesome Transport, LLC, Phantom Drilling Fluids Company, BJ Services Co., USA, Weatherford U.S., L.P., and Precision Energy Services's (collectively, the "Oklahoma Plaintiffs") Motion for Partial Summary Judgment and Brief in Support (the "Oklahoma Properties Motion"); and (iv) plaintiffs Weatherford U.S., L.P. and Precision Energy Services's (the "Weatherford Plaintiffs")[1] Motion for Partial Summary Judgment and Brief in Support (the "Texas Properties Motion") (collectively, the "Motions"). The Court heard the Motions on July 23, 2010 (the "Hearing").

The Court has jurisdiction over the parties and the issues raised in the Motions in accordance with 28 U.S.C. §§ 1334 and 157, either because the issues are core issues or because the parties have consented to the Court's entry of a final judgment. This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## I.       FACTUAL AND PROCEDURAL BACKGROUND

Cornerstone E&P Company, L.P. ("the Debtor"), is a Texas limited partnership.  On August 6, 2009, the Debtor and its general partner, Cornerstone Southwest GP, LLC (together with the Debtor, "Cornerstone"), a Texas limited liability company, each filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code.  On August 7, 2009, the Court

---

[1]  Collectively, the Baker Hughes Plaintiffs, the Oklahoma Plaintiffs and the Weatherford Plaintiffs will be referred to as the "Plaintiffs."

consolidated the two cases for procedural purposes only, with joint administration under case number 09-35228-bjh. Cornerstone is a private, independent oil and gas exploration and production company with interests in Texas and Oklahoma. All of Cornerstone's oil and gas assets are owned and operated through the Debtor.[2]

In December 2006, the Debtor entered into a credit agreement (the "Credit Agreement") with Union Bank to finance the Debtor's operations. Cornerstone Southwest GP, LLC guaranteed the Debtor's obligations under the Credit Agreement. In connection with the Credit Agreement, the Debtor executed in favor of Union Bank a Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Production (the "Texas Deed of Trust"), which Union Bank filed in the property records of Hill County, Texas on January 4, 2007. The Debtor and Union Bank also entered into the First Supplement to the Texas Deed of Trust (the "Texas Supplement") (collectively, the Texas Deed of Trust and the Texas Supplement will be referred to as the "Texas Mortgage Documents"), which Union Bank filed in the property records of Hill County, Texas on October 10, 2008.

On October 10, 2008, the Debtor also executed in favor of Union Bank a Mortgage, Line of Credit Mortgage, Security Agreement, Financing Statement, Fixture Filing and Assignment of Production ("the Oklahoma Mortgage"), which Union Bank filed in the property records of Hughes County, Oklahoma on October 14, 2008.[3]

Each of the Mortgage Documents purports to grant Union Bank a security interest and lien on the Debtor's real and personal property, fixtures, and production from or attributable to

---

[2] This information comes from Declaration of John Sanchez in Support of Cornerstone's Chapter 11 Petitions and First-Day Motions (ECF #17).

[3] Hereinafter, the Texas Deed of Trust, the Texas Supplement and the Oklahoma Mortgage will be referred to collectively as the "Mortgage Documents."

**Memorandum Opinion and Order** 3

the Debtor's oil and gas interests. The Mortgage Documents all contain exhibits ("Exhibit A" to the Texas Deed of Trust, the Texas Supplement, and the Oklahoma Mortgage, respectively) that list certain oil and gas leases as subject to the mortgage liens created by each of those documents. In addition, the Mortgage Documents contain language that purports to broaden the scope of the liens granted to Union Bank to property interests beyond those listed on the individual exhibits, as well as language that purports to grant Union Bank a lien on after-acquired assets and property interests. By virtue of advances made under the Credit Agreement, Union Bank asserts a secured claim against Cornerstone of $30,116,591.00, plus interest, fees, and other costs.

The Plaintiffs are mineral contractors who have filed statutory mechanics'/materialmens' liens ("M/M Liens") under Texas and Oklahoma law for unpaid pre-petition labor or materials provided to the Debtor in connection with the Debtor's oil and gas operations in Texas and Oklahoma (the "Subject Units"[4]). The issues raised by the Motions concern the Debtor's leasehold interests and rights associated with nine wells in Hill County, Texas, one well in Maverick County, Texas, and fourteen wells in Hughes County, Oklahoma and the relative lien rights of Union Bank and the Plaintiffs.

## II. PLEADINGS BEFORE THE COURT

Because of the number of parties involved and pleadings filed in this proceeding, a brief listing of the motions now before the Court may be helpful.

Union Bank filed the Union Bank Motion, to which the Baker Hughes Plaintiffs and the

---

[4] As used herein, the term "Subject Units" will have the definition agreed upon by the parties in the Joint Statement (as defined below) as the "oil and gas wells and associated units, leases, leasehold interests, property and rights, which are further described in the recorded unit designations filed by Cornerstone in Hill County, Texas for the Texas properties and the pooling orders issued by the Oklahoma Corporation Commission for the Hughes County, Oklahoma properties." (Joint Statement, at 9). The Subject Units located in Texas will be referred to as the "Texas Properties," while those Subject Units located in Oklahoma will be referred to as the "Oklahoma Properties."

Weatherford Plaintiffs each filed responses (the "Baker Hughes Response to Union Bank Motion" and "Weatherford Plaintiffs Response to Union Bank Motion," respectively). Plaintiffs Awesome Transport, LLC, and Phantom Drilling Fluids Company filed a separate response (the "Awesome/Phantom Response"), as did BJ Services Co., USA and Newpark Drilling Fluids, LLC (the "BJ Services Response"). Union Bank filed a consolidated reply (the "Union Bank Reply"). After the Hearing, the Weatherford Plaintiffs filed a sur-reply by leave of court on the issue of whether pooling of unrecorded leases with recorded leases constituted constructive notice under Texas or Oklahoma law (the "Weatherford Plaintiffs Sur-reply").

The Baker Hughes Plaintiffs filed the Baker Hughes Motion seeking partial summary judgment on various issues. Cornerstone and Union Bank each filed a response (the "Cornerstone Response to the Baker Hughes Motion" and the "Union Bank Response to the Baker Hughes Motion," respectively), to which the Baker Hughes Plaintiffs filed a combined reply (the "Baker Hughes Reply").

The Oklahoma Plaintiffs filed the Oklahoma Properties Motion seeking partial summary judgment regarding the Oklahoma Properties. Union Bank filed a response in opposition (the "Union Bank Response to the Oklahoma Properties Motion"), and the Oklahoma Plaintiffs filed a reply (the "Oklahoma Properties Reply"). After the Hearing, Union Bank filed a sur-reply by leave of court on the issue of whether the Court is bound by the holding in *Ladder Energy Co. v. Intrust Bank, N.A.*, 931 P.2d 83 (Okla. Ct. App. 1996) (the "Ladder Sur-reply"), to which the Weatherford Plaintiffs filed a sur-sur-reply (the "Ladder Sur-sur-reply").[5]

The Weatherford Plaintiffs also filed the Texas Properties Motion seeking partial

---

[5]  Although the Ladder Sur-sur-reply was filed without leave of court and over the opposition of Union Bank, the Court has read and considered the arguments therein.

summary judgment regarding the Texas Properties. Union Bank filed a response in opposition (the "Union Bank Response to the Texas Properties Motion").

In connection with the Motions, the parties also filed a Joint Statement Regarding (i) Contested Issues of Law; (ii) Stipulated Facts; and (iii) Contested Facts (the "Joint Statement") and an agreed supplemental appendix (the "Supplemental Appendix").

As part of the Joint Statement, the parties identified contested issues of law associated with each of the Motions. This Memorandum Opinion grants in part and denies in part various contested issues of law related to each of the Motions. As set forth below, any contested issue of law identified on the Joint Statement not addressed herein remains open for trial, which is scheduled to commence on August 9, 2010.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pylant v. Hartford Life & Acc. Ins. Co.*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact issue is material if its resolution could affect the outcome of the action." *Thompson v. Goetzmann*, 337 F.3d 489, 502 (5th Cir. 2003).

After the movant has presented a properly supported motion for summary judgment, the burden then shifts to the nonmoving party to show with "significant probative evidence" that there exists a genuine issue of material fact. *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (internal citation omitted). However, where "the burden at trial [as to the

material fact at issue] rests on the non-movant, the movant must merely demonstrate an absence of evidentiary support in the record for the non-movant's case." *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

On cross-motions for summary judgment, the court must review each party's motion independently, and view the evidence and inferences in the light most favorable to the nonmoving party. *Taylor v. Gregg*, 36 F.3d 453, 455 (5th Cir. 1994).

## IV.    LEGAL ANALYSIS

### A.    In General

The determination of whether a creditor has properly perfected its security interest is governed by state law. *See, e.g., Stanton v. Texas Drug Co. (In re Stanton)*, 254 B.R. 357, 361-62 (Bankr. E.D. Tex. 2000). Texas and Oklahoma law both provide statutory liens to contractors and subcontractors to secure payment for labor or materials provided for mineral development activities. TEX. PROP. CODE § 56.002; 42 OKLA. STAT. § 144, 145. These liens attach to the well or leasehold interest for which the labor or materials were provided. TEX. PROP. CODE § 56.003; 42 OKLA. STAT. § 144. Texas and Oklahoma law also provide that the inception date of a mineral contractor lien relates back to the date work was first performed or materials first supplied, but that the lien does not affect an encumbrance that attached to land or a leasehold before the lien's inception. TEX. PROP. CODE § 56.004; *In re Meg Petroleum Corp.*, 61 B.R. 14, 20 (Bankr. N.D. Tex. 1986) (citing *Crutcher, Rolfs, Cummings v. Big Three Welding Corp.*, 224 S.W.2d 884 (Tex. Civ. App. 1949); *rev'd on other grounds*, 229 S.W.2d 600 (1950) and *Wagner Supply Co. v. Bateman*, 18 S.W.2d 1052, 1059 (1929)); 42 OKLA. STAT. § 144. Thus, under the "first in time" rules under Texas and Oklahoma law, Union Bank will only take first priority

over a valid M/M Lien on a particular oil and gas lease where Union Bank perfected its lien prior to the date that the M/M Lien claimant first provided labor or materials attributable to that lease. *Hammann v. H.J. McMullen & Co.*, 62 S.W.2d 59, 61 (Tex. 1933); *Fourth Nat'l Bank of Tulsa v. Appleby*, 864 P.2d 827, 834 (Okla. 1993).

     **B.    Union Bank Motion**

     Union Bank asserts: (i) that it holds a perfected security interest in the Subject Units; (ii) that its lien takes priority over the M/M Liens because the Union Bank lien was filed before the Plaintiffs began providing labor or materials for the Subject Units; (iii) that it holds a valid, perfected lien on leases that the Debtor owned at the time the Mortgage Documents were filed but that were not specifically listed on Exhibit A; and (iv) that it holds a valid, perfected lien on leases that the Debtor acquired after the Mortgage Documents were recorded.

     The parties have stipulated that Union Bank holds valid, perfected, and enforceable liens on the oil and gas leases specifically listed on Exhibits A to the Texas Deed of Trust, the Texas Supplement, and the Oklahoma Mortgage. (Joint Statement, at 12 ¶ 21). Thus, at issue here are the security interests that Union Bank claims through the "blanket" and "after-acquired" provisions of the Mortgage Documents, which Union Bank asserts broaden the scope of its lien to leases owned by the Debtor that are not specifically listed in the exhibits to the Mortgage Documents and to leases acquired by the Debtor after recordation of the Texas Deed of Trust and the Oklahoma Mortgage.

     In the Joint Statement, the parties have identified the following contested issues of law related to the Union Bank Motion:

1. **Whether the Texas Mortgage Documents satisfy the Texas Statute of Frauds with respect to properties not specifically identified on Exhibit A to the Texas Mortgage Documents.**

"Oil and gas interests are real property, and thus contracts for the transfer or assignment of oil and gas interests are subject to the Statute of Frauds. To satisfy the Statute of Frauds, a contract must furnish within itself, or by reference to some other existing writing, the means or data by which the property to be conveyed may be identified with reasonable certainty." *Long Trusts v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006) (citing *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex.1972) and TEX. BUS. & COM. CODE § 26.01) (internal citations and quotations omitted)). A deed is void unless it contains such a description of the property it purports to convey. *Smith v. Sorells*, 87 S.W.2d 703, 705 (Tex. 1935).

Specifically in the context of oil and gas leases, under Texas law, a grant of all of a transferor's interests located within a clearly defined area, such as a named state or county, is sufficiently descriptive to effect a conveyance. *Texas Consol. Oils v. Bartels*, 270 S.W.2d 708, 712 (Tex. Civ. App. 1954). In *Bartels*, for example, the court held that a grant of all rights, title, and interest in "[a]ll the oil, gas and mining leases, royalties and overriding royalties located anywhere within the United States, any of which are located within the states of New Mexico, Kansas, Oklahoma, Louisiana and Texas" was sufficient to reasonably identify the interests conveyed. *Id.* Similarly, the Texas Supreme Court has held that an assignment of future leasehold interests affecting any of the lands expressly covered by a specific farmout agreement was a sufficient description to satisfy the statute of frauds, while an assignment of future interests in lands described only as "in the area of the farmout acreage" was insufficient. *Westland Oil Dev. Corp. v. Gulf Oil Tex.*, 637 S.W.2d 903, 908-09 (Tex. 1982).

The Weatherford Plaintiffs contend that the Texas Mortgage Documents fail to

reasonably identify the property to be encumbered through the "blanket" and "after-acquired" clauses by analogizing these provisions to the description of land "in the area of the farmout" that was held insufficient in *Westland Oil*. (Weatherford Resp. to Union Bank Mot., at 6). This analogy, however, is inapt. As noted above, the Texas Mortgage Documents grant Union Bank a security interest in all rights, titles, and interests of the Debtor, both then-owned and after-acquired, "which are located on or under or which concern any Property or Properties[6] located in counties referenced in Exhibit A…," with Property defined as "any property of any kind, whether real, personal, or mixed and whether tangible or intangible." (Union Bank Mot. App., at 101-02). Exhibits A to both the Texas Deed of Trust and Texas Supplement specifically list Hill County, Texas. (*See, e.g.*, Union Bank Mot. App., at 123). Thus, the descriptions provided in the Texas Mortgage Documents in fact more closely resemble the conveyance upheld in *Westland Oil*, *i.e.*, all future leasehold interests within a specified area—here, the counties identified in Exhibit A, which includes Hill County, Texas. *See Westland Oil Dev.*, 637 S.W.2d at 908-09.

Because the instruments furnish within themselves, along with reference to other existing writings, a means to reasonably identify the property to be encumbered, Union Bank is entitled to summary judgment that the Texas Mortgage Documents satisfy the Texas Statute of Frauds with respect to properties not specifically identified on Exhibits A to the Texas Mortgage Documents.

---

[6] Unless otherwise indicated, when using a term not defined herein, capitalized terms refer to the definitions contained in the Mortgage Documents.

Memorandum Opinion and Order                                                                  10

**2.  Whether the Oklahoma Mortgage satisfies the Oklahoma Statute of Frauds with respect to properties not specifically identified on Exhibit A to the Oklahoma Mortgage.**

The standard for the Oklahoma statute of frauds is similar to that of Texas. "A property description is sufficient with regard to the statute of frauds, if it is specific enough to identify the property to the exclusion of any other property." *Sperling v. Marler*, 963 P.2d 577, 581 n.1 (Okla. 1998) (citing *Thompson v. Giddings*, 276 P.2d 229, 232 (Okla. 1954)). Stated another way, a property description is adequate if "it identifies the property with such particularity that it cannot be confused with or claimed to apply to, any other property." *Giddings*, 276 P.2d at 233. Neither Plaintiffs nor Union Bank has cited any Oklahoma authority precisely on point concerning the sufficiency of descriptions for blanket grants or after-acquired real property interests under the Oklahoma statute of frauds, and the Court has located none, although Union Bank cites various examples of generalized, rather than specific, descriptions of property conveyed recognized by Oklahoma law. *See, e.g., Edwards v. Philips*, 172 P. 949, 950-52 (Okla. 1918) (descriptions such as "two-story brick building in Foss" and "my house and lot in the town of Ferson" were sufficient to satisfy statute of frauds).

The Plaintiffs raise only a general allegation that the property description contained in the Oklahoma Mortgage is insufficient as to oil and gas leases owned by the Debtor but not listed on Exhibit A to the Oklahoma Mortgage and as to after-acquired oil and gas leases. (*See, e.g,.*, Baker Hughes Resp. to Union Bank Mot., at 15-23). As with the grant of security interests under the Texas Mortgage Documents, the Oklahoma Mortgage furnishes the means to identify the conveyed property to the exclusion of any other property in that it limits the grant to existing and future leasehold interests in Hughes County, Oklahoma. *See, e.g.*, Union Bank Mot. App., at 244 (Hughes County, Oklahoma referenced on Exhibit A to Oklahoma Mortgage). Accordingly,

the Weatherford Plaintiffs have failed to meet their burden to produce significant probative evidence that a genuine issue of material fact exists on this point, and Union Bank is entitled to summary judgment that the Oklahoma Mortgage satisfies the Oklahoma statute of frauds as to leases that were not specifically identified on Exhibit A to the Oklahoma Mortgage.

      **3.   Whether the granting language of the Texas Mortgage Documents is ambiguous under Texas law.**

      The Baker Hughes Plaintiffs contend that the security interests conveyed are ambiguous because the definition of "Oil and Gas Property" or "Oil and Gas Properties" in the Mortgage Documents contains provisions that the Baker Hughes Plaintiffs assert are either unclear or inconsistent. (Baker Hughes Resp. to Union Bank Mot., at 21 – 23). The Mortgage Documents define "Oil and Gas Property" or "Oil and Gas Properties" as:

> (a) the oil and gas and/or oil, gas and mineral leases and leasehold interests, fee mineral interests, term mineral interests, participation interests, back-in or carried working interests, rights of first refusal, options, subleases, farmouts, royalties, overriding royalties, net profits interests, production payments and similar interests or estates described in Exhibit A attached hereto and made a part hereof for all purposes including the net revenue interests warranted in Exhibit A and any reversionary or carried interests relating to any of the foregoing, (b) all production units, and drilling and spacing units (and the Properties covered thereby) which may affect all or any portion of such interests including those units which may be described or referred to on official acts of any Federal, state or other governmental body or agency having jurisdiction, (c) the surface leases described in Exhibit A, (d) any and all non-consent interests owned or held by, or otherwise benefiting, Mortgagor and arising out of, or pursuant to, any of the Contracts, (e) any other interest in, to or relating to (i) all or any part of the land described in Exhibit A, the land relating to, or described in, the leases set forth in Exhibit A or in the documents described in Exhibit A, or (ii) any of the estates, property rights or other interests referred to above, (f) any instrument executed in amendment, correction, modification, confirmation, renewal or extension of the same, (g) any and all rights, titles and interests of Mortgagor (which are similar in nature to any of the rights, titles and interests described in (a) through (f) above) which are located on or under or which concern any **Property or Properties located in counties referenced in Exhibit A hereto or counties in which a counterpart of this Deed of Trust is filed of record in the real property records of such county**…. (emphasis added).

(Union Bank Mot. App., at 101, 222). In turn, Property is defined as "**any property of any kind, whether real, personal, or mixed and whether tangible or intangible.**" (Union Bank Mot. App., at 102, 223) (emphasis added).

The Baker Hughes Plaintiffs first assert that it is unclear whether the phrase "such interests" in section (b) of the definition of Oil and Gas Property or Oil and Gas Properties refers to the leases described in Exhibits A or to the production, drilling, and spacing units listed in section (b) and that the interests purportedly conveyed in section (b) are not limited by state or county. Second, the Baker Hughes Plaintiffs contend that section (e) is ambiguous in that the grant of "any other interest in, to or relating to" the interests noted is not limited in scope by county or state and does not describe the related interests to be encumbered. Third, the Baker Hughes Plaintiffs argue that it is unclear whether "the same" in section (f) refers to the entirety of the preceding section, or only to instruments executed with respect to interests listed on Exhibit A. Lastly, the Baker Hughes Plaintiffs contend that section (g) must be deemed ambiguous because it incorporates all of the previous alleged uncertainties. (Baker Hughes Resp. to Union Bank Mot., at 21-23).

The primary duty of the court in interpreting what estate a deed conveys is to ascertain the intent of the parties as expressed in the instrument itself. *Alford v. Krum*, 671 S.W.2d 870, 872 (Tex. 1984), *overruled on other grounds by Luckel v. White*, 819 S.W.2d 459 (Tex. 1991). In ascertaining that intent, the court must attempt to harmonize all parts of a deed because the parties to an instrument intend every clause to have some effect. *Woods v. Sims*, 273 S.W.2d 617, 620 (Tex. 1954). The inquiry to construe the legal effect of a grant or reservation in a deed is not to be determined alone from a single word, clause, or part but from every word, clause,

and part that is pertinent. *Zephyr Oil Co. v. Cunningham*, 265 S.W.2d 169, 174 (Tex. Civ. App. 1954). Whether a deed is ambiguous is a question of law. *Cherokee Water Co. v. Freeman*, 33 S.W.3d 349, 353 (Tex. App. 2000) (citing *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987)).

An instrument is not ambiguous if it can be given a definite or certain meaning as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). An ambiguity does not arise simply because the parties advance conflicting interpretations, but only if the deed is subject to two or more reasonable interpretations or has a doubtful and uncertain meaning. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000); *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996); *Towers of Tex., Inc. v. J & J Sys., Inc.*, 834 S.W.2d 1, 2 (Tex. 1992). If a court finds the language in a deed to be unambiguous, the court may construe the deed as a matter of law. *Corine, Inc. v. Harris*, 252 S.W.3d 657, 659 (Tex. App. 2008) (citing *Westwind Exploration, Inc. v. Homestate Sav. Ass'n*, 696 S.W.2d 378, 381 (Tex. 1985)).

Applying these principles to the definition of Oil and Gas Property and Oil and Gas Properties, the Court finds no ambiguity in the grant of interests described. When sections (a) and (b) are read and construed together, it is clear that the phrase "such interests" in section (b) is a reference back to the "interests" listed in section (a)–where that term is used repeatedly–rather than a circular reference to the production, drilling, and spacing units listed in section (b), which are nowhere described using the term "interests." Similarly, when sections (e) and (f) are read and construed together, the term "the same" in section (f) clearly refers to the categories of interests listed in section (e), which includes, among other interests, those leases described in Exhibit A. In the same vein, while any one category of interests granted by an individual section

of the definition may not refer to a particular state or county, the entire grant of interests conveyed by the Mortgage Documents is limited through sections (a) through (f) to interests connected with the properties described on Exhibits A and through section (g) to interests related to the Debtor's property in the counties in which Exhibits A were filed—specifically, Hill County, Texas and Hughes County, Oklahoma.

The Baker Hughes Plaintiffs next point to the alleged inconsistency between the specific grants of interests contained in the deed and the blanket grant provision. (Baker Hughes Resp. to Union Bank Mot., at 15). Here the plaintiffs rely upon *J. Hiram Moore, Ltd. v. Greer*, 172 S.W.3d 609 (Tex. 2005), where the Texas Supreme Court found that a deed was ambiguous where the entire specific grant purported to transfer mineral interests in a survey tract in which the grantor owned no interests (in effect, granting nothing), while a broader, blanket grant purported to transfer all of the grantor's mineral interests in certain counties (in effect, granting everything). *Greer*, 172 S.W.3d at 614. Because of this direct conflict, the Texas Supreme Court found that the deed could not be construed as a matter of law. *Id.*

Here, the Texas Mortgage Documents include specific grants of surface leases listed on Exhibits A and non-consent interests owned by the Debtor, in addition to the blanket grant of interests listed in section (g). Baker Hughes asserts that because Exhibits A contain no surface leases and there is no evidence of any recorded non-consent interests, the Texas Mortgage Documents are ambiguous as a matter of law since they simultaneously purport to grant nothing and everything. (Baker Hughes Resp. to Union Bank Mot., at 21-22).

First, as to both surface leases and non-consent interests, the Court finds that this alleged inconsistency does not render the Texas Mortgage Documents ambiguous as a matter of law. In contrast to *Greer*, where the conflict between the specific and general grant was so material that

it created uncertainty as to the whole of the property to be conveyed, here the conflict—to the extent it exists—is minor. As Justice Hecht noted in *Greer*, it is rare that the conflict between a specific and general grant is so great that the general grant cannot be given literal effect, such as when the general grant is repugnant to the rest of the deed. *Greer*, 172 S.W.3d at 615-16 (Hecht, J., concurring). "Even where different parts of the instrument appear to be contradictory and inconsistent with each other, the court will, if possible, harmonize the parts and construe the instrument in such way that all parts may stand and will not strike down any portion unless there is an irreconcilable conflict wherein one part of the instrument destroys in effect another part." *Woods*, 273 S.W.2d at 620-21. As such, Texas law recognizes that a general grant may enlarge a specific grant with no repugnance when the deed clearly evidences the grantor's intent to convey not only the specific property interests described, but also other interests "coming within the terms of the general description." *Sun Oil Co. v. Burns*, 84 S.W.2d 442, 446-47 (Tex. 1935).

Further, solely as to non-consent interests, the Court finds that no conflict exists. Unlike surfaces leases, the Baker Hughes Plaintiffs here contend only that no evidence exists that any non-consent interests owned by the Debtor were recorded so as to place third parties on notice of Union Bank's mortgage lien.[7] (Baker Hughes Resp. to Union Bank Mot., at 21-22). Failure to record, however, has no effect on the validity of a conveyance between the grantor and grantee. TEX. PROP. CODE § 13.001(b) (an "unrecorded instrument is binding on a party to the instrument…").

Because the language of the grant of security interests in the Texas Mortgage Documents

---

[7] In their Response, the Baker Hughes Plaintiffs concede that Cornerstone "may own some non-consent interests in Oklahoma… ." (Baker Hughes Resp. to Union Bank Mot., at 22). Cornerstone admitted in response to discovery, however, that Exhibits A contain no non-consent interests. (App. to Baker Hughes Resp. to Union Bank Mot., at 00016). To the extent the absence of non-consent interests on Exhibits A constitutes a conflict with the blanket grant provision, as discussed above, this conflict does not constitute a repugnance in the conveyance. *See Sun Oil*, 84 S.W.2d at 446-47.

does not support more than one reasonable interpretation and because the inconsistencies alleged by the Baker Hughes Plaintiffs do not constitute repugnances in those conveyances, the Court concludes that the Texas Mortgage Documents are not ambiguous as a matter of law. Union Bank is thus entitled to summary judgment on this issue.

### 4. Whether the granting language of the Oklahoma Mortgage is ambiguous under Oklahoma law.

Oklahoma law regarding ambiguity is similar to Texas law. A contract or conveyance is ambiguous only if the language of the document creates uncertainty between two or more proper meanings. *State, ex rel., Comm'rs of the Land Office v. Butler*, 753 P.2d 1334, 1336 (Okla. 1988). The determination of whether a document is ambiguous is a question of law. *Id.* As with Texas law, the court must seek to ascertain the parties' intent from the written provisions, and must construe all parts of the document together. 15 OKLA. STAT. §§ 152, 155, 157. Further, particular or specific clauses are subordinate to the general intent of the contract, and any repugnancy should be reconciled so as to "give some effect to the repugnant clause, subordinate to the general intent and purposes of the whole contract." 15 OKLA. STAT. §§ 166, 168. Lastly, Oklahoma rules of construction favor interpretation that allows the contract or conveyance to be "reasonable and capable of being carried into effect, if it can be done without violating the intention of the parties." 15 OKLA. STAT. § 159.

Because of these similarities, the analysis stated above in relation to Texas law applies equally here. The Court finds no uncertainty or inconsistency in the Oklahoma Mortgage's grant of a security interest in Oil and Gas Property or Oil and Gas Properties that would render the conveyances ambiguous as a matter of law, and thus the Court grants Union Bank summary judgment on this issue.

**5. Whether any of the advances made by Union Bank to Cornerstone were not obligatory under Oklahoma law.**

Under Oklahoma law, a mechanics'/materialmens' lien takes priority over a prior recorded mortgage for advances made after the inception of the mechanics'/materialmens' lien to the extent the advances are discretionary rather than obligatory under the terms of the loan agreement. *Liberty Nat'l Bank & Trust Co. v. Kaibab Indus.*, 591 P.2d 692, 694 (Okla. 1979); *Local Fed. Sav. & Loan Ass'n v. Davidson & Case Lumber Co.*, 255 P.2d 248, 253 (Okla. 1953) (for discretionary advances "materialmen who furnished material, after the recording of the mortgage, but before the money is paid, have a prior lien to that of the mortgagee"); *First Nat'l Bank & Trust Co. of Ardmore v. Worthle*, 714 P.2d 1044, 1047 (Okla. Civ. App. 1985). Advances are obligatory when the mortgage secures a set line of credit or provides for stated amounts of advances upon the occurrence of certain conditions. *Liberty Nat'l Bank*, 591 P.2d at 694; *Worthle*, 714 P.2d at 1047. Thus, any Plaintiff whose Oklahoma M/M Lien incepted prior to any discretionary advance made by Union Bank under the Credit Agreement will take priority over Union Bank to the extent of such discretionary advance.

Pursuant to the Credit Agreement, Union Bank was obligated to make advances under two types of commitments, Tranche A and Tranche B.[8] (Credit Agreement, Union Bank Mot. App., at 33). The Credit Agreement was amended to include an additional advance type, Tranche C, which was then later removed by further amendment. (*See, e.g.*, Supplemental App., at 11, 47). Under all three types of advances, Union Bank was obligated to make advances only up to the "Unused [Tranche A, B, or C] Commitment Amount," while Tranche B and C

---

[8] Although it is stipulated that Union Bank made advances and issued letters of credit to Cornerstone, the amounts and dates of Union Bank's advances and of Cornerstone's repayments on these obligations remain contested issues of fact. (Joint Statement, at 10, 37-38). Accordingly, the total amount of outstanding post-recordation advances remains at issue for trial.

advances were further limited by availability tests defined in the Credit Agreement. (Credit Agreement, Union Bank Mot. App. at 30, 33; Supplemental App., at 7). In addition, all advances were subject to certain conditions precedent, such as the absence of any default by the Debtor or any material change in certain representations and warranties. (Credit Agreement, Union Bank Mot. App., at 56-57).

The level of unused commitment amount for each type of advance at any particular time was calculated by making certain adjustments to Union Bank's "[Tranche A or Tranche B] Commitment at such time." (Credit Agreement, Union Bank Mot. App., at 31). In turn, Union Bank's Tranche A and Tranche B Commitments were defined by reference to amounts stated on Schedule II to the Credit Agreement. (Credit Agreement, Union Bank Mot. App., at 29-30). Schedule II to the third amendment to the Credit Agreement lists Union Bank's Tranche A Commitment as $50,000,000.00, and its Increased Tranche B Commitment as $20,000,000.00. (Supplemental App., at 63).

Union Bank has presented no evidence that: (i) the applicable conditions precedent were satisfied under the Credit Agreement for any advances made after October 14, 2008; (ii) Unused Commitment Amounts remained under any of the categories of advances; or (iii) the Tranche B or C availability tests were met. Because each of these matters presents genuine issues of material fact, summary judgment must be denied as to the priority of Union Bank's liens on the Oklahoma Properties to the extent they secure future advances made after the inception of any Oklahoma M/M Lien.

6. **Whether, under Texas law, Plaintiffs are deemed to have constructive notice of Union Bank's mortgage lien with respect to properties Cornerstone owned at the time the Texas Mortgage Documents were recorded, but were not specifically listed on Exhibit A to the Texas Mortgage Documents.**

TEX. PROP. CODE § 13.001(a) provides that "[a] conveyance of real property or an interest in real property or a mortgage or deed of trust is void as to a creditor or to a subsequent purchaser for a valuable consideration without notice unless the instrument has been acknowledged, sworn to, or proved and filed for record as required by law." Recording an instrument in the proper county provides "notice to all persons of the existence of the instrument." TEX. PROP. CODE § 13.002(1). A subsequent purchaser or encumbrancer is then charged with constructive knowledge of and is bound by "every recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims." *Westland Oil*, 637 S.W.2d at 908. As the Texas Supreme Court noted in *Westland Oil*, "[t]he rationale of the rule is that any description, recital of fact, or reference to other documents puts the purchaser upon inquiry, and he is bound to follow up this inquiry, step by step, from one discovery to another and from one instrument to another, until the whole series of title deeds is exhausted and a complete knowledge of all the matters referred to and affecting the estate is obtained." *Id.* (quoting *Loomis v. Cobb*, 159 S.W. 305 (Tex. Civ. App. 1913)). Texas law has recognized that a blanket grant of all mineral interests within a certain area, when properly recorded, provides constructive notice to subsequent purchasers. *Bartels*, 270 S.W.2d at 712.

The Plaintiffs argue that they cannot be charged with constructive notice here because the Texas Mortgage Documents were not part of the chain of title on the Texas leases to the extent the conveyances in the Texas Mortgage Documents are void under the statute of frauds. (*See*

Weatherford Resp. to Union Bank Mot., at 9-10). Chain of title refers to the regular sequence of transfers of real property from or under the sovereignty of the soil. *See* TEX. CIV. PRAC. & REM. CODE § 16.021; *see also Tri-Legends Corp. v. Ticor Title Ins. Co.*, 889 S.W.2d 432, 437 n.2 (Tex. App. 1994). Void deeds provide no title, and thus are not within chain of title. *Field Measurement Serv., Inc. v. Ives*, 609 S.W.2d 615, 620 (Tex. App. 1980); TEX. CIV. PRAC. & REM. CODE § 16.021.

This argument fails because, as discussed above, the Texas Mortgage Documents provide sufficient descriptions to satisfy the Texas statute of frauds with respect to properties Cornerstone owned at the time the Texas Mortgage Documents were recorded, but that were not specifically listed on Exhibit A. *See* section IV.B.1. Because the Texas Mortgage Documents satisfy the Texas statute of frauds and were properly recorded in Hill County, Texas, the Texas Mortgage Documents are within the chain of title on those leases, and thus Plaintiffs are deemed to have constructive notice of Union Bank's lien on properties owned by Cornerstone when the Texas Mortgage Documents were recorded but that were not specifically listed on Exhibit A to the Texas Mortgage Documents. Union Bank is entitled to summary judgment on this issue.

> **7. Whether, under Oklahoma law, Plaintiffs are deemed to have constructive notice of Union Bank's mortgage lien with respect to properties Cornerstone owned at the time the Oklahoma Mortgage was recorded, but were not specifically listed on Exhibit A to the Oklahoma Mortgage.**

16 OKLA. STAT. § 16 provides that "[e]very conveyance of real property acknowledged or approved, certified and recorded as prescribed by law from the time it is filed with the register of deeds for record is constructive notice of the contents thereof to subsequent purchasers, mortgagees, encumbrancers or creditors." In applying the effect of constructive notice under this statute, the Oklahoma Supreme Court noted that "[w]hatever is notice enough to excite attention

and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it." *Rubendall v. Talla*, 119 P.2d 851, 853 (Okla. 1941) (holding that a subsequent encumbrancer was charged with constructive notice of an obligation to execute a second mortgage contained in filed instrument).   Accordingly, Union Bank asserts that because the Oklahoma Mortgage was properly filed in Hughes County, the Plaintiffs are charged with knowledge of its contents, including the blanket mortgage provision.   Further, Union Bank contends that once an instrument is delivered to the proper recording officer, the document constitutes notice regardless of how the recording officer indexes the filing.  (Union Bank Reply, at 18) (citing *Hodges v. Simpson*, 213 P. 737, 740 (Okla. 1922)).

In opposition, the Plaintiffs rely upon *Luthi v. Evans*, 576 P.2d 1064 (Kan. 1978), a Kansas case that construes a Kansas statute that the Plaintiffs assert is similar to 16 OKLA. STAT. § 16.  In *Luthi*, the Kansas Supreme Court held that a recorded deed that contained a blanket grant of all of the transferor's interests in a certain county, while enforceable between the parties to the agreement, did not provide constructive notice to subsequent purchasers or encumbrancers under the Kansas recording statutes.  *Id.* at 628-29.

Union Bank argues that there is no need in this case to look beyond the law of Oklahoma, since Oklahoma law is sufficiently clear to decide the issue.  However, the Court notes that the cases that Union Bank relies upon are not directly on point in this instance, since none address the specific issue of whether a recorded blanket grant of interests constitutes constructive notice to subsequent encumbrancers.  Instead, Union Bank's primary authority, *Rubendall*, involved a covenant to execute a second mortgage on the very same property that was conveyed in the recorded instrument.  *Rubendall*, 119 P.2d at 852-53.  The only other case that Union Bank cites

Memorandum Opinion and Order                                                                                                        22

in support, *Hodges*, involved a clerical error made by the recording office in filing the instrument. *Hodges*, 213 P. at 738. *Rubendall* has limited application to the issue at hand, and *Hodges* is simply inapplicable here, since the purpose of its ruling is to protect an innocent filer from clerical errors rather than to establish the proper standard for constructive notice. *See Hodges*, 213 P. at 740.

When the existing state law provides no definitive answer on an issue, a federal court must make an "educated guess" as to how the highest court of the state would rule. *Travelers Cas. and Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 483 (5th Cir. 2008). In doing so, the court may consult a wide variety of sources, including the general rule of law and decisions from other jurisdictions. *Id.*

The Court will first examine the Oklahoma statutes governing recording. In interpreting Oklahoma law, the primary goal is to ascertain and give effect to legislative intent, which is first divined from the language of the statute. *Yocum v. Greenbriar Nursing Home*, 130 P.3d 213, 219 (Okla. 2005). "If a statute is plain and unambiguous, it will not be subjected to judicial construction, but will receive the effect its language dictates." *Id.*

By the plain language of the Oklahoma governing statute, a recorded conveyance provides constructive notice when it is "recorded as prescribed by law." 16 OKLA. STAT. § 16. 19 OKLA. STAT. § 298 requires that every document offered for recording "shall by its own terms describe the property by its specific legal description, and provide such information as is necessary for indexing as required in Sections 287 and 291 of this title...." 19 OKLA. STAT. § 298. In turn, sections 287 and 291 direct the clerk of each county to keep a grantor-grantee index and a tract index, respectively. 19 OKLA. STAT. §§ 287, 291. Thus, by the terms of the statute, a deed may only be "recorded as prescribed by law" if it contains a specific legal

description and provides sufficient information for indexing in both the grantor-grantee index and the tract index. The Court concludes that the language of the statute is unambiguous and must be given the effect of its plain meaning. Thus, under Oklahoma law, to be "recorded as prescribed by law" and thereby constitute constructive notice, a conveyance must provide a specific legal description sufficient for indexing in both the county grantor-grantee index and the county tract index.

The caselaw cited by the Baker Hughes Plaintiffs supports this conclusion. Although the Court notes that *Luthi v. Evans*, decided in 1978, has never been cited outside of Kansas for the proposition that a recorded blanket grant of real property interests does not constitute constructive notice to third parties, the notice statutes in Kansas and Oklahoma are very similar. *Compare* 16 OKLA. STAT. § 16 ("[Every conveyance of real property acknowledged or approved, certified and recorded as prescribed by law from the time it is filed with the register of deeds for record is constructive notice of the contents thereof to subsequent purchasers, mortgagees, encumbrancers or creditors.") *with* KAN. STAT. ANN. § 58-2222 ("Every such instrument in writing, certified and recorded in the manner hereinbefore prescribed, shall, from the time of filing the same with the register of deeds for record, impart notice to all persons of the contents thereof; and all subsequent purchasers and mortgagees shall be deemed to purchase with notice."). More significantly, both Kansas and Oklahoma, unlike Texas, utilize tract indexes in addition to a grantor-grantee index for recording conveyances of real property. 19 OKLA. STAT. §§ 287, 291; KAN. STAT. ANN. §§ 19-1205, 19-1210. This distinction is important because while a prospective purchaser or encumbrancer would be able to locate a blanket mortgage provision related to a particular real property interest through a grantor-grantee index, that same mortgage provision could not be located through a tract index. *See MidCountry Bank v. Krueger*, 782

N.W.2d 238, 248 (Minn. 2010) (mortgage that lacked specific description of property conveyed could not be located in tract index but could be found through grantor-grantee index); *accord Hanson v. Zoller*, 187 N.W.2d 47, 51 (N.D. 1971) (recorded deed with incorrect property description could only be located through grantor-grantee index).

The Court has located one recent case that arguably holds to the contrary. *MidCountry Bank*, 782 N.W.2d at 248-50. In *MidCountry*, the Minnesota Supreme Court held that subsequent purchasers were on constructive notice of a mortgage that could not be found in the county tract index because of a generalized property description since the mortgage could nonetheless be located through the grantor-grantee index. *MidCountry Bank*, 782 N.W.2d at 248-50. The important distinction, however, is that under Minnesota law, a conveyance provides constructive notice when "properly recorded." MINN. STAT. ANN. § 507.32 ("The record, as herein provided, of any instrument properly recorded shall be taken and deemed notice to parties."). The Minnesota Supreme Court granted review to determine what constituted proper recording, and held that in accord with prior Minnesota caselaw, proper recording was "not coterminous with perfect indexing or even perfect recording," but rather required only a reference in the indexes "sufficient to locate the document and a record of the document itself." *MidCountry Bank*, 782 N.W.2d at 248-49. Under this standard, because the mortgage was filed and could be located through the grantor-grantee index, the conveyance was properly recorded and constituted constructive notice. *Id.*

As noted, the standard here is not proper recording as interpreted by the state's highest court, but instead is recording "as prescribed by law." *See* 16 OKLA. STAT. § 16. Because the Oklahoma statutes prescribe in plain and unambiguous terms the requirements for filing, the Court concludes that a recorded blanket grant of security interests does not constitute

constructive notice to subsequent purchasers or encumbrancers because it lacks a specific legal description sufficient for indexing in a county tract index.  Accordingly, Union Bank is denied summary judgment that the Plaintiffs are deemed to have constructive notice of Union Bank's mortgage lien under Oklahoma law with respect to properties Cornerstone owned at the time the Oklahoma Mortgage was recorded, but that were not specifically listed on Exhibit A to the Oklahoma Mortgage.

> **8.  Whether, under Texas law, Plaintiffs are deemed to have constructive notice of Union Bank's mortgage lien with respect to properties Cornerstone acquired after the date the Texas Mortgage Documents were recorded.**

While this issue may have been susceptible to a summary disposition as a matter of law, the Court has simply run out of time to finalize its analysis of this issue prior to the trial date of August 9, 2010.[9]  Accordingly, this issue remains open for trial.

> **9.  Whether, under Oklahoma law, Plaintiffs are deemed to have constructive notice of Union Bank's mortgage lien with respect to properties Cornerstone acquired after the date the Oklahoma Mortgage was recorded.**

As noted in the Joint Statement, Cornerstone acquired certain oil and gas leases in Hughes County, Oklahoma, after the date the Oklahoma Mortgage was recorded (the "After-acquired Oklahoma Leases").  (Joint Statement, at 12 ¶ 20).  Oklahoma law expressly recognizes the validity of a lien granted in after-acquired property, and the Plaintiffs do not argue that Union Bank's liens are unenforceable against Cornerstone.  42 OKLA. STAT. § 8 ("An agreement may be made to create a lien upon property not yet acquired by the party agreeing to give the lien, or not yet in existence.");  *see, e.g.*, BJ Services Resp., at 5.  Under Oklahoma law, Union Bank's

---

[9]  The Agreed Scheduling Order submitted by the parties allowed dispositive motions to be filed so close to the trial date that the parties should have understood that this outcome was not only possible but likely.  The parties agree that trial should proceed as scheduled because a sale motion regarding the Oklahoma Properties is set for early September and the parties wish to have their lien priority disputes determined prior to that hearing.

mortgage lien attached on the date that Cornerstone acquired its interest in the After-acquired Oklahoma Leases.  *See* 42 OKLA. STAT. § 8.  At issue here, however, is whether the recording of the Oklahoma Mortgage provided constructive notice of Union Bank's lien on the After-acquired Oklahoma Leases to the Plaintiffs.  *See* 16 OKLA. STAT. § 16.

In support of their arguments that they were not on constructive notice, Plaintiffs primarily rely upon *Central Trust Co. of Illinois v. Minnetonka Lumber Co.*, 229 P. 823 (Okla. 1924), where the Supreme Court of Oklahoma held that the recording of a mortgage on after-acquired real property did not provide constructive notice to subsequent encumbrancers.  *See Central Trust*, 229 P. at 824.  In support of the rationale underlying *Minnetonka*, the Plaintiffs cite the Restatement (Third) of Mortgages § 7.5, which states that although after-acquired property provisions are effective between the mortgagor and mortgagee, such provisions should be treated as unrecorded as to third parties unless a subsequent notice is properly recorded that specifically references both the mortgage and the subsequently acquired real estate.  *See* RESTATEMENT (THIRD) OF PROP.: MORTGAGES § 7.5 (1997).[10]

Union Bank responds that: (i) its interests are protected by simply filing the Oklahoma Mortgage in Hughes County, regardless of how the document was ultimately indexed; (ii) *Central Trust* was subsequently overruled or superseded by *Ehret v. Price*, 254 P. 748 (Okla. 1927); and (iii) because the Plaintiffs filed the Oklahoma M/M Liens against wells or units, rather than individual leases, the Plaintiffs had constructive notice of Union Bank's mortgage for those wells or units that contained at least one lease that was recorded against the tract where the well was located.  (Union Bank Reply, at 20-21); Audiotape: Hearing conducted 7/23/10 at 1:19:54 – 1:23:14 (on file with Court).

---

[10]  Plaintiffs concede, however, that this Restatement provision has never been cited in any reported decision.

**Memorandum Opinion and Order**                                                                                      27

For the reasons explained more fully below, the Court disagrees with Union Bank. With regard to the first proposition, as discussed above in relation to whether the blanket grant of security interests in the Oklahoma Mortgage constituted constructive notice, the cases that Union Bank relies upon are designed to protect innocent filers from clerical errors rather than to establish the proper standard for constructive notice. *See* section IV.B.7 *supra*; *see also Hodges*, 213 P. at 740. Such cases only relieve the filer from further obligation once a "properly prepared instrument" is presented for recording. *Hodges*, 213 P. at 739. The Oklahoma statutes are clear that to impart constructive notice, a deed must be recorded "as prescribed by law," which requires that the document must "by its own terms describe the property [conveyed] by its specific legal description, and provide such information as is necessary for indexing" in both the county grantor-grantee index and the county tract index. 16 OKLA. STAT. § 16; 19 OKLA. STAT. § 298. Because the Oklahoma Mortgage, by its own terms, could not include property descriptions sufficient for indexing in a county tract index with respect to the After-acquired Oklahoma Leases, the document could not impart constructive notice to subsequent purchasers and encumbrancers under Oklahoma law. *See id.*

Union Bank is similarly incorrect that *Ehret* overruled or superseded the rule set out in *Central Trust*. In the *Ehret* case, decided three years after *Central Trust*, the Oklahoma Supreme Court found that under the statutes in effect at the time (which were also in effect at the time of *Central Trust*), a deed of after-acquired property that afforded a definite means of identifying the property to be conveyed through a map attached as an exhibit to the deed constituted constructive notice to third parties, noting that the circumstances of the case "[took] it out of the general rule announced in *Central Trust*...." *Ehret*, 254 P. at 752. Significantly, the Oklahoma Supreme Court noted in *Ehret* that the property at issue did not strictly come within the terms of

"after-acquired property." *Id.* Because *Ehret* only distinguishes, and does not eliminate, *Central Trust*, the Court concludes that the "general rule" that a recorded mortgage of a future interest does not impart constructive notice to third parties remains valid under Oklahoma law. *See id; Central Trust*, 229 P at 824.

Finally, with respect to Union Bank's contention that the Plaintiffs were on constructive notice of its lien claim on the After-acquired Oklahoma Leases because the Oklahoma Mortgage was recorded against at least some leases for each well or unit upon which the Plaintiffs assert a lien, the Court concludes that Union Bank has failed to carry its burden of proof. As Union Bank conceded at the Hearing, the summary judgment record does not contain sufficient documentation to trace leases from Exhibit A of the Oklahoma Mortgage to individual wells or units upon which the Plaintiffs assert a lien. Audiotape: Hearing conducted 7/23/10 at 11:13:44 – 11:14:52 (on file with Court). Thus, genuine issues of material fact remain with regard to each and every Oklahoma well or unit that Union Bank asserts contain at least one lease against which the Oklahoma Mortgage is recorded and indexed. Further, purely as a matter of law, Union Bank has cited no authority for the proposition that constructive notice of a mortgage lien against one lease in a well or unit constitutes constructive notice of the lien for all leases that comprise that well or unit. Accordingly, the Court must deny Union Bank summary judgment that, under Oklahoma law, the Plaintiffs are deemed to have constructive notice of Union Bank's mortgage lien with respect to the After-acquired Oklahoma Leases.

> 10. **Whether the filing of an election affidavit pursuant to OKLA. STAT. tit. 52, § 87.4 is required to impart constructive notice to third parties with respect to pooled leasehold interests acquired by Cornerstone in Hughes County, Oklahoma, under Oklahoma law.**

The Weatherford Plaintiffs contend that the filing of an affidavit under 52 OKLA. STAT. §

87.4 was required to establish constructive notice of Union Bank's liens on the After-acquired Oklahoma Leases. (Weatherford Pls. Resp. to Union Bank Mot., at 12). The Weatherford Plaintiffs cite no authority for this proposition, and the Court has located no Oklahoma cases that construe or reference this statute. 52 OKLA. STAT. § 87.4 provides:

> An affidavit evidencing any election for the drilling of a well under a pooling order issued pursuant to the proceedings set out in subsection (e) of Section 87.1 of Title 52 of the Oklahoma Statutes shall constitute constructive notice of the rights under the election claimed by the affiant when the affidavit is filed of record in the office of the county clerk for the county in which the lands described in the pooling order are located. The affidavit shall set out the name, address, if known, and election or deemed election for each pooled respondent included in the affidavit and shall have a copy of the pooling order attached. The affidavit may be filed by the operator designated in the pooling order or by any other interested party with knowledge of any election made. Filing of the affidavit shall not affect notice provided by virtue of pooling proceedings conducted by the Commission.

As explained at the Hearing, the Weatherford Plaintiffs make this argument as an additional requirement of constructive notice. In other words and according to the Weatherford Plaintiffs, if the Court had concluded that the recording of the Oklahoma Mortgage was sufficient to place the Plaintiffs on constructive notice of Union Bank's lien on the After-acquired Oklahoma Leases, that notice, in and of itself, would be legally insufficient unless the affidavit required by § 87.4 was also filed. Because the Court has already determined that the recording of the Oklahoma Mortgage did not establish constructive notice to Plaintiffs of Union Bank's lien on the After-acquired Oklahoma Leases, the issue of whether any further filing was required to establish such notice is no longer relevant.

### 11. Whether equitable subordination of Union Bank's liens is proper and justified.

In an attempt to defeat the Union Bank Motion, the Weatherford Plaintiffs contend that sufficient evidence exists in the summary judgment record to create a question of fact regarding

whether Union Bank's liens should be equitably subordinated. (Weatherford Pls. Resp. to Union Bank Mot., at 13-14). However, the Weatherford Plaintiffs did not plead a claim for equitable subordination of Union Bank's liens in their original complaint. The law is clear that a plaintiff "may not assert new claims in a response to a motion for summary judgment." *Curtis v. Arapaho Venture Ltd.*, No. 3:03-CV-2099-H, 2004 WL 2248236, at *5 (N.D. Tex. Oct. 5, 2004) (Sanders, J.) (citing *Wood Arts Golf, Inc. v. Callaway Golf Co.*, 196 F. Supp.2d 467, 469 n. 1 (S.D. Tex. 2002)). Accordingly, the Court concludes that the Weatherford Plaintiffs' attempt to create questions of fact regarding a possible equitable subordination claim against Union Bank does not preclude summary judgment in favor of Union Bank on those issues on which the Court has granted the Union Bank Motion.

### 12. Whether chain of title is applicable under Oklahoma law.

Although this legal issue appears in the Joint Statement, it was not fully developed by the parties in the Motions, responses, or replies. In response to the Court's questions about this issue at the Hearing, counsel for Awesome Transport, LLC indicated that this issue relates to the Plaintiffs' arguments concerning *Central Trust* and the question of whether a recorded conveyance of a future interest establishes constructive notice under Oklahoma law. Audiotape: Hearing conducted 7/23/10 at 12:00:07 – 12:04:48 (on file with Court). Because the Court has addressed the thrust of this issue as clarified by counsel at the Hearing previously, *see* section IV.B.9 *supra*, the Court need not address the issue further here.

### 13. Whether Union Bank is required to record a notice subsequent to a mortgage containing after-acquired property provisions identifying such properties in order to perfect its liens as to the after-acquired property.

While this issue may have been susceptible to a summary disposition as a matter of law,

the Court has simply run out of time to finalize its analysis of this issue prior to trial. Accordingly, this issue remains open for trial.

    **C.**    **Baker Hughes Motion**

According to the Joint Statement, the following contested issues of law relate to the Baker Hughes Motion:

> **1.**    **Whether, in Oklahoma, a mineral contractor must file its lien against oil and gas property within four months or 180 days from the date the work was last performed or materials or supplies were furnished, under OKLA. STAT. tit. 42, § 146.**

Under Oklahoma law, mechanics' and materialmens' liens are governed by 42 OKLA. STAT. Chapter 3.  42 OKLA. STAT. §§ 141 to 154.  Under those provisions, § 144 describes the statutory lien available to mineral contractors, while § 145 provides the statutory lien available to mineral sub-contractors.  42 OKLA. STAT. §§ 144, 145.  Section 146, which governs the enforcement of both mineral contractor and sub-contractor liens, provides in relevant part:

> The liens created by Sections 144 and 145 of this title shall be enforced pursuant to the provisions of Sections 171 through 178 of this title**. Notice of the lien shall be given and the materialman's statement or the lien of any laborer shall be filed, in the same manner as is provided for in Sections 141 through 143.4 of this title**, except that Section 142.6 of this title shall not apply to liens created pursuant to Sections 144 and 145 of this title **and the statement required to be filed in the office of the county clerk pursuant to Section 143 of this title as to liens created pursuant to Sections 144 and 145 of this title shall be filed within one hundred eighty (180) days after the date upon which material, machinery or supplies were last furnished or labor or services last performed under the relevant contract or subcontract, whichever the case may be.**

42 OKLA. STAT. § 146 (emphasis added).

The Baker Hughes Plaintiffs contend that this provision extends the deadline for filing both mineral contractor and sub-contractor lien statements to 180 days from the date the work was last performed or materials or supplies were furnished, while Union Bank asserts that § 146

only extends the deadline with respect to mineral sub-contractor liens.

As indicated above, §§ 141 through 143.4 of title 42 govern the notice requirements for filing oil and gas liens. Of those provisions, § 141 details the extent and inception date of an original contractor's lien against property. 42 OKLA. STAT. § 141 ("Any person who shall, under oral or written contract with the owner of any tract or piece of land, perform labor, furnish material… shall have a lien upon the whole of said tract or piece of land, the buildings and appurtenances."). Section 142 provides that "[a]ny person claiming a lien as aforesaid" must file a lien statement in the county records in which the property claimed against is located "within four (4) months after the date upon which material or equipment used on said land was last furnished or labor last performed... ." 42 OKLA. STAT. § 142. Thus, the time period for filing the required lien statement for a "traditional" mechanics' and materialmens' lien by an original contractor is four months. *Id.*; *see also Appleby*, 864 P.2d at 831.

Liens filed by sub-contractors are governed by § 143. 42 OKLA. STAT. § 143 ("Any person who shall furnish any such material or lease or rent equipment used on said land or perform such labor as a subcontractor… may obtain a lien upon such land, or improvements, or both, from the same time, in the same manner, and to the same extent as the original contractor."). The required lien statement for a sub-contractor, however, must be filed "within 90 days after the date upon which materials were last furnished or labor last performed under the subcontract." *In re Tefertiller*, 772 P.2d 396, 398 (Okla. 1989) (citing 42 OKLA. STAT. § 143).

As the plain language of the statute shows, with regard to oil and gas liens, § 146 only alters the applicable time period for lien statements required to be filed under § 143, that is, for *sub-contractors*: "the statement required to be filed in the office of the county clerk pursuant to Section 143 of this title as to liens created pursuant to Sections 144 and 145 of this title shall be

filed within one hundred eighty (180) days after the date upon which material, machinery or supplies were last furnished or labor or services last performed under the relevant contract or subcontract, whichever the case may be." 42 OKLA. STAT. § 146. Thus, while the applicable time period for oil and gas sub-contractor lien statements is extended from 90 to 180 days, the applicable time period for contractor liens—four months—remains unchanged.

The Baker Hughes Plaintiffs assert that this reading of the statute disregards the reference in § 146 to "liens created pursuant to §§ 144 and 145 of this title" because mineral sub-contractor liens arise only under § 145, and not under § 144. This argument ignores, however, the full text of § 145, which incorporates § 144 by direct reference by providing that a sub-contractor may obtain its lien "in the same manner and to the same extent as the original contractor for the amount due him for such labor, as provided in the preceding section." 42 OKLA. STAT. § 145. Such a reference to § 144 is necessary because that section contains additional provisions that require delivery of lien statements by certified or registered mail for effectiveness and that establish a trust fund for lienable claims, neither of which are recapitulated under § 145. 42 OKLA. STAT. § 144.1, 144.2, 145. Thus, because the full extent of the sub-contractor oil and gas lien can only be ascertained by reference to both sections 144 and 145, this reading of the statute does not render any portion superfluous.

In contrast, the interpretation proposed by the Baker Hughes Plaintiffs would impermissibly add language to the statute that does not exist. Section 146 contains no reference and makes no alteration to the deadline provided under § 142 for the filing of contractor lien statements. As the Oklahoma Supreme Court noted in *Appleby*, "§ 146 was substantially revised in 1983, and further revised in 1985 and 1990. These revisions, however, did not change the substance of the act. Section 146 continues to provide that **contractors'** oil and gas liens will be

filed and enforced as are other mechanics' and materialmen's liens." *Appleby*, 864 P.2d at 832 n.5 (emphasis added).

Accordingly, the Court concludes that under Oklahoma law, mineral contractor liens must be filed within four months from the date the work was last performed or materials or supplies were furnished. Thus, the Baker Hughes Plaintiffs' request for summary judgment as to the validity, perfection, and scope of liens against the Subject Units must be denied as to the liens claimed by Baker Hughes and Texas CES against Gecko 22-1H and the liens claimed by Stanley and Miller against Dingo 11-1H. *See* Baker Hughes Mot. App., at BAKE000543-550 (Baker Hughes); 001223-001230 (Texas CES); 001305-001360 (Stanley), and 001455-001462 (Miller).

> **2. Whether the Baker Hughes Plaintiffs are entitled to recover reasonable attorneys' fees from Cornerstone under chapter 56 of the Texas Property Code governing liens against mineral property on account of those M&M Lien Claims arising under Tex. Prop. Code § 56.001, et. seq.**

The Baker Hughes Plaintiffs assert that attorneys' fees are recoverable under two separate sections of Chapter 56 of the Texas Property Code: §§ 56.041 and 56.006.[11] (*See, e.g.*, Baker Hughes Reply, at 5-6). While Cornerstone disputes that attorneys' fees are recoverable under either of those sections, Cornerstone agrees that attorneys' fees may be available as an unsecured claim, under some circumstances, pursuant to TEX. CIV. PRAC. & REM. CODE 38.001, should the Baker Hughes Plaintiffs be able to prove their entitlement to recovery. Audiotape: Hearing conducted 7/23/10 at 9:41:59 – 9:42:13 (on file with Court); (Cornerstone Resp. to Baker Hughes Mot., at 4-6).

---

[11] For purposes of summary judgment, the Baker Hughes Plaintiffs do not seek a ruling as to the reasonableness of fees and have offered no evidence of any amount of fees. Counsel for the Baker Hughes Plaintiffs further conceded at the Hearing that genuine issues of material fact exist as to the recoverability of attorneys' fees under individual contracts between the Baker Hughes Plaintiffs and Cornerstone. Audiotape: Hearing conducted 7/23/10 at 9:53:47 – 9:55:13 (on file with Court).

For their claims under Chapter 56, the Baker Hughes Plaintiffs primarily rely upon Texas Property Code § 56.041, which provides that a mineral lien claimant "must enforce [its] lien within the same time and in the same manner as a mechanic's, contractor's, or materialman's lien under Chapter 53 [of the Texas Property Code]." TEX. PROP. CODE § 56.041.  In turn, Chapter 53, which governs traditional mechanics'/materialmen's liens, provides that "the court may award costs and reasonable attorney's fees as are equitable and just" in proceedings to foreclose a lien or "in any proceeding to declare that any lien or claim is invalid or unenforceable in whole or in part." TEX. PROP. CODE § 53.156.  To support their claim for attorneys' fees under these sections, the Baker Hughes Plaintiffs point to *McCarty v. Halliburton*, in which a Texas court of appeals held that together these two statutes authorize recovery of attorneys' fees in an action to foreclose a mineral lien.  725 S.W.2d 817, 822 (Tex. App. 1987).  In contrast, Cornerstone urges the Court to disregard *McCarty* and instead to focus upon the plain language of § 56.041, which, Cornerstone contends, incorporates only the procedure for enforcement under Chapter 53, but no associated rights under that chapter.  Cornerstone cites no authority for the proposition that attorneys' fees are not recoverable by mineral lien claimants, and the Court has located none.

The Court therefore agrees with the Baker Hughes Plaintiffs that Texas law allows for an award of attorneys' fees in actions to foreclose a mineral lien or to determine that a mineral lien is invalid or unenforceable in whole or in part.  Where a state's highest court has not spoken on an issue of law, a federal court may look to the state's appellate courts for guidance.  *Am. Nat. Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 328 (5th Cir. 2001).  Those decisions should not be disregarded unless the court "is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940).

While the *McCarty* court provided no analysis for the holding that § 56.041 incorporated the provisions of Chapter 53 related to recovery of attorneys' fees, the Court has no other persuasive data to suggest that the Texas Supreme Court would rule to contrary. In addition, it is well established that Texas courts liberally construe the mechanics'/materialmen's lien statutes to protect the interests of laborers and materialmen, including mineral lien claimants. *Blanco, Inc. v. Porras*, 897 F.2d 788, 791 (5th Cir. 1990) (citing *RepublicBank Dallas, N.A. v. Interkal, Inc.*, 691 S.W.2d 605, 607 (Tex. 1985), *First Nat'l Bank v. Whirlpool Corp.*, 517 S.W.2d 262, 269 (Tex. 1974), and *Hayek v. Western Steel Co.*, 478 S.W.2d 786, 795 (Tex. 1972)); *see also Sun Coast Plumbing Co., Inc. v. Shell Offshore Inc.*, No. B-09-204, 2010 WL 1404371, at *3-4 (S.D. Tex. Apr. 7, 2010). In this context, giving "liberal construction" means "to give the language of a statutory provision, freely and consciously, its commonly, generally accepted meaning, to the end that the most comprehensive application thereof may be accorded, without doing violence to any of its terms." *Wesco Distrib., Inc. v. Westport Group, Inc.*, 150 S.W.3d 553, 557 (Tex. App. 2004) (citing *Maryland Cas. Co. v. Smith*, 40 S.W.2d 913, 914 (Tex. Civ. App. 1931)).

Here, reading the provisions of § 56.041 that a mineral lien claim must be enforced "in the same manner" as liens under Chapter 53 to include both the duties required of *and* the rights granted to mechanics'/materialmens' lien claimants gives those provisions their most comprehensive application without nullifying or conflicting with other statutory provisions. *See Wesco Distrib.*, 150 S.W.3d at 560 (construction that deletes express provisions from statute does violence to its terms). The Court thus finds *McCarty* probative of how the Texas Supreme Court would rule on the issue. *See Ryan*, 274 F.3d at 328-29. Accordingly, the Baker Hughes Plaintiffs are entitled to summary judgment that attorneys' fees for actions to foreclose a lien or

to declare that any lien or claim is invalid or unenforceable, in whole or in part, are available under TEX. PROP. CODE § 56.041.[12]

The Baker Hughes Plaintiffs also contend that attorneys' fees are recoverable under TEX. PROP. CODE § 56.006, which provides that "[a]n owner of land or a leasehold my not be subjected to liability under this chapter greater than the amount agreed to be paid in the contract for furnishing material or performing labor." *See* TEX. PROP. CODE § 56.006. Relying on *McCarty*, the Baker Hughes Plaintiffs assert that under this provision, where the contract between a mineral lien claimant and a leasehold owner who is also the lease operator provides for recovery of attorneys' fees, a resulting claim for attorneys' fees necessarily arises under and is governed by § 56.006. (Baker Hughes Reply, at 5) (citing *McCarty*, 725 S.W.2d at 821).

The Court disagrees. Instead of providing an independent means of recovery, the terms of § 56.006 instead act to limit the liability of a land or lease owner and to define the scope of a claim under Chapter 56 by establishing that a mineral claimant cannot recover more under those statutes than was agreed to contractually between the parties. *See* TEX. PROP. CODE § 56.006. The Baker Hughes Plaintiffs simply misread *McCarty*, where the court held that while attorneys' fees were recoverable under § 56.041 (through § 53.156), the actual amount to be recovered was limited to that provided for by contract, citing § 56.006. *See McCarty*, 725 S.W.2d at 821-22.

Accordingly, the Court will grant that portion of the Baker Hughes Motion that requests a determination that reasonable attorneys' fees are recoverable from Cornerstone under TEX. PROP. CODE § 56.041 (through § 53.156) if the Baker Hughes Plaintiffs can demonstrate that

---

[12] Beyond the dispute over the availability of attorneys' fees under this section, Cornerstone further asserts that § 56.041 is inapplicable in this case because this action is not a proceeding to foreclose on a lien or to declare a lien invalid or unenforceable. At the Hearing, counsel for the Baker Hughes Plaintiffs conceded that fact issues remain as to what amount of attorneys' fees, if any, may be properly apportioned to these statutorily defined categories. Audiotape: Hearing conducted 7/23/10 at 9:55:42 – 9:57:42 (on file with Court).

their fees were incurred in a proceeding to foreclose a lien or in a proceeding to declare that a lien is invalid or unenforceable in whole or in part.

   3. **Whether the Baker Hughes Plaintiffs are entitled to recover reasonable attorneys' fees from Cornerstone under 42 OKLA. STAT. § 176 on account of those M&M Lien Claims arising under 42 OKLA. STAT. § 144, which includes the following sub-issues:**

   (a) **Whether entry of the summary judgment relief requested by the Baker Hughes Plaintiffs would constitute a "judgment . . . rendered" which would entitle them to recover reasonable attorneys' fees under 42 OKLA. STAT. § 176.**

   (b) **Whether, if the Court ultimately determines that Union Bank's mortgage liens are senior in priority to the M&M Liens of the Baker Hughes Plaintiffs in whole or in part, the Baker Hughes Plaintiffs have obtained a "judgment . . .rendered" which would entitle them to recover reasonable attorneys' fees under 42 OKLA. STAT. § 176.**

   (c) **Whether 42 OKLA. STAT. § 176, which provides for attorneys' fees "[i]n an action brought to enforce any lien," entitles the Baker Hughes Plaintiffs to attorneys' fees from Cornerstone for pre-petition actions such as preparing and filing affidavits of liens in the records of Hughes County, Oklahoma.**

   (d) **Whether 42 OKLA. STAT. § 176, which provides for attorneys' fees "[i]n an action brought to enforce any lien," entitles the Baker Hughes Plaintiffs to attorneys' fees from Cornerstone for post-petition actions in the Debtors' bankruptcy cases not directly involved with the filing and litigation of this adversary proceeding.**

   (e) **Whether 42 OKLA. STAT. § 176, which provides for attorneys' fees "[i]n an action brought to enforce any lien," entitles the Baker Hughes Plaintiffs to attorneys' fees from Cornerstone for post-petition actions in the Debtors' bankruptcy cases directly involved with the filing and litigation of this adversary proceeding.**

While these issues may have been susceptible to a summary disposition as a matter of law, the Court has simply run out of time to finalize its analysis of these issues prior to trial.

**Memorandum Opinion and Order**                                                                          39

Accordingly, these issues remain open for trial.

    **4.  Whether the Baker Hughes Plaintiffs' claims under applicable non-bankruptcy law to interest accruing on the principal amount of their respective M&M Lien Claims at the applicable contract rate (or statutory interest rate under applicable state law if a contract rate of interest is not applicable) are secured by the Baker Hughes Plaintiffs' M&M Liens under applicable state law.**

While this issue may have been susceptible to a summary disposition as a matter of law, the Court has simply run out of time to finalize its analysis of this issue prior to trial. Accordingly, this issue remains open for trial.

    **5.  Whether the Baker Hughes Plaintiffs' claims under applicable non-bankruptcy law to reasonable attorneys' fees are secured by the Baker Hughes Plaintiffs' M&M Liens under applicable state law.**

While this issue may have been susceptible to a summary disposition as a matter of law, the Court has simply run out of time to finalize its analysis of this issue prior to trial. Accordingly, this issue remains open for trial.

    **6.  Whether the Baker Hughes Plaintiffs' claims to interest accruing on the principal amount of their respective M&M Lien Claims at the applicable contract rate (or statutory interest rate under applicable state law if a contract rate of interest is not applicable) are secured by the Baker Hughes Plaintiffs' M&M Liens under applicable state law.**

While this issue may have been susceptible to a summary disposition as a matter of law, the Court has simply run out of time to finalize its analysis of this issue prior to trial. Accordingly, this issue remains open for trial.

    **7.  Whether the Baker Hughes Plaintiffs' claims to reasonable attorneys' fees are secured by the Baker Hughes Plaintiffs' M&M Liens under applicable state law.**

While this issue may have been susceptible to a summary disposition as a matter of law, the Court has simply run out of time to finalize its analysis of this issue prior to trial.

Accordingly, this issue remains open for trial.

**D.     The Oklahoma Properties Motion and The Texas Properties Motion**

The Oklahoma Plaintiffs filed the Oklahoma Properties Motion seeking partial summary judgment that under Oklahoma law a prior perfected mortgage lien against an Oklahoma working interest is subordinate to M/M Liens subsequently filed by mineral contractors who provided services for the exploration, development, and production of that working interest. The Weatherford Plaintiffs also filed the Texas Properties Motion seeking a similar determination under Texas law. Because the Texas Properties Motion and the Oklahoma Properties Motion both rely primarily on the *Ladder* decision, the Court will address these motions together.

In the Joint Statement, the parties identified the following contested issues of law in connection with the Oklahoma Properties Motion and the Texas Properties Motion:

1.  Whether statutory mineral liens have priority over prior-perfected mortgage liens with respect to working interest collateral under Oklahoma law;

2.  Whether statutory mineral liens have priority over prior-perfected mortgage liens with respect to working interest collateral under Texas law;

3.  Whether statutory M&M liens on a working interest are entitled to payment as costs of production under Oklahoma case law; and

4.  Whether the term "working interest" is, by definition, subject to the payment of costs.

Since the definition of the term "working interest" and the ramifications of the *Ladder* opinion are the central issues of both the Oklahoma Properties Motion and the Texas Properties Motion, a detailed discussion of these items is appropriate here.

**1.     What is a "Working Interest?"**

Under Texas law, a "working interest is an operating interest under an oil and gas lease

that provides its owner with the exclusive right to drill, produce, and exploit the minerals." *H.G. Sledge, Inc. v. Prospective Inv. and Trading Co., Ltd.*, 36 S.W.3d 597, 599 n.3 (Tex. App. 2000) (citing 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, *Oil & Gas Law* 1191 (1999)). As opposed to royalty interests, which are free of expenses, a working interest bears all of the operating and drilling costs. *Id.* at 599 n.2 – 3; *see also Newhouse v. Colony Ins. Co.*, No. 08-50370, 2010 WL 2546113, at *3 n.5 (5th Cir. June 23, 2010) (citing 8 WILLIAMS & MEYERS, *supra*, at 730 ("Under an oil and gas lease, operating expenses are the burden of the working interest in the property and a royalty interest is free of the burden of such expenses.")).

Oklahoma law construes working interest in the context of oil and gas leases in the same way—as an interest in an oil and gas lease that is subject to the costs of exploration and development. *See XAE Corp. v. SMR Prop. Mgmt. Co.*, 968 P.2d 1201, 1207 (Okla. 1998); *TXO v. Comm'rs of the Land Office*, 903 P.2d 259 (Okla. 1994).

Notably, Union Bank does not dispute this definition of a working interest under either Texas or Oklahoma law. (Union Bank Resp. to the Okla. Props. Mot., at 3).

## 2. The *Ladder* Case.

Ladder Energy Company ("Ladder") became the operator of various oil and gas leases in Grant County, Oklahoma in 1993. *Ladder*, 931 P.2d at 84. In 1987, well before Ladder became the operator, the owner of the working interest in the oil and gas leases executed a mortgage and security agreement on the oil and gas leases to Intrust Bank, N.A. (the "Bank"). *Id.* After Ladder assumed its duties as operator, disputes arose between Ladder and the owner of the oil and gas leases over certain operating expenses, which led Ladder to file a mineral lien against the leases. *Id.* After the lien was filed, the purchaser of gas produced by the leases suspended payment pending a determination of priorities. *Id.* Ladder sued to foreclose its mineral lien. *Id.*

The trial court entered judgment that both Ladder and the Bank had statutory liens, but that Ladder was entitled to reimbursement of its lease operating expenses from the suspended revenues. *Id.* at 84-85. In entering judgment, the trial court made the following pertinent findings of fact and conclusions of law: (i) the Bank's mortgage lien extended only to its mortgagor's working interest; (ii) as applicable in the case, the term "Proceeds" could only mean net proceeds; and (iii) the Bank was entitled to what remained of the suspended revenues after Ladder had recouped its lease operating expenses. *Id.* at 85. The Bank appealed on the issue of whether Ladder's lien, as operator, or the Bank's lien, which was prior in time, was superior. *Id.* at 84. On appeal, the Bank argued that because its lien was prior in time, it was entitled to all of the suspended revenues, citing 42 Okla. Stat. § 144, which provides that mineral liens are superior only to those liens that attach after commencement of labor or furnishing of materials by the mineral contractor. *Id.*

The court of appeals affirmed the judgment of the trial court and found no error in the trial court's division of the suspended revenues. *Id.* In doing so, the appeals court noted first that a mortgagee can acquire no greater interest than that owned by its mortgagor. *Id.* Thus, the Bank could only acquire a lien in the oil and gas leases to the extent of the interest held by the owner, which was found to be only a working interest. *Id.* The court of appeals noted that a working interest in a well "is typically subject to all the costs of exploration and development." *Id.* n.3 (citing *TXO v. Comm'rs of the Land Office*, 903 P.2d 259 (Okla. 1994)). Thus, the interest taken by the Bank—a lien on the owner's working interest—necessarily included the obligation of "paying for the costs of development and exploration, which is what the court awarded Ladder," even though it was clear that the Bank's mortgage and security agreement was prior in time. *Id.* The Bank appealed the decision, but the Oklahoma Supreme Court denied

certiorari, with all justices concurring.  (Okla. Props. Reply App., at 4).

### 3.    *Ladder's* Application and Relevance Here.

Initially, the parties disagreed as to the level of deference the Court must afford to *Ladder*.  In the Oklahoma Properties Motion, the Weatherford Plaintiffs argued that *Ladder* was controlling authority in Oklahoma, but they have since conceded that this characterization was incorrect.  (Okla. Props. Mot., at 6; Okla. Props. Reply, at 2 n.1).  By statute, opinions of the Oklahoma courts of appeal become binding and may only be cited as precedent when approved by the majority of the justices of the Supreme Court for publication in the official reporter.  20 OKLA. STAT. § 30.5.  Unless so approved, "[o]pinions released by the Court of Civil Appeals are persuasive only and lack precedential effect."  *MLC Mortgage Corp. v. Sun Am. Mortgage Co.*, 212 P.3d 1199, 1200 n.1 (Okla. 2009).  The Oklahoma Plaintiffs attempt to bolster the weight of the holding in *Ladder* by pointing out that the Oklahoma Supreme Court retains authority to order opinions withdrawn, citing OKLA. S. CT. R. 1.200(c)(2), which did not happen here.  But, the mere fact that the *Ladder* opinion was not ordered withdrawn does nothing to alter its status as persuasive authority only.  *See MLC Mortgage Corp.*, 212 P.3d at 1200 n.1.

When the existing state law provides no definitive answer on an issue, a federal court must make an "educated guess" as to how the highest court of the state would rule.  *Travelers Cas. and Sur. Co. of Am.*, 542 F.3d at 483.  The goal of the court in such instances is to predict state law, rather than to create or modify it.  *Herrmann Holdings Ltd. v. Lucent Techs., Inc.*, 302 F.3d 552, 558 (5th Cir. 2002) (citing *United Parcel Serv., Inc. v. Weben Indus., Inc.*, 794 F.2d 1005, 1008 (5th Cir. 1986)).  In making this prediction, the court will defer to intermediate state appellate court decisions unless convinced by other persuasive data that the highest court of the state would decide otherwise.  *Herrmann Holdings Ltd.*, 302 F.3d at 558.  However, the court

will not expand state law beyond its currently existing boundaries. *Barfield v. Madison County, Miss.*, 212 F.3d 269, 272 (5th Cir. 2000). Thus, in the absence of persuasive data that the Oklahoma Supreme Court would rule otherwise, *Ladder* is entitled to deference by this Court within the boundaries of existing Oklahoma law.

Ultimately, the level of deference to be accorded to *Ladder* is not of significance here, since even assuming that the holding in *Ladder* is correct, the Court concludes that the case is largely confined to its own facts and does not establish the proposition that the Oklahoma Plaintiffs assert in reliance upon it. It is important to highlight here certain aspects of the facts and the actual holding in *Ladder*. First, while the issue on appeal was framed by the Bank as a question of lien priority, at no point in its analysis does the *Ladder* court address the relative priority of the Bank's and Ladder's liens in any single piece of collateral. Instead, the *Ladder* court focuses exclusively on the extent of the Bank's lien and only identifies property that the Bank's lien did, and did not, encumber.[13] Second, the collateral at issue in *Ladder* was not the working interest in the oil and gas leases *per se*, but instead was suspended revenues from gas production. Lastly, in *Ladder*, the Bank held a lien on only the working interest owned by its borrower, as opposed to liens on other productions interests.

With this in mind, the Court turns to the Oklahoma Plaintiffs' legal contentions that statutory mineral liens have priority over prior-perfected mortgage liens with respect to working interest collateral under Oklahoma law under *Ladder*. The basic flaw in the Oklahoma Plaintiffs' argument is their attempt to bootstrap the *Ladder* court's determination of the extent

---

[13] In their reply, the Oklahoma Plaintiffs now appear to agree with this characterization of the *Ladder* opinion. "That is, in the words of the *Ladder* court, the "disagreement is over exactly what Bank took when [the property owner mortgaged its interest to the bank]" <u>not</u> one of lien priority." (Okla. Props. Reply, at 5) (quoting *Ladder*, 931 P.2d at 85) (emphasis in original).

**Memorandum Opinion and Order**                                                                 **45**

of the Bank's lien on suspended proceeds from gas production into a superior lien position for statutory mineral liens over a prior-perfected mortgage lien on a working interest. In short, the *Ladder* court did not address this issue. Rather, the *Ladder* court simply affirmed the trial court's application of the definition of working interest to find that the Bank held a lien in only that portion of suspended revenues that remained after costs were deducted. According to the *Ladder* court, as to the remainder of the suspended revenues (the portion that constituted Ladder's lease operating expenses), the Bank held no lien at all.

The situation and holding in *Ladder* – a pool of suspended revenues that, according to the *Ladder* court, could be segregated into discrete portions to which the mortgagee held a lien and to which it did not – should not be expanded beyond its facts and narrow holding to support the much broader legal principles that the Oklahoma Plaintiffs attempt to place upon it in the Oklahoma Properties Motion.[14] This is particularly true when such an expansion directly contradicts rights created by specific Oklahoma statutes. Accordingly, the Court must deny summary judgment on the Oklahoma Properties Motion.

As to the Texas Properties Motion, this same reasoning applies,[15] since the Texas Properties Motion is premised on extending what the Plaintiffs characterize as the *Ladder* holding to Texas oil and gas leases. (Tex. Props. Mot., at 6-7). As with Oklahoma law, to hold a prior recorded mortgage on working interest collateral subordinate to subsequently filed mechanics'/materialmens' liens for certain expenses would impermissibly expand Texas law

---

[14] The Court recognizes that it may have to address a suspended revenues entitlement issue between Union Bank and the Plaintiffs in the future with regard to certain proceeds currently being held by the Debtor pursuant to turnover orders previously entered by the Court. However, that issue is not before the Court in connection with the Motions and the Court expresses no view on it here.

[15] With, of course, the exception of that portion of the analysis as to the precedential value of *Ladder*. Since *Ladder* is not a Texas decision, the Court is under no obligation to afford deference to its holding with regard to Texas law. *See Herrmann Holdings*, 302 F.3d at 558.

beyond its currently existing boundaries. *See Barfield*, 212 F.3d at 272; *Hammann*, 62 S.W.2d at 61 (first in time rule generally applies to mechanics'/materialmens' liens). Accordingly, the Court must also deny summary judgment on the Texas Properties Motion.

## V.    CONCLUSION

For the reasons explained herein, the Union Bank Motion and the Baker Hughes Motion are granted in part and denied in part, while the Oklahoma Properties Motion and the Texas Properties Motion are denied.

**SO ORDERED**.