


U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed August 23, 2010**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CORNERSTONE E&P COMPANY, L.P, *et. al.*, | § | CASE NO. 09-35228-BJH-11 |
| | § | |
| Debtors. | § | |
| | § | |
| BAKER HUGHES OILFIELD OPERATIONS, INC., *et. al.*, | § | |
| | § | Adversary No. 09-3447-bjh |
| Plaintiffs | § | (consolidated with proceedings |
| | § | numbered 09-3448, 09-3450, |
| vs. | § | 09-3452, and 09-3457) |
| | § | |
| UNION BANK OF CALIFORNIA, N.A. N/K/A UNION BANK, N.A., *et. al.* | § | |
| | § | |
| Defendants | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are the adversary complaints (collectively, the "Complaints") filed by:

(i) Baker Hughes Oilfield Operations, Inc. ("Baker Hughes"), Schlumberger Technology

Corporation, Simons Petroleum, Inc., Texas CES, Inc., T.K. Stanley, Inc., Pumpco Energy

**Memorandum Opinion and Order**

Services, Inc., I.E. Miller Services, Inc., Bridgeport Tank Trucks, LLC, and Select Energy Services, LLC d/b/a Tejas Oilfield Services (collectively, the "Baker Hughes Plaintiffs"), (ii) Awesome Transport, LLC, (iii) Weatherford U.S., L.P., and Precision Energy Services, Inc. (collectively, the "Weatherford Plaintiffs"), (iv) B.J. Services Company, USA and Newpark Drilling Fluids, LLC (collectively, "BJ Services"), and (v) Phantom Drilling Fluids Company (collectively with the Baker Hughes Plaintiffs, Awesome Transport, LLC, the Weatherford Plaintiffs and BJ Services, the "Plaintiffs") against Union Bank of California, N.A. n/k/a Union Bank, N.A. ("Union Bank"), Cornerstone E&P Company, L.P. (the "Debtor"), and the Debtor's general partner and another debtor, Cornerstone Southwest GP, LLC (together with the Debtor, "Cornerstone"). The Court tried the Complaints on August 9-11, 2010.

The Court has jurisdiction over the parties and the issues raised in the Complaints in accordance with 28 U.S.C. §§ 1334 and 157, either because the issues are core issues or because the parties have consented to the Court's entry of a final judgment. This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On August 6, 2009, Cornerstone filed voluntary petitions under Chapter 11 of the United States Bankruptcy Code. On August 7, 2009, the Court consolidated the two cases for procedural purposes only, with joint administration under case number 09-35228-bjh. Cornerstone is a private, independent oil and gas exploration and production company with interests in Texas and Oklahoma. All of Cornerstone's oil and gas assets are owned and

operated through the Debtor.[1]

In December 2006, the Debtor entered into a credit agreement (the "Credit Agreement") with Union Bank to finance the Debtor's operations. Cornerstone Southwest GP, LLC guaranteed the Debtor's obligations under the Credit Agreement. In connection with the Credit Agreement, the Debtor executed in favor of Union Bank a Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Production (the "Texas Deed of Trust"), which Union Bank filed in the property records of Hill County, Texas on January 4, 2007. The Debtor and Union Bank also entered into the First Supplement to the Texas Deed of Trust (the "Texas Supplement") (collectively, the Texas Deed of Trust and the Texas Supplement will be referred to as the "Texas Mortgage Documents"), which Union Bank filed in the property records of Hill County, Texas on October 10, 2008.

On October 10, 2008, the Debtor also executed in favor of Union Bank a Mortgage, Line of Credit Mortgage, Security Agreement, Financing Statement, Fixture Filing and Assignment of Production ("the Oklahoma Mortgage"), which Union Bank filed in the property records of Hughes County, Oklahoma on October 14, 2008.[2]

Each of the Mortgage Documents purports to grant Union Bank a security interest and lien on the Debtor's real and personal property, fixtures, and production from or attributable to the Debtor's oil and gas interests. The Mortgage Documents all contain exhibits ("Exhibit A" to the Texas Deed of Trust, the Texas Supplement, and the Oklahoma Mortgage, respectively) that list certain oil and gas leases as subject to the mortgage liens created by each of those

---

[1] This information comes from Declaration of John Sanchez in Support of Cornerstone's Chapter 11 Petitions and First-Day Motions (ECF #17).

[2] Hereinafter, the Texas Deed of Trust, the Texas Supplement and the Oklahoma Mortgage will be referred to collectively as the "Mortgage Documents."

**Memorandum Opinion and Order**

documents. In addition, the Mortgage Documents contain language that purports to broaden the scope of the liens granted to Union Bank to property interests in leases owned by Cornerstone beyond those listed on the individual exhibits, as well as language that purports to grant Union Bank a lien on after-acquired assets and property interests. By virtue of advances made under the Credit Agreement, Union Bank asserts a secured claim against Cornerstone of $30,116,591.00, plus interest, fees, and other costs.

The Plaintiffs are mineral contractors who have filed statutory mechanics'/materialmens' liens ("M/M Liens") under Texas and Oklahoma law for unpaid pre-petition labor or materials provided to the Debtor in connection with the Debtor's oil and gas operations in Texas and Oklahoma (the "Subject Units"[3]). The issues raised by the Complaints concern the Debtor's leasehold interests and rights associated with wells in Hill County, Texas, Maverick County, Texas, and Hughes County, Oklahoma and the relative lien rights of Union Bank and the Plaintiffs.

The Court heard certain motions for summary judgment filed by Union Bank, the Baker Hughes Plaintiffs, the Weatherford Plaintiffs, and the Oklahoma Plaintiffs on July 23, 2010 (collectively, the "Motions"). The Court granted a portion of the Baker Hughes Motion by oral ruling at the July 23 hearing, which ruling was embodied in an Order entered on August 13, 2010 (the "Baker Hughes Order"). *See* Order on Baker Hughes Plaintiffs' Motion for Partial Summary Judgment, Docket No. 165. By Memorandum Opinion and Order entered on August

---

[3] As used herein, the term "Subject Units" will have the definition agreed upon by the parties in the Joint Statement (as defined below) as the "oil and gas wells and associated units, leases, leasehold interests, property and rights, which are further described in the recorded unit designations filed by Cornerstone in Hill County, Texas for the Texas properties and the pooling orders issued by the Oklahoma Corporation Commission for the Hughes County, Oklahoma properties." (Joint Statement, at 9). The Subject Units located in Texas will be referred to as the "Texas Properties," while those Subject Units located in Oklahoma will be referred to as the "Oklahoma Properties."

9, 2010,[4] the Court disposed of the balance of the Motions by granting them in part and denying them in part.[5] *See* Memorandum Opinion and Order, Docket No. 152 (the "Summary Judgment Opinion and Order"). The issues not resolved by the Baker Hughes Order and the Summary Judgment Opinion and Order proceeded to trial.

In connection with the Motions, the parties filed a Joint Statement Regarding (i) Contested Issues of Law; (ii) Stipulated Facts; and (iii) Contested Facts (the "Joint Statement"). In connection with the trial, the parties filed a Joint Pre-Trial Order and certain agreed amendments to that order (the "Joint Pre-Trial Order"), which also contained a significant number of factual stipulations.[6] The Court hereby adopts the parties' statements of stipulated facts from both the Joint Statement and the Joint Pre-Trial Order.[7]

## II.    CONTENTIONS OF THE PARTIES

In summary, the Plaintiffs contend that (i) they have valid and enforceable M/M Liens against the Texas Properties and the Oklahoma Properties, (ii) the Mortgage Documents fail to satisfy the Texas and Oklahoma Statutes of Frauds with respect to properties not listed on Exhibit A to the Mortgage Documents, (iii) the granting language of the Mortgage Documents is ambiguous under Texas and Oklahoma law, (iv) they do not have either actual notice or constructive notice of Union Bank's mortgage lien with respect to properties Cornerstone owned at the time the Mortgage Documents were recorded, but were not specifically listed on Exhibit A

---

[4]  The parties were provided a PDF version of this Memorandum Opinion and Order on August 7, 2010.

[5]  Capitalized terms used herein that are not defined herein shall have the meaning ascribed to those terms in the Summary Judgment Opinion and Order.

[6]  The Joint Pre-Trial Order was admitted into evidence at trial as BJ Services Exhibit 16.

[7]  To the extent the factual stipulations contained in the Joint Pre-Trial Order conflict with those contained in the Joint Statement, the Joint Pre-Trial Order will control as the last filed statement of the parties.

**Memorandum Opinion and Order**                                                                 **5**

to the Mortgage Documents,[8] such that their M/M Liens have priority over Union Bank's mortgage lien, (v) they do not have either actual notice or constructive notice of Union Bank's mortgage lien with respect to properties Cornerstone acquired after the date the Mortgage Documents were recorded,[9] such that their M/M Liens have priority over Union Bank's mortgage lien, (vi) to the extent Union Bank's mortgage lien has priority over their M/M Liens, that certain of Union Bank's advances were not obligatory such that certain of their M/M Liens have priority over Union Bank's mortgage lien with respect to those discretionary advances, (vii) to the extent Union Bank's mortgage lien has priority over their M/M Liens, equity should adjust the relative priority of the liens to the extent that the Plaintiffs' work on the wells enhanced the value of Union Bank's collateral, and (viii) under the holding of the Oklahoma Court of Civil Appeals in *Ladder Energy Co. v. Intrust Bank, N.A.*, 931 P.2d 83 (Okla. Ct. App. 1996), Union Bank's mortgage lien is subordinate to the M/M Liens on Cornerstone's working interest in oil and gas properties because working interest is, by definition, subject to costs of production.[10]

While Union Bank and Cornerstone agree that many of the Plaintiffs hold valid and enforceable M/M Liens,[11] Union Bank contends that certain of the Plaintiffs failed to timely file their M/M Liens with respect to certain wells in Hughes County, Oklahoma. Union Bank further contends that: (i) the Mortgage Documents satisfy the Texas and Oklahoma Statutes of Frauds;

---

[8] Hereinafter, the Court will refer to such leases, in Texas and Oklahoma, as "Blanket Leases."

[9] Hereinafter, the Court will refer to such properties, in Texas and Oklahoma, as "After-acquired Properties." The Court has chosen the term "properties" rather than "leases" because of the fact that, in Oklahoma, Cornerstone acquired oil and gas interests both through leasing and through the process of "forced pooling," as described in section III.C.(1).(a) *infra*. Unless otherwise specified herein, the Court's holdings with respect to Oklahoma law apply equally to Oklahoma interests that Cornerstone acquired under leases and through forced pooling.

[10] Although *Ladder* is an Oklahoma decision, the Plaintiffs argue that its application should be extended to Texas as well.

[11] The amounts owing to each of the Plaintiffs have now been stipulated to among the parties.

**Memorandum Opinion and Order** 6

(ii) the granting language of the Mortgage Documents is not ambiguous under Texas and Oklahoma law; (iii) its mortgage lien was properly recorded in Hill County, Texas and Hughes County, Oklahoma such that it holds a valid and enforceable first lien on the Texas Properties and the Oklahoma Properties; (iv) the Plaintiffs have either actual notice or constructive notice of Union Bank's mortgage lien with respect to the Blanket Leases such that the Plaintiffs' M/M Liens are inferior to Union Bank's mortgage lien; (v) the Plaintiffs have either actual notice or constructive notice of Union Bank's mortgage lien with respect the After-acquired Properties such that the Plaintiffs' M/M Liens are inferior to Union Bank's mortgage lien; (vi) all of its advances under the Credit Agreement were obligatory; (vii) there is no recognized claim for enhanced value with respect to the goods and services the Baker Hughes Plaintiffs[12] provided to Cornerstone, and that even assuming such a claim exists under Oklahoma caselaw, the Baker Hughes Plaintiffs failed to prove such a claim; and (viii) *Ladder* is wrongly decided, is factually distinguishable, and is not binding upon this Court.

The Court will analyze these legal issues separately below.

## III. LEGAL ANALYSIS

### A. In General

The determination of whether a creditor has properly perfected its security interest is governed by state law. *See, e.g., Stanton v. Texas Drug Co. (In re Stanton)*, 254 B.R. 357, 361-62 (Bankr. E.D. Tex. 2000). Texas and Oklahoma law both provide statutory liens to contractors and subcontractors to secure payment for labor or materials provided for mineral development activities. TEX. PROP. CODE § 56.002; 42 OKLA. STAT. § 144, 145. These liens attach to the well

---

[12] While only the Baker Hughes Plaintiffs pled this claim in its Complaint, the other Plaintiffs hope to pigggy-back onto this theory by virtue of their argument that their liens have equal dignity with those of the Baker Hughes Plaintiffs. *See infra* at section III.C.(1)(e). Union Bank contends that by failing to plead such a claim, the other Plaintiffs are precluded from asserting it.

or leasehold interest for which the labor or materials were provided. TEX. PROP. CODE § 56.003; 42 OKLA. STAT. § 144. Texas and Oklahoma law also provide that the inception date of a mineral contractor lien relates back to the date work was first performed or materials first supplied, but that the lien does not affect an encumbrance that attached to land or a leasehold before the lien's inception. TEX. PROP. CODE § 56.004; *In re Meg Petroleum Corp.*, 61 B.R. 14, 20 (Bankr. N.D. Tex. 1986) (citing *Crutcher, Rolfs, Cummings v. Big Three Welding Corp.*, 224 S.W.2d 884 (Tex. Civ. App. 1949); *rev'd on other grounds*, 229 S.W.2d 600 (1950) and *Wagner Supply Co. v. Bateman*, 18 S.W.2d 1052, 1059 (1929)); 42 OKLA. STAT. § 144. Thus, under the "first in time" rules under Texas and Oklahoma law, Union Bank will only take first priority over a valid M/M Lien on a particular oil and gas lease where Union Bank perfected its lien prior to the date that the M/M Lien claimant first provided labor or materials attributable to that lease. *Hammann v. H.J. McMullen & Co.*, 62 S.W.2d 59, 61 (Tex. 1933); *Fourth Nat'l Bank of Tulsa v. Appleby*, 864 P.2d 827, 834 (Okla. 1993).

## B.    The Court's Prior Rulings on the Motions

### (1)    The Baker Hughes Motion

As noted previously, at the hearing on the Motions, the Court orally granted the Baker Hughes Plaintiffs a summary judgment with respect to: (i) the principal amounts of the Baker Hughes Plaintiffs' respective M/M Lien claims; (ii) the validity, perfection, enforceability, and extent of certain of the Baker Hughes Plaintiffs' respective M/M Lien claims; (iii) the recoverability of interest and reasonable attorneys' fees on the Baker Hughes Plaintiffs' respective M/M Lien claims under applicable non-bankruptcy law; and (iv) the absence of a mortgage lien or security interest by Union Bank on Cornerstone's assets located in Maverick County, Texas. The Baker Hughes Order embodies these rulings. In the Summary Judgment

Opinion and Order, the Court also granted the Baker Hughes Plaintiffs a summary judgment with respect to their entitlement to recover reasonable attorneys' fees from Cornerstone under Chapter 56 of the Texas Property Code governing liens against mineral property on account of those M/M Lien claims arising under TEX. PROP. CODE § 56.001, et. seq.[13]

However, in the Summary Judgment Opinion and Order, the Court denied the Baker Hughes Plaintiffs' request for a summary judgment that a mineral lien contractor must file its lien against oil and gas property within 180 days from the date the work was last performed or materials or supplies were furnished in accordance with 42 OKLA. STAT. § 146. In denying summary judgment, the Court concluded that a mineral lien contractor must file its lien against oil and gas property within four months from the date the work was last performed or materials or supplies were furnished. *See* Summary Judgment Opinion and Order, pp. 32-35.

On August 10, 2010, the Baker Hughes Plaintiffs filed their motion for reconsideration of the Summary Judgment Opinion and Order (the "Motion to Reconsider") with respect to this legal conclusion and their brief in support of that motion. The Court requested further briefing from Union Bank on this issue, which was filed on August 13, 2010.

After carefully considering the new arguments advanced by the Baker Hughes Plaintiffs and Union Bank's response, the Court is satisfied that the Baker Hughes Plaintiffs are correct–*i.e.*, the Court misconstrued the relevant statutes in the Summary Judgment Opinion and Order and, as a result, its prior ruling was in error. Accordingly, the motion for reconsideration is granted and upon reconsideration, the Court concludes, for the reasons explained below, that a mineral contractor in Oklahoma must file its lien against oil and gas property within 180 days

---

[13] At trial, the parties agreed to defer the litigation of the legal issues surrounding the recoverability of certain categories of attorneys' fees under relevant statutes and whether recoverable interest and attorneys' fees are part of a secured claim (or are simply an unsecured claim) until after the issues of liability are determined.

**Memorandum Opinion and Order** 9

from the date the work was last performed or materials or supplies were furnished.

The difficulty in construing 42 OKLA. STAT. § 146 arises from the portion of the statute that provides that "the statement required to be filed in the office of the county clerk pursuant to Section 143 of this title as to liens created pursuant to Sections 144 and 145 of this title shall be filed within one hundred eighty (180) days after the date upon which material, machinery or supplies were last furnished or labor or services last performed under the relevant contract or subcontract, whichever the case may be." As the Court noted in the Summary Judgment Opinion and Order, § 143 here refers to the section of the Oklahoma mechanics'/materialmen's lien statutes that governs liens filed by or through a subcontractor. 42 OKLA. STAT. § 143. Section 143 provides that a subcontractor must file a verified statement containing certain information to obtain a lien. *Id.* Similarly, § 142 provides that an original contractor must file a verified statement containing certain information to obtain a lien. 42 OKLA. STAT. § 142.[14] Thus, as the Court concluded in the Summary Judgment Opinion and Order, because § 146 makes direct reference to § 143, while making no direct reference to § 142, the statute appears to limit the 180-day filing provision to the statement required under § 143–that is, the subcontractor statement.

However, as the Baker Hughes Plaintiffs pointed out in the Motion to Reconsider, this reading is inconsistent with the final portion of the statutory provision–*i.e.*, "the statement required to be filed . . . shall be filed within one hundred eighty (180) days after the date upon which material, machinery or supplies were last furnished or labor or services last performed

---

[14] In their Motion to Reconsider, the Baker Hughes Plaintiffs assert that § 142 is not applicable to liens arising under § 144, since § 142 refers to liens claimed "as aforesaid," meaning the traditional mechanics'/materialmen's contractor lien described in § 141. This is at odds, however, with the additional authority cited by the Baker Hughes Plaintiffs and Awesome Transport, LLC, which expressly states that § 144 lien statements must be filed in accordance with all except the temporal provisions of § 142. *K & H Well Serv., Inc. v. Tcina Holding, Co.*, 51 P.3d 1219, 1225 (Okla. 2002).

**Memorandum Opinion and Order**                                                                                    **10**

*under the relevant contract or subcontract, whichever the case may be*," which clearly contemplates filings related to both contracts and subcontracts. *See* 42 Okla. Stat. § 146 (emphasis added). However, as Union Bank notes in response to the Motion to Reconsider, reading the 180-day provision of § 146 to apply to both contractors and subcontractors would appear to simply ignore the reference to § 143 altogether.

Under Oklahoma law, rules of statutory construction must be applied when the meaning of a statute appears less than clear or certain because of its susceptibility to more than one interpretation. *See Lang v. Erlanger Tubular Corp.*, 206 P.3d 589, 597 (Okla. 2009). When possible, a statute must be given a construction that "renders every word operative, rather than one which makes some words idle and meaningless." *Dye v. Choctaw Casino of Pocola*, 230 P.3d 507, 512 n.6 (Okla. 2009). "In construing a statute, the whole must be considered and all parts given their obvious intended meaning, and no part stricken down, unless in irreconcilable conflict with the remainder." *Earnest, Inc. v. LeGrand*, 621 P.2d 1148, 1151 (Okla. 1980). In cases of irreconcilable conflict, however, the Oklahoma Supreme Court has ruled that the provision that is "last in order or position and arrangement" should prevail. *Id.*

Although the Court has attempted to construe § 146 as a whole so as to give plain effect to all of its provisions and render none inoperative, the Court must conclude that an irreconcilable conflict exists in § 146 between the direct reference to § 143 that limits the 180-day filing deadline to oil and gas subcontractor liens and the later reference to "relevant contract[s] or subcontract[s], whichever the case may be" that applies the 180-day deadline to both oil and gas contractors and subcontractors. *See* § 146. Applying the rule of statutory construction that the provision that appears last in order or position controls over a prior conflicting provision, the Court thus concludes that the 180-day deadline of § 146 applies to oil

and gas liens filed by both contractors and subcontractors. *See LeGrand*, 621 P.2d at 1151.

Moreover, when state law governs an issue, a bankruptcy court is bound to apply the law as interpreted by the state's highest court, and when no direct guidance from the state's highest court is available, the court must determine to the best of its ability how that court would rule if faced with the issue. *Ladue v. Chevron, U.S.A., Inc.*, 920 F.2d 272, 274 (5th Cir. 1991). The Baker Hughes Plaintiffs and Awesome Transport, LLC, have directed the Court to additional authority regarding the interpretation of § 146 as to the deadline for an original contractor to file an oil and gas lien arising under §144. In *K & H Well Service, Inc. v. Tcina Holding, Co.*, decided in 2002, the Oklahoma Supreme Court noted that a § 144 "oil and gas lien statement must be filed in accordance with all, but the temporal, provisions of [§ 142]." *K & H Well Serv.*, 51 P.3d at 1225. Although the Oklahoma Supreme Court offered no further discussion or analysis, at the very least, this statement in *K & H Well Service* indicates that the Oklahoma Supreme Court would interpret the statute to apply the 180-day filing requirement to oil and gas contractor liens arising under § 144.

Accordingly, after carefully considering both the Oklahoma Supreme Court's statement in *K & H Well Service* and the relevant statutory provisions, the Court concludes that a mineral contractor in Oklahoma must file its lien against oil and gas property within 180 days from the date the work was last performed or materials or supplies were furnished.

### (2) The Oklahoma and Texas Properties Motions

In the Summary Judgment Opinion and Order, the Court denied the Motion for Partial Summary Judgment filed by the Weatherford Plaintiffs, Awesome Transport, LLC, Phantom Drilling Fluids Company, and BJ Services (the "Oklahoma and Texas Properties Motions"). In the Oklahoma and Texas Properties Motions, the plaintiffs sought a determination that Union

Bank's lien on Cornerstone's working interest in oil and gas properties is subordinate to M/M Liens because a mortgage interest in a working interest cannot be conveyed free of costs, relying upon an intermediate Oklahoma appellate court decision in *Ladder Energy Co. v. Intrust Bank, N.A.*, 931 P.2d 83 (Okla. Ct. App. 1996) as authority for such a determination.   In denying the Oklahoma and Texas Properties Motions, the Court concluded that *Ladder* is not of significance here, since even assuming that the holding in *Ladder* is correct, the case is largely confined to its own facts and does not establish the proposition that the plaintiffs have  asserted in reliance upon it.  *See* Summary Judgment Opinion and Order, pp.44-47.

During closing arguments at trial, the Weatherford Plaintiffs offered additional arguments regarding why the Plaintiffs' M/M Liens should be found superior to Union Bank's lien on working interests under *Ladder*.  For the reasons explained in footnote 15 *infra*, the Court will address this argument in a supplemental opinion and order.

(3)    The Union Bank Motion

In the Summary Judgment Opinion and Order, the Court granted Union Bank a summary judgment with respect to the Plaintiffs' claims that the Mortgage Documents failed the Texas and Oklahoma Statutes of Frauds and were ambiguous, holding that the Mortgage Documents satisfy the applicable Statute of Frauds and that the Mortgage Documents are not ambiguous. The Court also granted Union Bank a summary judgment that the Plaintiffs are deemed to have constructive notice of Union Bank's mortgage lien with respect to the Texas Blanket Leases.

In closing arguments at trial, the Plaintiffs made certain arguments concerning the Texas Statute of Frauds and the Texas Blanket Leases, which the Court will construe as an oral motion for reconsideration of the Summary Judgment Opinion and Order.  The Court will address the arguments advanced at trial next.

The Plaintiffs assert that because the grant of security interests contained in the Texas Mortgage Documents as to Texas Blanket Leases fails the Statute of Frauds and is thus a failed conveyance, the recording of the Texas Mortgage Documents does not constitute constructive notice to the Plaintiffs of Union Bank's lien on Texas Blanket Leases. In making this argument, the Plaintiffs note that contracts for the transfer or assignment of real property interests such as oil and gas interests are subject to the Statute of Frauds. *See Long Trusts*, 222 S.W.3d at 416. "To satisfy the Statute of Frauds, a contract must furnish within itself, or by reference to some other existing writing, the means or data by which the property to be conveyed may be identified with reasonable certainty." *Id.* at 416 (citing *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex.1972) and TEX. BUS. & COM. CODE § 26.01). And, according to the Plaintiffs, (i) a deed is void unless it contains such a description of the property it purports to convey, *Smith v. Sorelle*, 87 S.W.2d 703, 705 (Tex. 1935), and (ii) because void deeds provide no title, such conveyances are not within the chain of title. *Field Measurement Serv., Inc. v. Ives*, 609 S.W.2d 615, 620 (Tex. App. 1980); TEX. CIV. PRAC. & REM. CODE § 16.021. Accordingly, unless the Texas Statute of Frauds is satisfied, the Plaintiffs contend that the Texas Mortgage Documents are not within the chain of title for Texas Blanket Leases and constitute no constructive notice of Union Bank's lien on such leases.

The Court agrees with much of the legal predicate for the Plaintiffs' argument, but disagrees with the Plaintiffs' ultimate conclusions that the Texas Mortgage Documents: (i) fail the Texas Statute of Frauds; (ii) are not within the chain of title; and (iii) do not constitute constructive notice of Union Bank's lien on such leases. Let me explain.

Specifically in the context of oil and gas leases, under Texas law, a grant of all of a transferor's interests located within a clearly defined area, such as a named state or county, is

sufficiently descriptive to effect a conveyance and thus satisfy the Statute of Frauds. *Texas Consol. Oils v. Bartels*, 270 S.W.2d 708, 712 (Tex. Civ. App. 1954). In *Bartels*, for example, the court held that a grant of all rights, title, and interest in "[a]ll the oil, gas and mining leases, royalties and overriding royalties located anywhere within the United States, any of which are located within the states of New Mexico, Kansas, Oklahoma, Louisiana and Texas" was sufficient to reasonably identify the interests conveyed. *Id.* Similarly, the Texas Supreme Court has held that an assignment of future leasehold interests affecting any of the lands expressly covered by a specific farmout agreement was a sufficient description to satisfy the Statute of Frauds, while an assignment of future interests in lands described only as "in the area of the farmout acreage" was insufficient. *Westland Oil Dev. Corp. v. Gulf Oil Tex.*, 637 S.W.2d 903, 908-09 (Tex. 1982).

At trial, the Plaintiffs argued that the Texas Mortgage Documents fail the Statute of Frauds as described in *Long Trusts*, where the Texas Supreme Court held that a description of oil and gas leases located "in the Northeast portion of Rusk County, Texas" that contained only "the lessor name, the survey name, the term, and the net acreage for each lease at issue" was insufficient to identify the exact location of the properties conveyed with reasonable certainty. Audiotape: Trial conducted 8/11/10 at 1:48:37 – 1:53:00 (on file with Court); *Long Trusts*, 222 S.W.3d at 416. The Plaintiffs contend that the blanket grant of security interests in the Texas Mortgage Documents fails the standard under *Long Trusts* because those documents contain no information that exactly identifies the leases to be conveyed, such as the volume and page number of recording in the county records. Audiotape: Trial conducted 8/11/10 at 1:48:37 – 1:53:00 (on file with Court). The Plaintiffs similarly contend that the leases purportedly covered by the after-acquired clause also fail the Statute of Frauds because there was no other document

existing at the time the Texas Mortgage Documents were executed that sufficiently identified the leases conveyed. *Id.* In sum, the Plaintiffs appear to assert that *Long Trusts*, decided in 2006, establishes a more stringent standard to satisfy the Statute of Frauds than earlier Texas cases that "allowed for more lenient property descriptions." Audiotape: Trial conducted 8/11/10 at 1:49:29 – 1:50:29 (on file with Court).

The Court disagrees both that *Long Trusts* invalidates the grants of security interests to Union Bank and that *Long Trusts* mandates a higher degree of specificity for property descriptions than previously required under the Texas Statute of Frauds. The conveyances noted by the Plaintiffs at issue in *Long Trusts* were neither blanket grants of security interests nor grants of after-acquired interests, but were instead specific conveyances of properties that could not be identified with reasonable certainty because the location of the properties was described only as an indeterminate portion of a larger tract. *See Long Trusts*, 222 S.W.3d at 416 (citing *Sorelle*, 87 S.W.2d at 705 ("[A] deed purporting to convey land, which describes it only by quantity and as being part of a larger tract, with nothing whereby to identify what specific portion of the larger tract is intended to be conveyed, is void for uncertainty of description.")). This holding is entirely consistent with *Westland Oil*, in which the Texas Supreme Court held that an assignment of future leasehold interests affecting any of the lands expressly covered by a specific farmout agreement was a sufficient description to satisfy the Statute of Frauds, but an assignment of future interests in lands described only as "in the area of the farmout acreage" was not sufficient. *See Westland Oil*, 637 S.W.2d at 908-09.

The common element in *Long Trusts* and *Westland Oil* is the need for objectively defined boundaries in property descriptions to provide reasonably certain identification. *See Long Trusts*, 222 S.W.3d at 416 and *Westland Oil*, 637 S.W.2d at 908-09. Far from announcing a new

standard in *Long Trusts*, the Texas Supreme Court instead recognized that this has long been the standard under the Texas Statute of Frauds, with reliance on cases as early as 1935. *See Long Trusts*, 222 S.W.3d at 416 (citing *Sorelle*, 87 S.W.2d at 705). When a conveyance transfers all of the grantor's interests contained within such an area, Texas law has recognized the validity of both blanket descriptions and grants of after-acquired interests. *Westland Oil*, 637 S.W.2d at 909; *Bartels*, 270 S.W.2d at 711.

As noted above, the Texas Mortgage Documents grant Union Bank a security interest in all rights, titles, and interests of the Debtor, both then-owned and after-acquired, "which are located on or under or which concern any Property or Properties located in counties referenced in Exhibit A…," with Property defined as "any property of any kind, whether real, personal, or mixed and whether tangible or intangible." Union Bank Ex. 26, at UNION BANK000262-263; Union Bank Ex. 27, at UNION BANK001469. Exhibits A to both the Texas Deed of Trust and the Texas Supplement specifically list Hill County, Texas. (*See, e.g.*, Union Bank Ex. 26, at UNION BANK000323). Thus, consistent with *Long Trusts*, the descriptions provided in the Texas Mortgage Documents closely resemble the conveyance upheld in *Westland Oil*–*i.e.*, all future leasehold interests within a specified area—here, the counties identified by reference to then-existing writings through Exhibits A, which include Hill County, Texas. *See Westland Oil*, 637 S.W.2d at 908-09.

Because the instruments furnish within themselves, along with reference to other existing writings through their exhibits, a means to reasonably identify the property to be encumbered, the Court is satisfied with its legal conclusions and will not modify the grant of summary judgment to Union Bank that the Texas Mortgage Documents satisfy the Texas Statute of Frauds with respect to the Texas Blanket Leases. *See* Summary Judgment Opinion and Order, pp. 11-

17. And, because the Statute of Frauds is satisfied, the Texas Mortgage Documents therefore appear in the chain of title for Texas Blanket Leases and constitute constructive notice to the Plaintiffs of Union Bank's lien on such leases. *See Sorelle*, 87 S.W.2d at 705, *Field Measurement Serv.*, 609 S.W.2d at 620, and *Westland Oil*, 637 S.W.2d at 908. Accordingly, the Court also remains satisfied with its prior holding that the Plaintiffs are deemed to have constructive notice of Union Bank's mortgage lien with respect to the Texas Blanket Leases and thus will not modify its prior legal conclusions. *See* Summary Judgment Opinion and Order, pp. 20-21.

### C. Legal Issues that Remain for Determination at Trial

#### (1) Oklahoma Issues[15]

##### (a) Cornerstone's Oklahoma Operations

Before addressing the remaining legal issues under Oklahoma law, some additional background on Cornerstone's Oklahoma operations may be helpful. All of Cornerstone's well units in Oklahoma were created by "forced pooling" of interests. *See* Joint Pre-trial Order, at 18, 25-27. Forced pooling is a mechanism governed by the Oklahoma Corporation Commission (the "OCC"), whereby the owners of drilling rights in a particular area are compelled to merge their interests and obligations in the production of oil and gas to prevent waste, to encourage maximum production, and to protect correlative rights. *Fleet v. Sanguine, Ltd.*, 854 P.2d 892,

---

[15] The Court has been advised that the parties are scheduled to attend a global mediation session in the underlying bankruptcy cases on August 24 and 25, and that rulings from the Court following the trial of these adversary proceedings could be of assistance to the parties in that context. Given these time constraints, this Memorandum Opinion and Order does not fully address two additional Oklahoma issues. First, the Court will not address an alternative ruling to the granting of the Rule 52(c) Motion with respect to alleged discretionary advances made by Union Bank to Cornerstone. *See infra* at section III.C.(1).(d). Second, the Court will not address the issue of whether the Baker Hughes Plaintiffs are entitled to recover reasonable attorneys' fees from Cornerstone under 42 OKLA. STAT. § 176 on account of the M/M Lien claims arising under 42 Okla. Stat. § 144. Those issues do not affect the relative lien priority of Union Bank's mortgage lien and the Plaintiffs' M/M Liens. Accordingly, those issues will be subsequently addressed by the Court in a supplemental opinion and order.

895 n.8 (Okla. 1993). The first step in this process is to obtain the entry of a spacing order from the OCC that establishes the unit and the boundaries of that unit. *See id.* at 895 n.9; *see also Gulfstream Petroleum Corp. v. Layden*, 632 P.2d 376, 379 (Okla. 1981) (holding that a spacing order is "an essential and compulsory requirement" for pooling). In addition to creating and establishing the boundaries of the unit, the spacing order also: (i) pools royalty interests (but not working interests) within the unit; (ii) directs that only one well shall be drilled in the unit within a specific location; and (iii) prohibits the drilling of a well at another location or the operation of a well drilled in violation of the spacing order. *Fleet*, 854 P.2d at 892 n.9 (citing *Gulfstream Petroleum*, 632 P.2d at 379). A pooling order combines the working interests of owners of land embraced in the spacing unit so that the land may be developed as a unified tract. *Gulfstream Petroleum*, 632 P.2d at 379.

The spacing orders and pooling orders issued by the OCC are public records. Audiotape: Trial conducted 8/10/10 at 12:21:10 - 12:21:28 (on file with Court) (cross-examination of Gail Cope); Audiotape: Trial conducted 8/11/10 at 10:35:46 - 10:35:54 (on file with Court) (direct examination of Verland Behrens).

For all of the Oklahoma wells at issue here, Cornerstone obtained both spacing orders[16] and pooling orders from the OCC that established and pooled 640-acre units that coincided with the entire 640-acre Hughes County plat sections[17] for the location of the wells. *See* Weatherford

---

[16] At trial, the Plaintiffs objected to certain testimony based on the assertion that the spacing orders were not in the record. Audiotape: Trial conducted 8/11/10 at 10:40:11 - 10:41:08 (on file with Court). However, that objection was overruled because Weatherford Pls. Ex. 70 appears to contain both the spacing orders and pooling orders for the units at issue here, as well as orders allowing "location exceptions" for the placement of wells within the units. *See, e.g.*, Weatherford Pls. Ex. 70, at CS-01918 - CS01954.

[17] Under the rectangular Oklahoma survey system, the state is divided north and south by the "baseline" and east and west by the "Indian Meridian." Audiotape: Trial conducted 8/10/10 at 10:38:53 - 10:55:12 (on file with Court) (direct examination of Gail Cope). The survey outlines six-mile square "townships" that in turn comprise thirty-six one-mile square sections. *Id.* For descriptive purposes, sections are numbered within a township and located by counting north or south from the baseline and east or west from the Indian Meridian. *Id.* Thus, a legal description of

**Memorandum Opinion and Order** 19

Pls. Ex. 70, *e.g.*, at CS-01919 (pooling order) and CS-01951 (spacing order) for Section 12, Township 5 North, Range 9 East (Cobra 12-1H unit[18])); Audiotape: Trial conducted 8/9/10 at 3:24:07 - 3:25:25 (on file with Court) (re-direct of John Sanchez). Cornerstone internally made the determination of where to form a unit in advance of applying for a unit designation. Audiotape: Trial conducted 8/9/10 at 2:38:14 - 2:38:54 (on file with Court) (direct examination of John Sanchez).

When arranging for a Plaintiff to work on an Oklahoma well, Cornerstone would generally provide the well name, its location, and, depending on the nature of the services being requested, additional information about the mineral formation and planned drilling process. *Id.* In their lien affidavits, the Plaintiffs provided descriptions of the wells for which they provided labor or services in the same way–by well name and location–as required by statute. *See, e.g.*, Weatherford Pls. Ex. 41, at 3-4; Awesome Transport LLC Ex. 2, at 1; 42 OKLA. STAT. § 142 (requiring lien statement to include a legal description of the property subject to the lien).

With this background in mind, the Court will turn to the Oklahoma issues that remain for determination.

> **(b) Whether, under Oklahoma law, the Plaintiffs are deemed to have constructive notice of Union Bank's mortgage lien with respect to Oklahoma Blanket Leases.**
>
> **(i) Constructive Notice**

---

"section twelve, five north, nine east" denotes the twelfth section of the township located five townships north of the baseline and nine townships east of the Indian Meridian. *Id.* Hereinafter, section descriptions will be abbreviated by section, township, and range number such that, for example, "section twelve, five north, nine east" will be abbreviated as "12-5N-9E."

[18] In the names of Cornerstone's units, the number corresponds to the section number where the unit was located, while "H" refers to the fact that the well was a horizontal gas well. *See* Audiotape: Trial conducted 8/9/10 at 11:46:05 - 11:47:14 (on file with Court) (direct examination of John Sanchez).

16 OKLA. STAT. § 16 provides that "[e]very conveyance of real property acknowledged or approved, certified and recorded as prescribed by law from the time it is filed with the register of deeds for record is constructive notice of the contents thereof to subsequent purchasers, mortgagees, encumbrancers or creditors." In applying the effect of constructive notice under this statute, the Oklahoma Supreme Court has noted that "[w]hatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it." *Rubendall v. Talla*, 119 P.2d 851, 853 (Okla. 1941) (holding that a subsequent encumbrancer was charged with constructive notice of an obligation to execute a second mortgage contained in filed instrument). Accordingly, Union Bank asserts that because the Oklahoma Mortgage was properly filed in Hughes County, the Plaintiffs are charged with knowledge of its contents, including the blanket mortgage provision. Further, Union Bank contends that once an instrument is delivered to the proper recording officer, the document constitutes notice regardless of how the recording officer indexes the filing, citing *Hodges v. Simpson*, 213 P. 737, 740 (Okla. 1922).

In opposition, the Plaintiffs rely upon *Luthi v. Evans*, 576 P.2d 1064 (Kan. 1978), a Kansas case that construes a Kansas statute that the Plaintiffs assert is similar to 16 OKLA. STAT. § 16. In *Luthi v. Evans*, the Kansas Supreme Court held that a recorded deed that contained a blanket grant of all of the transferor's interests in a certain county which could not have been found in the tract record, while enforceable between the parties to the agreement, did not provide constructive notice to subsequent purchasers or encumbrancers under the Kansas recording statutes. *Id.* at 628-29.

Union Bank argues that there is no need in this case to look beyond the law of Oklahoma,

since Oklahoma law is sufficiently clear to decide the issue. However, the Court notes that the cases that Union Bank relies upon are not directly on point in this instance, since none address the specific issue of whether a recorded blanket grant of interests constitutes constructive notice to subsequent encumbrancers. Instead, Union Bank's primary authority, *Rubendall*, involved a covenant to execute a second mortgage on the very same property that was conveyed in the recorded instrument. *Rubendall*, 119 P.2d at 852-53. The only other case that Union Bank cites in support, *Hodges*, involved a clerical error made by the recording office in filing the instrument. *Hodges*, 213 P. at 738. *Rubendall* has limited application to the issue at hand, and *Hodges* is simply inapplicable here, since the purpose of its ruling is to protect an innocent filer from clerical errors rather than to establish the proper standard for constructive notice. *See Hodges*, 213 P. at 740.

When the existing state law provides no definitive answer on an issue, a federal court must make an "educated guess" as to how the highest court of the state would rule. *Travelers Cas. and Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 483 (5th Cir. 2008). In doing so, the court may consult a wide variety of sources, including the general rule of law and decisions from other jurisdictions. *Id.*

Turning first to the Oklahoma statutes governing recording, the Court notes that in interpreting Oklahoma law, the primary goal is to ascertain and give effect to legislative intent, which is first divined from the language of the statute. *Yocum v. Greenbriar Nursing Home*, 130 P.3d 213, 219 (Okla. 2005). "If a statute is plain and unambiguous, it will not be subjected to judicial construction, but will receive the effect its language dictates." *Id.*

By the plain language of the Oklahoma governing statute, a recorded conveyance provides constructive notice when it is "recorded as prescribed by law." 16 OKLA. STAT. § 16.

19 OKLA. STAT. § 298 requires that every document offered for recording "shall by its own terms describe the property by its specific legal description, and provide such information as is necessary for indexing as required in Sections 287 and 291 of this title...." 19 OKLA. STAT. § 298. In turn, §§ 287 and 291 direct the clerk of each county to keep a grantor-grantee index and a tract index, respectively. 19 OKLA. STAT. §§ 287, 291. Thus, by the terms of the statute, a deed may only be "recorded as prescribed by law" if it contains a specific legal description and provides sufficient information for indexing in both the grantor-grantee index and the tract index. The Court concludes that the language of the statute is unambiguous and must be given the effect of its plain meaning. Thus, as a matter of law, to be "recorded as prescribed by law" and thereby constitute constructive notice solely by virtue of the fact of its filing, a conveyance must provide a specific legal description sufficient for indexing in both the county grantor-grantee index and the county tract index.

The caselaw cited by the Baker Hughes Plaintiffs supports this conclusion. Although the Court notes that *Luthi v. Evans*, decided in 1978, has never been cited outside of Kansas for the proposition that a recorded blanket grant of real property interests does not constitute constructive notice to third parties, the notice statutes in Kansas and Oklahoma are very similar. *Compare* 16 OKLA. STAT. § 16 ("[Every conveyance of real property acknowledged or approved, certified and recorded as prescribed by law from the time it is filed with the register of deeds for record is constructive notice of the contents thereof to subsequent purchasers, mortgagees, encumbrancers or creditors.") *with* KAN. STAT. ANN. § 58-2222 ("Every such instrument in writing, certified and recorded in the manner hereinbefore prescribed, shall, from the time of filing the same with the register of deeds for record, impart notice to all persons of the contents thereof; and all subsequent purchasers and mortgagees shall be deemed to purchase with

notice."). More significantly, both Kansas and Oklahoma, unlike Texas, utilize tract indexes in addition to a grantor-grantee index for recording conveyances of real property. 19 OKLA. STAT. §§ 287, 291; KAN. STAT. ANN. §§ 19-1205, 19-1210. This distinction is important because while a prospective purchaser or encumbrancer would be able to locate a blanket mortgage provision related to a particular real property interest through a grantor-grantee index, that same mortgage provision could not be located through a tract index. *See MidCountry Bank v. Krueger*, 782 N.W.2d 238, 248 (Minn. 2010) (mortgage that lacked specific description of property conveyed could not be located in tract index but could be found through grantor-grantee index); *accord Hanson v. Zoller*, 187 N.W.2d 47, 51 (N.D. 1971) (recorded deed with incorrect property description could only be located through grantor-grantee index).

The Court has located one recent case that arguably holds to the contrary. *MidCountry Bank*, 782 N.W.2d at 248-50. In *MidCountry*, the Minnesota Supreme Court held that subsequent purchasers were on constructive notice of a mortgage that could not be found in the county tract index because of a generalized property description since the mortgage could nonetheless be located through the grantor-grantee index. *MidCountry Bank*, 782 N.W.2d at 248-50. The important distinction, however, is that under Minnesota law, a conveyance provides constructive notice when "properly recorded." MINN. STAT. ANN. § 507.32 ("The record, as herein provided, of any instrument properly recorded shall be taken and deemed notice to parties."). The Minnesota Supreme Court granted review to determine what constituted proper recording, and held that in accord with prior Minnesota caselaw, proper recording was "not coterminous with perfect indexing or even perfect recording," but rather required only a reference in the indexes "sufficient to locate the document and a record of the document itself." *MidCountry Bank*, 782 N.W.2d at 248-49. Under this standard, because the mortgage was filed

and could be located through the grantor-grantee index, the conveyance was properly recorded and constituted constructive notice.  *Id.*

As noted, the legal standard here is not proper recording as interpreted by the state's highest court, but instead is recording "as prescribed by law."  *See* 16 OKLA. STAT. § 16. Because the Oklahoma statutes prescribe in plain and unambiguous terms the requirements for filing, the Court concludes that a recorded blanket grant of security interests, *standing alone*, does not constitute constructive notice to subsequent purchasers or encumbrancers because it lacks a specific legal description sufficient for indexing in a county tract index.

The above analysis caused the Court to deny that portion of the Union Bank Motion that sought a legal determination that the Plaintiffs were charged with constructive notice of Union Bank's lien on the Oklahoma Blanket Leases simply because the Oklahoma Mortgage was recorded in Hughes County.  Accordingly, the parties proceeded to trial on this relative priority issue between Union Bank's lien on the Oklahoma Blanket Leases and the M/M Liens on those same leases.

In its post-trial brief on this issue, Union Bank essentially asserts that the Court must parse the statutory requirements more finely than it did in the Summary Judgment Opinion and Order in light of the unique facts established at trial–*i.e.*, that the Oklahoma Mortgage actually appears in both the grantor-grantee index and the tract index for all but one of the sections where the Subject Units were located, and that the Plaintiffs should be found to be on constructive notice of the Oklahoma Mortgage and all of its contents because of those unique facts.  *See, e.g.*, Weatherford Pls. Exs. 105 and 106; Union Bank Brief Regarding Constructive Notice ("Union Bank Constructive Notice Brief"), at 8.  By way of example, Union Bank proved at trial that the Oklahoma Mortgage appears in the tract indexes for 25-5N-9E and for 8-4N-9E.  Weatherford

Pls. Ex. 106, at 5; Weatherford Pls. Ex. 105, at 4. Further, for 8-4N-9E, the Oklahoma Mortgage is indexed against the entire tract, while for 25-5N-9E, the Oklahoma Mortgage is only indexed against five out of the sixteen quarter-quarter sections of the tract. *Compare* Weatherford Pls. Ex. 105, at 4 (Oklahoma Mortgage indexed across all four quarter-sections) *with* Weatherford Pls. Ex. 106, at 5 (Oklahoma Mortgage indexed against the northwest quarter-quarter section of the northeast quarter section and all four quarter-quarter sections of the northwest quarter-section). Thus, Union Bank contends that *Luthi v. Evans*, where no indication of the conveyance of the property at issue appeared in the tract index, is distinguishable. *See* Union Bank Constructive Notice Brief, at 13 (citing *Luthi v. Evans*, 562 P.2d 127, 136-37 (Kan. App. 1977)).

In short, Union Bank argues that based on the trial record, constructive notice should be found to exist here because a hypothetical examiner searching title for an oil and gas lease on which Union Bank asserts a lien through the blanket grant in the Oklahoma Mortgage would actually find the Oklahoma Mortgage *just as if* the lease had been specifically listed on Exhibit A. However, as Union Bank's expert admitted on cross-examination, this situation will only occur for any Oklahoma Blanket Lease that happens to be located in the same quarter-quarter section[19] as a lease that was specifically listed on Exhibit A. *See* Audiotape: Trial conducted 8/11/10 at 11:04:47 - 11:06:44 (on file with Court) (testimony of Verland Behrens that Oklahoma Mortgage indexed against those quarter-quarter sections where leases listed on Exhibit A were located). Obviously, the Plaintiffs disagree with Union Bank's new arguments, contending instead that Oklahoma law does not charge them with constructive notice of Union Bank's lien on the Oklahoma Blanket Leases and that they had no duty to make further inquiry.

---

[19] The Hughes County tract indexes further sub-divide sections into quarter sections (northwest, northeast, southwest, southeast) and quarter sections into quarter-quarter sections. *See, e.g.*, Weatherford Pls. Ex. 105, at 1.

From the Court's perspective, the critical issues in dispute here are precisely what information in the county records the Plaintiffs are charged with knowledge of through constructive notice and why they are charged with such knowledge.[20] At the outset of its analysis, the Court notes that there is no Oklahoma authority directly on point. The parties have not cited the Court to any reported decisions answering this precise question(s) and the Court's research has located none. Accordingly, the Court concludes that this is an issue(s) of first impression under Oklahoma law.

The starting point in answering this question must be the relevant statutes. As noted previously, 16 OKLA. STAT. § 16 expressly provides that "[e]very conveyance of real property acknowledged or approved, certified and recorded as prescribed by law from the time it is filed with the register of deeds for record is constructive notice of the contents thereof to subsequent purchasers, mortgagees, encumbrancers or creditors." And, as discussed above, because the Oklahoma Mortgage can not be recorded "as prescribed by law" as to the Oklahoma Blanket Leases because it contains no specific property descriptions for the Oklahoma Blanket Leases sufficient for indexing in the applicable tract index, the recording of the Oklahoma Mortgage, standing alone, constitutes no constructive notice of Union Bank's lien on the Blanket Leases. Stated another way, 16 OKLA. STAT. § 16 and 19 OKLA. STAT. § 298, as a matter of law, impute no knowledge of the county property records to the Plaintiffs with respect to the Oklahoma Blanket Leases. Even when recorded, documents that do not satisfy all of the relevant statutory

---

[20] It is undisputed that the Plaintiffs never actually checked the real property records in Hughes County, Oklahoma before commencing their work on a well at Cornerstone's request. Moreover, the testimony at trial established that it is not the Baker Hughes Plaintiffs' custom and practice to check the real property records before commencing work on a well. *See, e.g.*, Audiotape: Trial conducted 8/10/10 at 12:27:16 - 12:27:43 (on file with Court) (direct examination of David Mullroney). Finally, Union Bank's expert testified that it was not customary for oilfield services providers such as the Plaintiffs to conduct such searches and that he could not recall having been hired by such a vendor to conduct such a search. Audiotape: Trial conducted 8/11/10 at 10:56:57 - 10:59:00 (cross examination of Verland Behrens). So, the issue is correctly framed as what the Plaintiffs are charged with knowing by statute in Oklahoma.

requirements do not constitute constructive notice simply because of their filing. *See Amarex, Inc. v. El Paso Natural Gas Co.*, 772 P.2d 905, 909 (Okla.1987) (recorded instrument not signed by any person or entity in the chain of title does not constitute constructive notice).

Thus, with respect to the Oklahoma Blanket Leases, absent some independent duty to investigate the property records, the Plaintiffs cannot be charged with constructive knowledge of the filing of the Oklahoma Mortgage and its contents, regardless of what the record would have revealed to a hypothetical examiner. To charge the Plaintiffs with constructive knowledge of Union Bank's lien on the Oklahoma Blanket Leases that–by fortuitous circumstances alone–happen to be located in the same quarter-quarter section as a lease listed on Exhibit A, as Union Bank requests, would nullify the requirements of 19 OKLA. STAT. § 298. Accordingly, the Court concludes that the fact that the Oklahoma Mortgage is recorded and indexed against quarter-quarter sections where Oklahoma Blanket Leases happen to be located does not charge the Plaintiffs with constructive notice of Union Bank's lien on those leases.

Additionally, Union Bank asserts that the Plaintiffs are charged with constructive notice of its lien on the Oklahoma Blanket Leases because, as stipulated, the Oklahoma Mortgage appears in the chain of title for Cornerstone's Oklahoma leases that were listed on Exhibit A. *See* Joint Pre-trial Order, at 17 ¶ 16. As Union Bank correctly notes, under Oklahoma law, a claimant under chain of title to a property is charged with constructive notice of the full contents of documents that are within the chain of title on that property. *Creek Land & Improvement Co. v. Davis*, 115 P. 468, 470 (Okla. 1911). Thus, from the Court's perspective, the Plaintiffs may be charged with constructive knowledge of the blanket grant of security interests in the Oklahoma Mortgage to the extent that an Exhibit A lease is within the chain of title of the real property through which the Plaintiffs make a claim. *See id.*

Significantly, the Plaintiffs did not work on Oklahoma leases owned by Cornerstone individually, but instead performed labor or provided materials attributable to *wells* located in units formed by Cornerstone through spacing and pooling orders entered by the OCC. *See, e.g.*, Joint Pre-trial Order, at 35 ¶ 63 ("On December 18, 2008, Weatherford commenced work on the Panda 5-1H Well in Hughes County, Oklahoma"); Weatherford Pls. Ex. 41, at 2 - 4 (lien affidavit describing labor and/or material provided for "the digging, drilling, torpedoing, completing, operating, or repairing" of Panda Well 5-1H, among others); Weatherford Pls. Ex. 70, at CS-02236 - CS-02241 (drilling and spacing unit order for 5-5N-9E), CS-02213 - CS-02235 (pooling orders for unit covering all of 5-5N-9E). As allowed by Oklahoma law, the Plaintiffs filed their liens against the wells for which they provided labor and/or materials, and those liens in turn attached to the leases associated with those wells as provided by statute. *See* 42 OKLA. STAT. § 144. This distinction is critical, because the property the Plaintiffs are allowed by statute to rely upon to secure their claims are wells rather than individual leases.

Once again, no party has cited the Court to any case directly on point on the issue of whether the chain of title to an individual lease is attributable to a well associated with that lease under Oklahoma law, and the Court has located none. But, of even more significance here is the fact that the only evidence in the record that links the wells the Plaintiffs worked on with individual leases are the spacing orders and pooling orders that formed the units where the wells were located. *See, e.g.*, Weatherford Pls. Ex. 70, *e.g.*, at CS-01919 (pooling order) and CS-01951 (spacing order) for 12-5-N-9E (Cobra 12-1H unit)); Audiotape: Trial conducted 8/9/10 at 3:24:07 - 3:25:25 (on file with Court) (re-direct of John Sanchez). Moreover, no evidence was adduced at trial to show that any of the Plaintiffs had actual knowledge of the existence or extent of the units associated with the wells; and thus, there is no evidence to link the Exhibit A leases

to the wells that the Plaintiffs worked on. Further, unlike Texas (as discussed below; *see infra* at section III.C.(2).(a)), no spacing or pooling orders were filed in the Hughes County records to put the Plaintiffs on constructive notice of the existence or extent of any of the units where the wells that the Plaintiffs worked on were located.

Accordingly, the Court must conclude, based on the lack of any demonstrated link between the Exhibit A leases and the wells the Plaintiffs worked on, that the Plaintiffs are not charged with constructive knowledge of the contents of Union Bank's mortgage, including the blanket grant of security interests, simply because of the appearance of the Oklahoma Mortgage in the chain of title for the Exhibit A leases.

### (ii)    Inquiry Notice

This, however, does not end the Court's analysis pertaining to notice. Again relying on chain of title, Union Bank asserts that the Plaintiffs were on inquiry notice of Union Bank's liens on the Oklahoma Blanket Leases. *See Boswell Energy Corp. v. Arrowhead Homes, Inc.*, 99 P.3d 1229, 1233 (Okla. Civ. App. 2004) (citing *Creek Land & Improvement*, 115 P. at 470) (where contents of chain-of-title documents contain sufficient facts "to put a prudent person on inquiry," claimant will then be charged "with actual notice of whatever reasonable inquiry would have disclosed"). Although the Court just concluded that the chain of title for the Exhibit A leases may not be attributed to the wells on which the Plaintiffs worked and then filed liens, Oklahoma law has recognized that certain facts within an M/M lien claimant's actual and constructive knowledge may place that claimant on inquiry notice of additional facts that could have been discovered with reasonable diligence. *See, e.g., Sisemore v. Voelkle*, 312 P.2d 922, 925 (Okla. 1957) (where mechanics/materialmen were on constructive notice that party with whom they contracted was not the record owner of property, claimants "were chargeable with knowledge of

all facts which they might have ascertained by the exercise of reasonable diligence, as by inquiry of the plaintiff as to the status of the property"); *see also McGlumphy v. Jetero Const. Co., Inc.*, 593 P.2d 76, 82 (Okla. 1978) (M/M lien claimants held to be on inquiry notice of source of funds used to pay for materials); *accord Smith v. Thompson*, 402 P.2d 882, 885 (Okla. 1965) ("question of fact" existed as to whether M/M lien claimants' prior work on other properties for owner was sufficient to place claimants on inquiry notice of mortgage). Such inquiry may properly lead the party on notice to documents outside the property records. *See Creek Land*, 115 P. at 469-71 (identification of consideration in deed as "[t]wo hundred and thirty-five ($235.00) dollars (subject to contract), in hand paid" was sufficient to charge transferee with knowledge of terms of contract).

Thus, the Court must analyze the facts to see if the Plaintiffs were on inquiry notice of Union Bank's lien on the Blanket Leases. Since the analysis of whether the Plaintiffs were on inquiry notice of Union Bank's lien applies equally to the Oklahoma Blanket Leases and the Oklahoma After-acquired Properties, the Court will analyze the issue of inquiry notice for these classes of leases together below. *See infra* at section III.C.(1).(c).(ii).

> **(c)      Whether, under Oklahoma law, Plaintiffs are deemed to have constructive mortgage notice of Union Bank's mortgage lien with respect to Oklahoma After-acquired Properties.**

> **(i)      Constructive Notice**

As noted in the Joint Statement and the Joint Pre-Trial Order, Cornerstone acquired certain oil and gas leases in Hughes County, Oklahoma after the date that the Oklahoma Mortgage was recorded (the "Oklahoma After-acquired Properties"). (Joint Statement, at 12 ¶ 20; Joint Pre-Trial Order, at 19 ¶ 20). Oklahoma law expressly recognizes the validity of a lien granted in after-acquired property, and the Plaintiffs do not dispute that Union Bank's liens are

enforceable against Cornerstone. 42 OKLA. STAT. § 8 ("An agreement may be made to create a lien upon property not yet acquired by the party agreeing to give the lien, or not yet in existence."). Under Oklahoma law, Union Bank's mortgage lien attached on the date that Cornerstone acquired its interest in the Oklahoma After-acquired Properties. *See* 42 OKLA. STAT. § 8. At issue here, however, is whether the recording of the Oklahoma Mortgage provided constructive notice of Union Bank's lien on the Oklahoma After-acquired Properties to the Plaintiffs. *See* 16 OKLA. STAT. § 16.

In support of their arguments that they were not on constructive notice, Plaintiffs primarily rely upon *Central Trust Co. of Illinois v. Minnetonka Lumber Co.*, 229 P. 823 (Okla. 1924), where the Supreme Court of Oklahoma held that the recording of a mortgage on after-acquired real property did not provide constructive notice to subsequent encumbrancers. *See Central Trust*, 229 P. at 824. In support of the rationale underlying *Minnetonka*, the Plaintiffs cite the Restatement (Third) of Mortgages § 7.5, which states that although after-acquired property provisions are effective between the mortgagor and mortgagee, such provisions should be treated as unrecorded as to third parties unless a subsequent notice is properly recorded that specifically references both the mortgage and the subsequently acquired real estate. *See* RESTATEMENT (THIRD) OF PROP.: MORTGAGES § 7.5 (1997).[21]

Union Bank responds that: (i) its interests are protected by simply filing the Oklahoma Mortgage in Hughes County, regardless of how the document was ultimately indexed; (ii) *Central Trust* was subsequently overruled or superseded by *Ehret v. Price*, 254 P. 748 (Okla. 1927); and (iii) because the Plaintiffs filed the Oklahoma M/M Liens against wells or units, rather than individual leases, the Plaintiffs had constructive notice of Union Bank's mortgage for

---

[21] Plaintiffs concede, however, that this Restatement provision has never been cited in any reported decision.

those wells or units that contained at least one lease that was recorded against the tract where the well was located.

For the reasons explained more fully below, the Court disagrees with Union Bank. As to the first proposition, as discussed above in relation to whether the blanket grant of security interests in the Oklahoma Mortgage constituted constructive notice, the cases that Union Bank relies upon are designed to protect innocent filers from clerical errors rather than to establish the proper standard for constructive notice. *See* section III.C.(1).(b).(i) *supra*; *see also Hodges*, 213 P. at 740. Such cases only relieve the filer from further obligation once a "properly prepared instrument" is presented for recording. *Hodges*, 213 P. at 739. The Oklahoma statutes are clear that to impart constructive notice, a deed must be recorded "as prescribed by law," which requires that the document must "by its own terms describe the property [conveyed] by its specific legal description, and provide such information as is necessary for indexing" in both the county grantor-grantee index and the county tract index. 16 OKLA. STAT. § 16; 19 OKLA. STAT. § 298. Because the Oklahoma Mortgage, by its own terms, could not include property descriptions sufficient for indexing in a county tract index with respect to the Oklahoma After-acquired Properties, that document, standing alone, could not impart constructive notice to subsequent purchasers and encumbrancers under Oklahoma law. *See id.*

Union Bank is similarly incorrect that *Ehret* overruled or superseded the rule set out in *Central Trust*. In the *Ehret* case, decided three years after *Central Trust*, the Oklahoma Supreme Court found that under the statutes in effect at the time (which were also in effect at the time of *Central Trust*), a deed of after-acquired property that afforded a definite means of identifying the property to be conveyed through a map attached as an exhibit to the deed constituted constructive notice to third parties, noting that the circumstances of the case "[took] it out of the

general rule announced in *Central Trust....*" *Ehret*, 254 P. at 752. Significantly, the Oklahoma

Supreme Court noted in *Ehret* that the property at issue did not strictly come within the terms of

"after-acquired property." *Id.* Because *Ehret* only distinguishes, and does not eliminate, *Central*

*Trust*, the Court concludes that the "general rule" that a recorded mortgage of a future interest

does not impart constructive notice to third parties remains valid under Oklahoma law. *See id;*

*Central Trust*, 229 P at 824.

The above analysis caused the Court to deny that portion of the Union Bank Motion that

sought a legal determination that the Plaintiffs were charged with constructive notice of Union

Bank's liens on the Oklahoma After-acquired Properties.

As with its claim regarding the Oklahoma Blanket Leases, Union Bank also contends that

the Plaintiffs must be deemed to have constructive knowledge of its lien on the Oklahoma After-

acquired Properties for those wells located in sections where the Oklahoma Mortgage appears in

the tract index. As discussed above with respect to the Oklahoma Blanket Leases, however, this

situation occurs only for Oklahoma After-acquired Properties that happen–through luck, not

design–to be located in those sections that also contained at least one Exhibit A lease, since the

tract indexing for the Oklahoma Mortgage is derived from the property descriptions for those

leases listed on Exhibit A to the Oklahoma Mortgage.

An example of this occurrence is illustrated by the entries in the section 8-4N-9E tract

index for the Oklahoma After-acquired Property that Cornerstone acquired from Elson Oil

Company. *See* Joint Pre-trial Order, at 27, Schedule G (lease from Elson Oil Company);

Weatherford Pls. Ex. 105, at 4 (entry for Oklahoma Mortgage), 5 (entry for Elson Oil Company).

In the section 8-4N-9E tract index, the Oklahoma Mortgage is indexed against all sixteen

quarter-quarter sections, while the Elson Oil Company lease is indexed against the eight quarter-

quarter sections for the northwest and southwest quarter sections. *Id.* Notably, from Union Bank's perspective, this is also exactly how the record would have appeared had the Elson Oil Company lease been specifically listed in the Oklahoma Mortgage as a lease to be acquired in the future by Cornerstone–in other words, if the Elson Oil Company lease had been recorded "as prescribed by law." Because the same result is reached in this instance, Union Bank argues that the statutory requirement for constructive notice has been met; and thus, the Plaintiffs should be charged with knowledge of Union Bank's lien on the Elson Oil Company lease through the after-acquired property clause contained in the Oklahoma Mortgage.

However, the Court disagrees with Union Bank for the same reasons discussed above with respect to the Oklahoma Blanket Leases. Accepting Union Bank's argument nullifies the express terms of 16 OKLA. STAT. § 16 and 19 OKLA. STAT. § 298, which, as a matter of law, impute no knowledge of the county property records to the Plaintiffs for the Oklahoma After-acquired Properties, since those leases cannot be recorded "as prescribed by law." Under Oklahoma law, information that actually appears in the county records is insufficient to constitute constructive notice to third parties simply by virtue of its recording when the instrument recorded does not satisfy all of the relevant statutory requirements. *See Amarex, Inc.*, 772 P.2d at 909. Because of this, absent an independent duty to inspect or investigate the property records, the indexing of the Oklahoma Mortgage against quarter-quarter sections where After-acquired Properties happen to be located does not constitute constructive notice of Union Bank's lien.

Accordingly, since the Oklahoma Mortgage cannot be deemed to have been recorded "as prescribed by law" as to the Oklahoma After-acquired Properties, the Plaintiffs cannot be charged with constructive notice of Union Bank's security interest in those leases.

**(ii)** **Inquiry Notice**

As noted above, Oklahoma caselaw has recognized that certain circumstances may place M/M lien claimants on inquiry notice of additional facts that could have been discovered with reasonable diligence, including information contained in documents outside the county records. *See, e.g., Sisemore*, 312 P.2d at 925; *Jetero Const.*, 593 P.2d at 82; *Creek Land*, 115 P. at 469-71. Whether circumstances are sufficient to place M/M lien claimants on inquiry notice is a question of fact. *See Smith*, 402 P.2d at 885. A party must be charged with inquiry notice where the facts that were within the claimant's actual and constructive knowledge would cause a prudent person to make a further investigation. *See Sisemore*, 312 P.2d at 925.

Here, the Court finds that the facts available to the Plaintiffs through actual and constructive knowledge at the time their liens incepted are insufficient to charge them with inquiry notice of Union Bank's security interests in either the Oklahoma Blanket Leases or the Oklahoma After-acquired Properties. Let me explain.

The starting point in an inquiry notice analysis is what the Plaintiffs knew or are charged with knowing by statute when their liens incepted–*i.e.*, when they first provided goods and/or services, on a particular well. Obviously, the Plaintiffs knew that they had been asked to provide goods or services to a well located in Hughes County at Cornerstone's request.[22] *See, e.g.*, Audiotape: Trial conducted 8/9/10 at 2:39:33 - 2:39:53; 2:40:21 - 2:40:25 (on file with Court) (testimony of John Sanchez that Cornerstone provided vendors with, at a minimum, well name and location); 2:53:40 - 2:54:20 (testimony of John Sanchez that Cornerstone called vendors out only to locations where Cornerstone held surface rights). Moreover, at the time they started their

---

[22] There is no evidence that the Plaintiffs knew, when they commenced their work, whether Cornerstone was the owner/operator of the well(s) or simply the operator of the well(s).

work on the wells, the Plaintiffs were charged with constructive knowledge of Union Bank's lien on the Exhibit A leases by statute because the Oklahoma Mortgage was recorded "as prescribed by law" with respect to the Exhibit A leases. *See* 16 OKLA. STAT. § 16; 19 OKLA. STAT. § 298**.** In addition, the Plaintiffs were charged with knowledge that if an Exhibit A lease was connected to a well for which they were providing goods or services, that lease was subject to Union Bank's lien pursuant to the terms of the recorded Oklahoma Mortgage.

But, without knowledge of the applicable unit boundaries for the wells the Plaintiffs worked on, the Plaintiffs would have no ability to link an Exhibit A lease to any particular well. Thus, unless there are sufficient circumstances to place the Plaintiffs on inquiry notice of the existence and extent of the units associated with the wells they worked on, the Plaintiffs cannot be charged with knowledge of Union Bank's lien.

Because the boundaries of every unit corresponded to the boundaries of the plat section where the unit was located and, except for the Lizard well, contained at least one lease listed on Exhibit A, the Plaintiffs knew that Union Bank asserted a prior lien on at least one oil and gas lease located in the same 640-acre plat section where the well was located.[23]  Expert testimony indicated, however, that pooled units for gas wells can be as large as 640 acres or as small as 160 acres, that the area is not always perfectly square, and that well placement within the unit may vary.  Audiotape: Trial conducted 8/10/10 at 11:12:27 - 11:25:38 (testimony of Gail Cope); 8/11/10 at 9:50:17 -  9:50:31 (testimony of Terry Cross) (on file with Court).  Lastly, although each well name provided to the Plaintiffs began with a number that corresponded to the plat section where the well was located, each of the wells the Plaintiffs worked on was a horizontal well that could extend out from the well site in any direction, which could not be determined

---

[23]  With the exception, of course, of the one well unit–the Lizard well–that contained no Exhibit A lease.

from inspection of the surface of the well. *See, e.g.*, Weatherford Pls. Ex. 41, at 4 (Panda Well #5-1H located in 5-5N-9E; Dingo Well #11-1H located in 11-5N-9E; Okapi Well #17-1H located in 17-4N-9E); Audiotape: Trial conducted 8/9/10 at 11:46:05 - 11:47:14 (on file with Court) (direct examination of John Sanchez). As a result, a Plaintiff could have drawn no inferences from the location of a well site in relation to an Exhibit A lease within a section that would indicate that a unit had been formed that contained both the well and an Exhibit A lease.

Thus, although certain of these circumstances may have indicated that a unit had been formed, the Court finds that the facts within the Plaintiffs' actual and constructive knowledge were not so compelling as to cause a prudent person to inquire further about the existence and extent of a unit in regard to any of the wells on the Oklahoma Properties. Significantly, the factual scenarios where Oklahoma courts have imposed a duty to inquire upon M/M lien claimants involved circumstances that evidenced significant issues related to the property at issue and the validity of their claims. *Sisemore*, 312 P.2d at 925; *Jetero Const.*, 593 P.2d at 82. For example, in *Sisemore*, the M/M lien claimants had constructive and actual knowledge that the party with whom they contracted was neither the record owner nor had possession of the property at issue. *Sisemore*, 312 P.2d at 924-25. The court found that these circumstances were sufficient to cause a prudent person to inquire further because a mechanics'/materialmen's lien could not be validly claimed under contract with a party who held no legal or equitable title. *Id.*

Here, by contrast, no such evidence exists that would have put the Plaintiffs on notice of a threat to the validity of their liens. Accordingly, the Court concludes that the Plaintiffs were under no duty of inquiry, and thus cannot be charged with constructive notice of facts that could have been learned by further investigation regarding the existence or extent of units associated with the wells they worked on.

Because the Plaintiffs were not charged with constructive knowledge of Union Bank's mortgage lien on the Oklahoma Blanket Leases and the Oklahoma After-acquired Properties, and were under no duty to make a further inquiry, the Court concludes that the Plaintiffs' M/M Liens are superior to Union Bank's mortgage lien on the Oklahoma Blanket Leases and the Oklahoma After-acquired Properties.

> **(d)** **Whether any of the advances made by Union Bank to Cornerstone were not obligatory under Oklahoma law.**

Under Oklahoma law, a mechanics'/materialmens' lien takes priority over a prior recorded mortgage for advances made after the inception of the mechanics'/materialmens' lien to the extent the advances are discretionary rather than obligatory under the terms of the loan agreement. *Liberty Nat'l Bank & Trust Co. v. Kaibab Indus.*, 591 P.2d 692, 694 (Okla. 1979); *Local Fed. Sav. & Loan Ass'n v. Davidson & Case Lumber Co.*, 255 P.2d 248, 253 (Okla. 1953) (for discretionary advances "materialmen who furnished material, after the recording of the mortgage, but before the money is paid, have a prior lien to that of the mortgagee"); *First Nat'l Bank & Trust Co. of Ardmore v. Worthle*, 714 P.2d 1044, 1047 (Okla. Civ. App. 1985). Advances are obligatory when the mortgage secures a set line of credit or provides for stated amounts of advances upon the occurrence of certain conditions. *Liberty Nat'l Bank*, 591 P.2d at 694; *Worthle*, 714 P.2d at 1047. Thus, any Plaintiff whose Oklahoma M/M Lien incepted prior to any discretionary advance made by Union Bank under the Credit Agreement will take priority over Union Bank to the extent of such discretionary advance.

At trial, following the close of the Plaintiffs' cases in chief, Union Bank made an oral motion under FED. R. CIV. P. 52(c) (the "Rule 52(c) Motion") for judgment against the Plaintiffs on this issue. As part of the Rule 52(c) Motion, Union Bank asserted that: (i) none of the

Plaintiffs, except the Weatherford Plaintiffs, had presented any evidence that any of their liens incepted before an advance was made under the Credit Agreement; (ii) as a matter of law, the determination of whether an advance is obligatory must be made only from the face of the loan agreement, and that no inquiry or examination of extrinsic evidence is permitted, relying in part upon *Home Lumber Co. v. Kopfmann*, 535 N.W.2d 302 (Minn. 1995); and (iii) even assuming that examination of extrinsic evidence is proper, the Weatherford Plaintiffs had offered no evidence as to any particular advance to show that the advance was discretionary at the time it was made.

Because the Plaintiffs conceded that only the Weatherford Plaintiffs have any liens that pre-date an advance made under the Credit Agreement, the Court granted the Rule 52(c) Motion as to all of the Plaintiffs except the Weatherford Plaintiffs. Audiotape: Trial conducted 8/10/10 at 2:58:05 - 2:59:39 (on file with Court). By agreement of the Weatherford Plaintiffs and Union Bank, and in order to conclude the evidence at trial, the Court carried the Rule 52(c) Motion to allow the Weatherford Plaintiffs the opportunity to brief the issue of whether the determination of whether an advance is obligatory or discretionary is limited to the terms of the loan agreement, with the understanding that if the Court ultimately concluded after that briefing that the Rule 52(c) Motion should have been granted, any testimony presented thereafter related to the issue of discretionary advances would be excluded by the Court. If, however, the Court concluded that the Rule 52(c) Motion should not be granted, any testimony presented after such motion had been made related to the issue of discretionary advances would be fully considered by the Court in coming to its decision on the discretionary advance issue.

The Weatherford Plaintiffs submitted a post-trial brief on the issue of discretionary advances (the "Weatherford Post-trial Brief"), to which Union Bank filed a response (the "Union

Bank Post-trial Response").[24]  The Court will turn now to the Rule 52(c) Motion.

In a bench trial, once "a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue." FED. R. CIV. P. 52(c). "Judgment entered under Rule 52(c) is made after the [court] has heard all of the evidence bearing on crucial issues of fact." *Samson v. Apollo Res., Inc.*, 242 F.3d 629, 632 (5th Cir.), *cert. denied*, 534 U.S. 825 (2001) (citation omitted).  Interpreting the analogous provisions of former Rule 41(b), the Fifth Circuit has stated that dismissal of the plaintiff's case is warranted when the "court, even before hearing the defendant's evidence, determines that the plaintiff has failed to offer persuasive evidence regarding the necessary elements of his case." *U.S. v. Rockwell Space Operations Co.*, No. CIV.A.H-96-3626, 2002 WL 864246, at *10 (S.D. Tex. 2002) (unpublished case) (*quoting duPont v. Southern Nat'l Bank*, 771 F.2d 874, 879 (5th Cir. 1985)).   In reaching this determination, the court may weigh evidence, make credibility judgments, and even draw inferences unfavorable to the plaintiffs.  *North Mississippi Communications, Inc. v. Jones*, 792 F.2d 1330, 1333 (5th Cir. 1986).

While neither Union Bank nor the Weatherford Plaintiffs have identified an Oklahoma case that deals squarely with the issue of whether extrinsic evidence may be examined to determine whether an advance is obligatory or discretionary, Union Bank asserts that Oklahoma courts that have applied the obligatory advance theory to future advances have nonetheless limited their inquiry only to the terms of the agreement between the parties.  *See* Union Bank

---

[24]  Prior to trial, Union Bank also filed a trial brief on this issue of obligatory advances.  Hereinafter, the Court will refer to this brief as the "Union Bank Trial Brief."

Trial Brief, at 3-4 and Weatherford Post-trial Brief, at 2-4.   In response, the Weatherford Plaintiffs cite the Oklahoma Supreme Court's warning that "conditions upon advances under some circumstances may be so burdensome as to in effect allow the lender to have an option" in deciding whether to make an advance.   Weatherford Post-trial Brief, at 4 (citing *Liberty Nat'l Bank*, 591 P.2d at 694).   Thus, the Weatherford Plaintiffs contend that Oklahoma law contemplates examining evidence outside the four corners of the lending document to determine whether an advance was truly obligatory.   Further, the Weatherford Plaintiffs contend that allowing a lender such as Union Bank to characterize advances made after a waived default as obligatory would undermine the policy embodied in Oklahoma law to protect the interests of intervening lienholders to the extent of discretionary advances.   Weatherford Post-trial Brief, at 2.

To bolster its argument that the Court should look only to the terms of the lending agreement, Union Bank relies upon the analysis in *Home Lumber Co.*, where the Minnesota Supreme Court held that advances are deemed obligatory unless the "controlling documents themselves clearly define the option" to decline to make the advance.   *Home Lumber*, 535 N.W.2d at 305.   The Minnesota Supreme Court based this holding on the rationale that conditions precedent to making advances under a loan agreement are for the protection of the lender, rather than third parties such as M/M lien claimants, and that a lender is free to waive such provisions at any time.   *Id.*   The *Home Lumber* court reasoned that, because the M/M lien claimants in that case were neither parties to the loan agreement nor the intended beneficiaries of any protections it contained, the very standing of such claimants was not clear.   *Id.*   Going further, the Minnesota Supreme Court noted that allowing M/M lien claimants to characterize advances following a default waived by a lender would "require the mortgagee to guess at the

eventual outcome of a fact determination on whether the disbursements were optional and could allow [M/M lien claimants] a windfall." *Id.*

The Court finds the reasoning of *Home Lumber* persuasive. As noted by the Minnesota Supreme Court, the position urged by the Weatherford Plaintiffs would leave lenders uncertain as to the status of any advance, since a later determination that the lender has waived a technical default could render the advance discretionary. As a further result, no lender would ever waive any default, no matter how slight, for fear of losing its seniority as to any subsequent advance. Accordingly, in considering the Rule 52(c) Motion, the Court will limit its examination to the terms of the Credit Agreement.

Pursuant to the Credit Agreement, Union Bank was obligated to make advances under two types of commitments, Tranche A and Tranche B.[25] (Weatherford Pls. Ex. 13, at 33). The Credit Agreement was amended to include an additional advance type, Tranche C, which was then later removed by further amendment. (*See, e.g.*, Weatherford Ex. 16, at CS-07472; Weatherford Ex. 27, at CS-07506). Under all Tranche A and B advances, Union Bank was obligated to make advances only up to the "Unused [Tranche A or B] Commitment Amount," while Tranche B advances were further limited by availability tests defined in the Credit Agreement. (Weatherford Pls. Ex. 13, at 30, 33). In addition, all advances were subject to certain conditions precedent, such as the absence of any default by the Debtor or any material change in certain representations and warranties. (*Id.*, at 56-57). The Credit Agreement obligated Cornerstone to maintain a specified current ratio as of the end of each fiscal quarter and to warrant the absence of liens except for those expressly permitted under the Credit

---

[25] The parties have stipulated to the amounts and dates of advances and letters of credit that Union Bank issued to Cornerstone under the Credit Agreement, as well as the amounts and dates of payments made by Cornerstone to Union Bank. Joint Pre-trial Order, at 15-16.

Agreement. Weatherford Pls. Ex. 13, at 26 (definition of "Permitted Liens"), 62 § 4.17 (warranty of absence of liens except for permitted liens); 72 § 6.01 (list of permitted liens), 78 § 6.16 (current ratio covenant). As these terms indicate, so long as Cornerstone had availability within the stated limits and no defaults existed, Union Bank had no discretion to decline advances under the Credit Agreement.

The Weatherford Plaintiffs have offered no arguments that the terms of the Credit Agreement granted Union Bank the discretion to decline advances. Instead, the Weatherford Plaintiffs contend that certain advances under the Credit Agreement were discretionary because of the following alleged defaults that were not waived by Union Bank: (i) the attachment of certain of the Plaintiffs' liens; (ii) Cornerstone's failure to file required documentation to perfect Union Bank's mortgage; and (iii) Cornerstone's continued failure to maintain the required current ratio. Weatherford Post-trial Brief, at 3. Significantly, as highlighted in *Home Lumber*, each of these alleged defaults requires examination of extrinsic evidence to determine whether certain conditions precedent to advances were met that are for the protection of Union Bank, rather than third parties.

Because the Weatherford Plaintiffs' arguments are based solely on extrinsic evidence, the Court concludes that the Weatherford Plaintiffs have failed to meet their burden of proof. Accordingly, the Court will grant the remainder of the Rule 52(c) Motion in favor of Union Bank on the discretionary advance issue, concluding that the Weatherford Plaintiffs have failed in their proof at trial.

       **(e)**       **Whether, under Oklahoma law, any of the Plaintiffs are entitled to recover the enhanced value their goods and services provided to Union Bank's collateral.**

The Baker Hughes Plaintiffs seek a declaratory judgment that Union Bank's liens on the

Oklahoma Properties are junior to the Baker Hughes Plaintiffs' M/M Liens to the extent of any enhanced value to the Oklahoma Properties that accrued as a result of "the goods, materials, supplies, machinery, equipment and labor furnished" by the Baker Hughes Plaintiffs. Baker Hughes Pls. Compl. and Req. For Decl. J., at 40-41. Although no other Plaintiff has expressly pled this cause of action in its respective complaint, the remaining Plaintiffs also seek to assert this cause of action under the theory of "equal dignity" among M/M Lien claims. Audiotape: Trial conducted 8/10/10 at 5:36:18 - 5:40:50 (on file with the Court). Union Bank disputes both the existence of the claim for enhanced value and the right of the other Plaintiffs to attempt to assert it without having pled such a claim.

At the close of the Plaintiffs' cases in chief, Union Bank moved for judgment on this cause of action under FED. R. CIV. P. 52(c) (the "Enhanced Value Rule 52(c) Motion"). In the Enhanced Value Rule 52(c) Motion, Union Bank asserts that: (i) no such cause of action exists under Oklahoma law; and (ii) even if enhanced value does constitute a valid cause of action under Oklahoma law, the Baker Hughes Plaintiffs have failed in their burden of proof. As part of the Enhanced Value Rule 52(c) Motion, Union Bank also moved for judgment on this issue as to those Plaintiffs who did not expressly plead enhanced value as a cause of action.

At the time of trial, no briefing on this claim had been filed. As a result, the Court requested that the Baker Hughes Plaintiffs provide it with some briefing–*i.e.*, at least citations to the cases that the Baker Hughes Plaintiffs relied upon to establish this cause of action under Oklahoma law. The Court also allowed Union Bank to file a response upon receipt of the Baker Hughes Plaintiffs' cases.

After considering the cases and arguments advanced by the parties, the Court agrees with Union Bank that, to the extent enhanced value is a recognized cause of action under Oklahoma

law,[26] the Baker Hughes Plaintiffs have presented insufficient evidence to support such a claim here. In *Home Building & Loan Ass'n v. White*, the first of the two cases cited by the Baker Hughes Plaintiffs, and the only one that directly addresses the concept of enhanced value, the Oklahoma Supreme Court expressly measured the extent of the superior M/M lien as "the value of the new building *over and above* the value of the original building at the time of the commencement of such improvements." *Home Building & Loan Ass'n v. White*, 284 P. 889, 894 (Okla. 1930) (emphasis added).

Here, although the Baker Hughes Plaintiffs presented some very general testimony that the labor and materials provided by them resulted in some increase in value between November 2008 and April 2009, there is no evidence in the record of the value of any particular well against which the Baker Hughes Plaintiffs assert a lien either before labor and/or materials were provided or after. *See, e.g.*, Audiotape: Trial conducted 8/9/10 at 11:43:31 - 11:47:37 (on file with the Court) (testimony of John Sanchez).

When questioned about the absence of evidence of the extent of the enhanced value provided by them during closing arguments, counsel for the Baker Hughes Plaintiffs argued that they are entitled to recover not less than the amount Cornerstone was invoiced for the labor and/or material that the plaintiffs contributed to the well, relying on *Palmer v. Crews Lumber Co., Inc.*, 510 P.2d 269, 271 (Okla. 1973). As Union Bank notes, however, nowhere in the analysis of the materialman's claim at issue does *Palmer* address or rely upon the concept of enhanced value to the property. *See Palmer*, 510 P.2d at 271. Instead, the Oklahoma Supreme Court held in *Palmer* that the materialman's lien for the full value of materials provided was

---

[26] The cases cited by the Baker Hughes Plaintiffs are not oil and gas M/M Lien cases; they were unable to locate any cases where this enhanced value theory had been applied in the oil and gas context.

superior to a prior mortgage based upon a theory of estoppel that prevented the mortgagee from asserting the priority of its claim. *Id.* So, the Baker Hughes Plaintiffs have cited the Court to no authority that enhanced value can simply be measured by the amounts invoiced to Cornerstone. And, as a matter of logic, that argument is flawed. It simply does not follow that because work was done on a well that cost money, the value of the well increased by the amount of money spent.

As such, the Court concludes that, to the extent that enhanced value is a cognizable cause of action under Oklahoma law, such a claim requires—at a minimum—a showing of the value of the collateral before and after the claimant provided labor and/or materials. What that means here, of course, is that the Baker Hughes Plaintiffs failed in their proof. They failed to prove the value of any of the wells they assert liens on before they commenced work and the value of those same wells upon the conclusion of their work. Accordingly, the Court will grant the Enhanced Value Rule 52(c) Motion in favor of Union Bank. And, because the Baker Hughes Plaintiffs failed to establish a prima facie case for enhanced value, the Court does not need to address the contention of the remaining Plaintiffs that the doctrine of equal dignity among M/M Liens allows them to assert this cause of action along with the Baker Hughes Plaintiffs.

> **(2)** **Texas Issues**
>
> > **(a)** **Whether, under Texas law, Plaintiffs are deemed to have constructive notice of Union Bank's mortgage lien with respect to Texas After-acquired Properties.**

Under Texas law, "[a] person is charged with constructive notice of the actual knowledge that could have been acquired by examining public records." *Mooney v. Harlin*, 622 S.W.2d 83, 85 (Tex. 1981). Union Bank asserts that because the Plaintiffs were on constructive notice as of the date of recordation of the properly-filed Texas Mortgage Documents, which include a grant

of security interests in the Texas After-acquired Properties, then the Plaintiffs must be charged with actual notice of Union Bank's lien on the Texas After-acquired Properties because those leases were properly recorded and appear in the Hill County grantor-grantee index. Additionally, Union Bank contends that the Plaintiffs must be charged with constructive knowledge of Union Bank's lien on the Texas After-acquired Properties to the extent that those leases were included in unit designations filed of record in Hill County that pooled the interests of leaseholders in the unit.

In response, the Plaintiffs assert that no constructive notice of Union Bank's lien on the Texas After-acquired Properties can be imputed to them because the Texas Mortgage Documents do not specifically reference the leases to be acquired, as required under Texas law.[27] With regard to unit designations, the Plaintiffs assert that, while recording of a unit designation represents constructive notice to third parties of voluntary pooling of interests, the Plaintiffs cannot be charged with constructive knowledge of unit designations filed after the inception of their liens nor for leases that were not included in the unit designations.

With regard to Union Bank's contention that the recording of the Texas Mortgage Documents, standing alone, imparts constructive notice to the Plaintiffs of Union Bank's lien on the Texas After-acquired Properties, the Court agrees that the Plaintiffs are not on constructive notice of Union Bank's lien on the Texas After-acquired Properties because the Texas Mortgage Documents do not specifically reference the leases to be acquired by Cornerstone in the future. To the extent the cases identified by the Plaintiffs directly address conveyances of future interests in real property, Texas law appears to require that the instrument contain a description

---

[27] The Plaintiffs also contend that they are not charged with constructive notice because the Texas Mortgage Documents fail the Statute of Frauds in conveying a security interest in the Texas After-acquired Properties. These arguments are addressed in section III.B.(3) *supra*.

of the exact property to be acquired by the transferor to constitute constructive notice upon recording. *See, e.g., Simon v. State Mut. Life Assur. Co.*, 126 S.W.2d 682, 685 (Tex. Civ. App. 1939) (citing *Richardson v. Washington*, 31 S.W. 614, 617 (Tex. 1895) (holding that parties to chattel mortgage of after-acquired property must show transferor's intent to acquire the "very property" that lien will encumber)). Since the Texas Mortgage Documents contain no such description of the leases subsequently acquired by Cornerstone, Union Bank cannot meet this requirement.

*Bartels*, which Union Bank contends establishes that recorded after-acquired mortgage provisions place subsequent purchasers or encumbrancers on constructive notice, is also consistent with the cases that require conveyances of future interests to identify the "very property" to be encumbered. In *Bartels*, the court held that although it was unclear whether the document at issue was an immediate transfer of the property identified or only a contract to convey the property in the future, the recording provided constructive notice to third parties even if the deed was a contract to convey. *Bartels*, 270 S.W.2d at 712. Even assuming the conveyance in *Bartels* was a promise to make a future transfer of then-owned properties (the reverse of the situation here, which involves a present transfer of interests in unidentified properties not yet acquired), the "very properties" to be conveyed could be identified at the time the instrument was recorded–*i.e.*, all of the transferor's interests in the named counties. *See id.* at 711-12.

Union Bank's reliance on *Mooney* is similarly misplaced. In *Mooney*, the Texas Supreme Court held that constructive knowledge may only be attributed to a party for those facts that could have been discovered through the exercise of reasonable diligence. *Mooney*, 622 S.W.2d at 85. Under Texas law, subsequent purchasers or encumbrancers are not charged with

searching the record prior to the date that their transferor acquired its interest in the property conveyed. *Anderson v. Farmer*, 189 S.W. 508, 509 (Tex. Civ. App. 1916).

What that means here is that the Plaintiffs are only charged with knowledge of what appears in the deed records *after* Cornerstone acquired a particular lease following the signing and recording of the Texas Mortgage Documents. And, of course, if title was run on that After-acquired Property, the Texas Mortgage Documents would not appear since they were recorded before Cornerstone acquired the lease in question, not after. So, as relevant here, the Plaintiffs cannot properly be charged with knowledge of facts that could only be gained through inspection of a portion of the record that they were not bound to inspect. Accordingly, the Court concludes that the recording of the Texas Mortgage Documents, standing alone, does not constitute constructive notice of Union Bank's security interest in the Texas After-acquired Properties.

As noted previously, however, the Plaintiffs did not work on individual Cornerstone leases in isolation. Rather, the Plaintiffs performed labor or provided materials attributable to well units comprised of multiple underlying leases pooled under unit designations that were also filed of record in Hill County. *See, e.g.*, Joint Pre-trial Order, at 36 ¶ 73 ("On March 8, 2009, Weatherford commenced work on the Colonial Trust 1H Well in Hill County, Texas"); Weatherford Pls. Ex. 42, at 2-4 (lien affidavit describing labor and/or material provided for "the digging, drilling, torpedoing, completing, operating, or repairing" of Colonial Trust Well #1H, among others); Baker Hughes Pls. Ex. 5, at 7-9 (file stamped copy of unit designation for Colonial Trust Unit). Because oil and gas leases typically establish the terms of pooling in the lease provisions, the unit designation and the underlying leases are inextricably linked. *See Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 422-24 (Tex. 2008) (considering question of whether "standard industry pooling clause" in lease required termination of pooling upon

expiration of single lease); *see also* Weatherford Pls. Ex. 2, at 14 ¶ 6 (Paid Up Oil and Gas Lease Between Dale and Sandra Freeman and the Debtor) (describing pooling rights granted to the Debtor, including obligation to "file of record a written declaration describing the unit"). As noted by the Baker Hughes Plaintiffs, once properly recorded, unit designations enter the chain of title on the properties covered and constitute constructive notice to third parties. *See* Baker Hughes Pls. Trial Brief–Constructive Notice, at 5 (citing *Westland Oil*, 637 S.W.2d at 908).

Under Texas law, a claimant under chain of title to a particular property is charged with constructive notice of all of the contents of documents that form an essential link in that chain of title, including references to other recorded and unrecorded documents fairly disclosed in the instrument. *Westland Oil*, 637 S.W.2d at 908 (charging subsequent purchaser with constructive knowledge of unrecorded operating agreement unambiguously referenced in assignment). Claimants must follow the chain of any such references "from one instrument to another" until they have obtained full knowledge of the matters referred to that affect the estate. *Id.* (quoting *Loomis v. Cobb*, 159 S.W. 305, 307 (Tex. Civ. App. 1913)).

Here, the Court has already determined that the Plaintiffs were on constructive notice of Union Bank's security interest in leases that Cornerstone owned at the time that the Texas Mortgage Documents were recorded, regardless of whether or not those leases were specifically listed on Exhibits A. Summary Judgment Opinion and Order, at 8, 20-21. Additionally, Union Bank has established that each well unit in Texas contained at least one lease that was listed on Exhibit A to the Texas Mortgage Documents. Joint Pre-Trial Order, at 24-25 (all Hill County units show some positive percentage of acreage owned listed on Exhibit A to the Texas Deed of Trust or the Texas Supplement). Under *Westland Oil*, because the Texas Mortgage Documents are in the chain of title to the Exhibit A leases, the Plaintiffs are charged with notice of the

contents of the instruments, including the after-acquired mortgage clause, as of the date of the recording of the Texas Mortgage Documents. *See Westland Oil*, 637 S.W.2d at 908.

From this starting premise, Union Bank asserts that because the Plaintiffs had constructive notice of the after-acquired clause as of the date the Texas Mortgage Documents were recorded, the Plaintiffs must then be charged with constructive notice of Union Bank's lien on each After-acquired Property as it was recorded in Hill County, since once gained, knowledge cannot be "erased" or selectively applied between separate leases. Here, however, Union Bank overlooks the holding in *Westland Oil* that a claimant under chain of title to a property is charged with inspecting only documents referred to in a chain-of-title instrument *that affect the property at issue*. *Westland Oil*, 637 S.W.2d at 908. As the Texas Supreme Court has described this rule, the claimant is charged with "constructive notice of every matter connected with or affecting [the] estate which appears by recital, reference, or otherwise upon the face of any deed which forms an essential link in the chain of instruments *Loomis*, 159 S.W. at 307.

Under this analysis, the after-acquired clause in the Texas Mortgage Documents only became relevant to the Plaintiffs–that is, only became connected to and affected the estates to which the Plaintiffs had a claim ( *i.e.*, the wells and the leases underlying the wells)–when unit designations were filed in the Hill County records that pooled leases owned by Cornerstone when the Texas Mortgage Documents were filed with After-acquired Properties. Before the recording of a unit designation, there was nothing in the deed records to link the grant of security interests in after-acquired property in the Texas Mortgage Documents to any of the Texas After-acquired Properties. At the time a unit designation was recorded, however, the Plaintiffs were placed on constructive notice of the precise leases that comprised that unit, thus providing the necessary link from the grant of a security interest in After-acquired Properties in the Texas

Mortgage Documents to specifically identifiable leases.

For these reasons, the Court concludes that the Plaintiffs are charged with constructive notice of Union Bank's mortgage lien on the Texas After-acquired Properties as of the date that an After-acquired Property was pooled of record with any lease owned by Cornerstone at the time the Texas Mortgage Documents were recorded.[28]  As such, Union Bank's mortgage lien will take priority on a Texas After-acquired Property over the lien claim of any Plaintiff whose M/M Lien incepted after the date that the designation for the unit that contained that lease was filed in the Hill County records.

## IV.    CONCLUSION

In summary, for the reasons explained above, the Court concludes that: (i) Union Bank's mortgage lien on the Oklahoma Blanket Leases and the Oklahoma After-acquired Properties, while fully valid and enforceable against Cornerstone, is junior in priority to the Plaintiffs' M/M Liens on those properties, (ii) Union Bank's mortgage lien on the Texas Blanket Leases is senior in priority to the Plaintiffs' M/M Liens on those leases, (iii) Union Bank's mortgage lien on the Texas After-acquired Properties is senior in priority to the Plaintiffs' M/M Liens on those leases where the Plaintiffs' M/M Lien incepted after the date that the designation for the unit that contained the lease was filed in the Hill County records, and (iv) Union Bank's mortgage lien on the Texas After-acquired Properties, while fully valid and enforceable against Cornerstone, is junior in priority to the Plaintiffs' M/M Liens on those leases where the Plaintiffs' M/M Liens

---

[28]  As noted at trial, of all of the Plaintiffs' M/M Lien claims, only two claims–one from the Baker Hughes Plaintiffs and one from the Weatherford Plaintiffs–fall in between the recording of the Texas Deed of Trust and the Texas Supplement.  In other words, the units at issue for those two claims contained leases that were not listed on Exhibit A to the Texas Deed of Trust but were owned by Cornerstone when the Texas Deed of Trust was recorded, and then those leases were subsequently listed on Exhibit A to the Texas Supplement.  Because the Court has concluded that the Plaintiffs were on constructive notice of Union Bank's mortgage lien on Texas Blanket Leases as well as leases listed on Exhibit A to the Texas Deed of Trust, the Baker Hughes Plaintiffs and the Weatherford Plaintiffs were thus on constructive notice of Union Bank's mortgage lien on those leases as of the date of the recording of the Texas Deed of Trust.  *See* discussion at Audiotape: Trial conducted 8/11/10 at 4:36:37 - 4:38:32 (on file with the Court).

incepted before the date that the designation for the unit that contained the lease was filed in the Hill County records.

        **SO ORDERED**.