U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS



**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

*[signature]*

**United States Bankruptcy Judge**

**Signed August 25, 2010**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **CORNERSTONE E&P COMPANY, L.P,** *et. al.*, | § | **CASE NO. 09-35228-BJH-11** |
| | § | |
| **Debtors.** | § | |
| | § | |
| **BAKER HUGHES OILFIELD OPERATIONS, INC.,** *et. al.*, | § | |
| | § | **Adversary No. 09-3447-bjh** |
| **Plaintiffs** | § | **(consolidated with proceedings** |
| | § | **numbered 09-3448, 09-3450,** |
| **vs.** | § | **09-3452, and 09-3457)** |
| | § | |
| **UNION BANK OF CALIFORNIA, N.A. N/K/A UNION BANK, N.A.,** *et. al.* | § | |
| | § | |
| **Defendants** | § | |

## SUPPLEMENTAL OPINION

The Court tried the adversary complaints (collectively, the "Complaints") filed by: (i) Baker

Hughes Oilfield Operations, Inc. ("Baker Hughes"), Schlumberger Technology Corporation, Simons Petroleum, Inc., Texas CES, Inc., T.K. Stanley, Inc., Pumpco Energy Services, Inc., I.E. Miller Services, Inc., Bridgeport Tank Trucks, LLC, and Select Energy Services, LLC d/b/a Tejas Oilfield Services (collectively, the "Baker Hughes Plaintiffs"), (ii) Awesome Transport, LLC, (iii) Weatherford U.S., L.P., and Precision Energy Services, Inc. (collectively, the "Weatherford Plaintiffs"), (iv) B.J. Services Company, USA and Newpark Drilling Fluids, LLC (collectively, "BJ Services"), and (v) Phantom Drilling Fluids Company (collectively with the Baker Hughes Plaintiffs, Awesome Transport, LLC, the Weatherford Plaintiffs and BJ Services, the "Plaintiffs") against Union Bank of California, N.A. n/k/a Union Bank, N.A. ("Union Bank"), Cornerstone E&P Company, L.P. (the "Debtor"), and the Debtor's general partner and another debtor, Cornerstone Southwest GP, LLC (together with the Debtor, "Cornerstone") on August 9-11, 2010. Thereafter, the Court issued its Memorandum Opinion and Order, which (i) was entered on the docket in these adversary proceedings on August 23, 2010 and (ii) disposed of substantially all of the issues that were tried by the parties (the "Trial Opinion").

However, as noted in the Trial Opinion, three issues remained open for resolution by the Court following the issuance of the Trial Opinion. First, whether Union Bank's prior mortgage lien is subordinate to subsequent mineral liens against Union Bank's working interest collateral under the decision in *Ladder Energy Co. v. Intrust Bank, N.A.*, 931 P.2d 83 (Okla. Civ. App. 1996). Second, are the Baker Hughes Plaintiffs entitled to recover reasonable attorneys' fees from Cornerstone under 42 OKLA. STAT. § 176 on account of the M/M Lien[1] claims arising under 42 OKLA. STAT. §144. Third, if the Court's primary ruling in the Trial Opinion granting Union Bank's Rule 52(c) Motion

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to that term in the Trial Opinion.

regarding the discretionary advance issue was in error, did the extrinsic evidence offered at trial establish that Union Bank made any discretionary advances to Cornerstone. Each of these issues will be discussed separately below.

## I.      LEGAL ANALYSIS

### A.      Is Union Bank's Prior Mortgage Lien Subordinate to Certain M/M Liens Against Union Bank's Working Interest Collateral under *Ladder*?

As noted in the Trial Opinion, in the Summary Judgment Opinion and Order, the Court denied the Motion for Partial Summary Judgment (the "Oklahoma and Texas Properties Motions") filed by the Weatherford Plaintiffs, Awesome Transport, LLC, Phantom Drilling Fluids Company, and BJ Services (collectively, the "Ladder Plaintiffs"). In the Oklahoma and Texas Properties Motions, the Ladder Plaintiffs sought a determination that Union Bank's prior mortgage lien[2] on Cornerstone's working interest in oil and gas properties is subordinate to their subsequent M/M Liens because a mortgage interest in a working interest cannot be conveyed free of costs, relying upon an intermediate Oklahoma appellate court decision in *Ladder Energy Co. v. Intrust Bank, N.A.*, 931 P.2d 83 (Okla. Civ. App. 1996) as authority for such a determination. In denying the Oklahoma and Texas Properties Motions, the Court concluded that *Ladder* is not of significance here, since even assuming that the holding in *Ladder* is correct, the case is largely confined to its own facts and does not establish the proposition that the Ladder Plaintiffs have asserted in reliance upon it. *See* Summary

---

[2]  Of course, this argument was an alternative argument to their primary argument that the Plaintiffs' M/M Liens were senior to Union Bank's mortgage lien on the Oklahoma Blanket Leases and the Oklahoma After-acquired Properties because the Plaintiffs did not have either actual notice or constructive notice of Union Bank's mortgage lien with respect to either the Oklahoma Blanket Leases or the Oklahoma After-acquired Properties. Given this Court's conclusion in the Trial Opinion that Union Bank's mortgage lien on the Oklahoma Blanket Leases and the Oklahoma After-acquired Properties is junior in priority to the Plaintiffs' M/M Liens, the relevance of a *Ladder* analysis is now limited to Union Bank's prior mortgage lien on those properties that were specifically listed on Exhibit A to the Oklahoma Mortgage.

Judgment Opinion and Order, pp. 44-47.

During closing arguments at trial, counsel for the Weatherford Plaintiffs offered additional arguments regarding why Union Bank's prior mortgage lien is subordinate to the Ladder Plaintiffs' M/M Liens against Union Bank's working interest collateral under *Ladder*. In addressing these arguments, a short discussion of working interests and the *Ladder* decision will be helpful.

### 1.    What is a "Working Interest?"

Under Texas law, a "working interest is an operating interest under an oil and gas lease that provides its owner with the exclusive right to drill, produce, and exploit the minerals." *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.*, 36 S.W.3d 597, 599 n.3 (Tex. App. 2000) (citing 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, *Oil & Gas Law* 1191 (1999)). As an oil and gas interest, a working interest is an interest in real property. *Long Trusts v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006). As opposed to royalty interests, which are free of expenses, a working interest bears all of the operating and drilling costs. *Id.* at 599 n.2–3; *see also Newhouse v. Colony Ins. Co.*, No. 08-50370, 2010 WL 2546113, at *3 n.5 (5th Cir. June 23, 2010) (citing 8 WILLIAMS & MEYERS, *supra*, at 730 ("Under an oil and gas lease, operating expenses are the burden of the working interest in the property and a royalty interest is free of the burden of such expenses.")).

Oklahoma law construes a working interest in the context of oil and gas leases in the same way—as an interest in an oil and gas lease that is subject to the costs of exploration and development. *See XAE Corp. v. SMR Prop. Mgmt. Co.*, 968 P.2d 1201, 1207 (Okla. 1998) and *TXO v. Comm'rs of the Land Office*, 903 P.2d 259, 262-63 (Okla. 1994).

### 2.    The *Ladder* Case.

Ladder Energy Company ("Ladder") became the operator of various oil and gas leases in

Grant County, Oklahoma in 1993. *Ladder*, 931 P.2d at 84. In 1987, well before Ladder became the operator, the owner of the working interest in the oil and gas leases executed a mortgage and security agreement on the oil and gas leases to Intrust Bank, N.A. (the "Bank"). *Id.* After Ladder assumed its duties as operator, disputes arose between Ladder and the owner of the oil and gas leases over certain operating expenses, which led Ladder to file a mineral lien against the leases. *Id.* After the lien was filed, the purchaser of gas produced by the leases suspended payment pending a determination of priorities. *Id.* Ladder sued to foreclose its mineral lien. *Id.*

The trial court entered judgment that both Ladder and the Bank had statutory liens, but that Ladder was entitled to reimbursement of its lease operating expenses from the suspended revenues. *Id.* at 84-85. According to the court of appeals, in entering judgment in favor of Ladder, the trial court made the following pertinent findings of fact and conclusions of law: (i) the Bank's mortgage lien extended only to its mortgagor's working interest; (ii) as applicable in the case, the term "proceeds" could only mean net proceeds; and (iii) the Bank was entitled to what remained of the suspended revenues after Ladder had recouped its lease operating expenses. *Id.* at 85. The Bank appealed on the issue of whether Ladder's lien, as operator, or the Bank's lien, which was prior in time, was superior. *Id.* at 84. On appeal, the Bank argued that because its lien was prior in time, it was entitled to all of the suspended revenues, citing 42 OKLA. STAT. § 144, which provides that mineral liens are superior only to those liens that attach after the commencement of labor or the furnishing of materials by the mineral contractor. *Id.*

The court of appeals affirmed the judgment of the trial court and found no error in the trial court's division of the suspended revenues. *Id.* In doing so, the appeals court noted first that a mortgagee can acquire no greater interest than that owned by its mortgagor. *Id.* Thus, the Bank

could only acquire a lien in the oil and gas leases to the extent of the interest held by the owner, which was found to be only a working interest. *Id.* Specifically, the court of appeals stated:

> While it is clear that Bank's mortgage and security interest are prior in time to the interest of Ladder, Bank's interest is subject to the obligations and liabilities of the interest held by WMA [the working interest mortgagor]. Those obligations and liabilities include paying for the costs of development and exploration.

*Id*. at 85.

### 3.    *Ladder's* Application and Relevance Here.

As noted previously, in the Summary Judgment Opinion and Order, the Court concluded that *Ladder* is not of significance here, since even assuming that the holding in *Ladder* is correct, the case is largely confined to its own facts and does not establish the proposition that the Ladder Plaintiffs have asserted in reliance upon it. In this regard, the Court notes certain aspects of the facts and the actual holding in *Ladder* that distinguish its applicability here. Most significantly, the collateral at issue in *Ladder* was not the working interest in the oil and gas leases *per se*, but instead was suspended revenues from gas production. Further, while the issue on appeal was framed by the Bank as a question of lien priority, the *Ladder* court did not address the relative priority of the Bank's and Ladder's liens in any single piece of collateral, but instead the decision focused exclusively on the extent of the Bank's lien and only identified property that the Bank's lien did, and did not, encumber. Specifically, the *Ladder* court concluded "'[p]roceeds' in this context can only mean net proceeds." *Id*. at 85. In short, the *Ladder* court concluded that the Bank's lien on proceeds only extended to those proceeds remaining after the amounts owing to Ladder, as operator, were deducted.

At trial, counsel for the Weatherford Plaintiffs argued that Union Bank's prior mortgage lien is subordinate to subsequent mineral contractor liens, not as a matter of lien priority *per se*, but because a mortgagee's lien can attach to no greater interest than that owned by the mortgagor.

According to the Weatherford Plaintiffs' counsel, because the necessary attribute of a working interest is that it is a cost-bearing interest, a mortgagee's lien on a working interest must always be subject to costs. And, while counsel for the Weatherford Plaintiffs agreed at trial that what was at issue in *Ladder* was the extent of the Bank's lien on suspended revenues from gas production, she further argued that the *Ladder* decision *implicitly* rests upon the application of the same principle–that a working interest always bears costs–to the working interest itself to arrive at its holding. Audiotape: Trial conducted 8/11/10 at 2:40:42 - 2:41:15 (on trial with Court) (closing argument of Weatherford Plaintiffs).

As the Court stated in the Summary Judgement Opinion and Order, the basic flaw in the Oklahoma Plaintiffs' argument is their attempt to bootstrap the *Ladder* court's determination of the extent of the Bank's lien on suspended proceeds from gas production into a superior lien position for statutory mineral liens over a prior-perfected mortgage lien on a working interest, which, as noted previously, is a real property interest. Simply put, the *Ladder* court did not address the extent of a mortgagee's security interest in a working interest as an interest in real property. Rather, the *Ladder* court simply affirmed the trial court's application of the definition of working interest to measure the extent of the Bank's lien in proceeds from a working interest. Accordingly, this Court concluded in the Summary Judgment Opinion and Order that the *Ladder* holding has no application apart from the disposition of proceeds from a working interest. The Court continues to believe that its prior analysis of *Ladder* is correct.

However, as noted previously, according to counsel for the Weatherfold Plaintiffs' trial argument, the Court is supposed to divine the intent of the *Ladder* court in coming to its conclusion regarding the extent of the Bank's lien on proceeds from suspended gas production and apply that

divined intent to the working interest itself. The Court declines to do so for at least three reasons.

First, the actual discussion of the extent of the Bank's lien on suspended proceeds from gas production in the *Ladder* decision comprises four (4) short paragraphs. To say that the *Ladder* court's analysis of this issue is terse is an understatement. Nowhere in that terse analysis does the *Ladder* court mention, let alone discuss, whether it would apply the same analysis to a real property interest. Of course, even if the *Ladder* court had discussed applying the same analysis to the working interest itself, that discussion would simply be dicta and of no real consequence. Counsel for the Weatherford Plaintiffs now asks this Court to go even further and conclude that the *Ladder* decision *implicitly* rests upon the application of the same principle–that a working interest always bears costs–to the working interest itself to arrive at its holding. There is simply no basis upon which to come to such a conclusion from the *Ladder* court's four (4) paragraphs of analysis.

Second, when state law governs an issue, a bankruptcy court is bound to apply the law as interpreted by the state's highest court, and when no direct guidance from the state's highest court is available, the court must determine to the best of its ability how that court would rule if faced with the issue. *Ladue v. Chevron, U.S.A., Inc.*, 920 F.2d 272, 274 (5th Cir. 1991). Here, the Court concludes that the Oklahoma Supreme Court has itself spoken to the relative priority of a prior bank lien and a subsequent M/M lien in a decision dated three years prior to *Ladder*. Specifically, in *The Fourth Nat'l Bank of Tulsa v. Appleby*, 864 P.2d 827 (Okla. 1993), the central issue addressed by the Oklahoma Supreme Court was "[w]hich takes precedence between [the operator's] mechanic's and materialmen's liens and Bank's mortgages." *Id*. at 829. In that case, Appleby, a working interest owner, failed to pay her share of lease operating expenses to ANR, a well operator who filed forced pooling applications with the Oklahoma Corporation Commission. When Appleby defaulted on her

mortgage, the mortgagee bank sued to foreclose. ANR filed a counterclaim alleging that it had liens for its joint interest billings and later filed formal lien statements pursuant to 42 OKLA. STAT. §§ 141 et seq. *Id*. at 830. Ultimately, the *Appleby* court determined that ANR's liens would have priority over the bank's mortgage lien to the extent the operator's liens had an inception date which pre-dated the bank's lien. However, due to the statute of limitations having run on certain of ANR's unpaid invoices, the *Appleby* court concluded that "[b]ecause Bank filed its mortgages before July 14, 1986, Bank's liens take priority over ANR's liens." *Id*. at 834. In other words, the *Appleby* court applied a traditional "first in time" analysis in order to determine which lien takes precedence. And, because the Bank's liens were prior in time, they were senior to the subsequent M/M liens.

*Appleby* is the controlling precedent in Oklahoma. And, under an *Appleby* "first in time" analysis, Union Bank's prior mortgage lien is senior to the subsequent M/M Liens of the Ladder Plaintiffs.

Third, as the Court noted in the Summary Judgment Opinion and Order, because the reading of *Ladder* urged by the Ladder Plaintiffs would expand state law in direct contravention of the rights created by specific statutes with regard to lien priority – *i.e.*, 42 OKLA. STAT. § 144 (oil and gas well liens shall be preferred over liens and encumbrances that attach "subsequent to" the first date labor and/or materials provided) and 42 OKLA. STAT. § 15 ("Other things being equal, different liens upon the same property have priority according to the time of their creation...."), the situation and holding in *Ladder*–a pool of suspended revenues that, according to the *Ladder* court, could be segregated into discrete portions to which the mortgagee held a lien and to which it did not–should not be extended beyond its facts and narrow holding to support the much broader legal principles that the Ladder Plaintiffs attempt to place upon it.

Accordingly, the Court concludes that Union Bank's prior mortgage lien on working interest collateral is not subordinate to the Ladder Plaintiffs' subsequent M/M Liens on the basis of the holding in *Ladder*, and that priority between Union Bank and the Plaintiffs for liens on Cornerstone's working interests is governed by otherwise applicable state law as described herein and in the Trial Opinion.

**B.      Whether the Baker Hughes Plaintiffs are entitled to recover reasonable attorneys' fees from Cornerstone under 42 OKLA. STAT. § 176 on account of the M/M Lien Claims arising under 42 OKLA. STAT. § 144.**

42 OKLA. STAT. § 176 provides that "[i]n an action brought to enforce any lien the party for whom judgment is rendered shall be entitled to recover a reasonable attorney's fee, to be fixed by the court, which shall be taxed as costs in the action." In the summary judgment motion filed by the Baker Hughes Plaintiffs (the "Baker Hughes Motion"), the Baker Hughes Plaintiffs argued that: (i) this provision represents a broad "prevailing party" attorneys' fee statute for actions to enforce M/M lien claims, and (ii) they are entitled to recover attorneys' fees from Cornerstone in this adversary proceeding. In response to the Baker Hughes Motion, Cornerstone argued that 42 OKLA. STAT. § 176 does not apply because: (i) this adversary proceeding is not a proceeding to enforce a lien; and (ii) no judgment had yet been rendered for the Baker Hughes Plaintiffs. Cornerstone cited no authority to the Court for either proposition.

As noted in the Summary Judgment Opinion and Order, the Court simply ran out of time to address this issue prior to trial. Accordingly, the Court will address it here.

After careful consideration of the terms of the statute itself and the relevant case law, the Court concludes that the Baker Hughes Plaintiffs are correct for two reasons. First, although most Oklahoma cases that involve awards of attorneys' fees under § 176 appear to be foreclosure

actions–particularly in cases where mineral contractor liens were at issue–the Oklahoma Supreme Court has awarded attorneys' fees under § 176 in a suit for declaratory judgment on the priority of competing liens, as well as in other actions that did not involve direct foreclosure of a lien. *See First Cmty. Bank of Blanchard v. Hodges*, 907 P.2d 1047, 1051-54 (Okla. 1995); *see also Winkler v. Solutions Group, Inc.*, 915 P.2d 386, 388 (Okla. Civ. App. 1995) (approving trial court award of fees under § 176 to prevailing party in competing claims to garnished funds); *see, e.g., K & H Well Serv., Inc. v. Tcina Holding, Co.*, 51 P.3d 1219, 1225-27 (Okla. 2002) (attorneys' fees awarded under § 176 in lien foreclosure action).

In *Hodges*, the Oklahoma Supreme Court approved an award of appeal-related attorneys' fees to the successful party on appeal in a suit to determine priority between a general judgment lien and a lien ordered by a divorce decree. *Hodges*, 907 P.2d at 1049, 1055. In that case, the Oklahoma Supreme Court held that the award of appellate-level attorneys' fees was appropriate because of the statutory authority for recovery of attorneys' fees in the trial court under § 176. *Id.* at 1055. Accordingly, the Court agrees with the Baker Hughes Plaintiffs that this adversary proceeding, as a declaratory judgment action to determine relative lien priorities, is an action to enforce a lien within the meaning of § 176.

Second, as a result of the Court's rulings in the Baker Hughes Order and the Trial Opinion, the Court concludes that the other requirement of the statute – *i.e.*, a final judicial resolution of the issues – has been satisfied here such that the Baker Hughes Plaintiffs are entitled to a recovery of their reasonable fees. *See Rotan Motor Co. v. Farmers & Merchants State Bank of Valley*, 249 P.2d 125, 129 (Okla. 1952) (voluntary dismissal prior to judgment did not trigger entitlement to fees under § 176). To fall within the statute, the claimant must be a party "for whom judgment is rendered,"

meaning a party that prevailed on a lien claim. *See Pierson v. Am. Nat. Bank of Shawnee*, 325 P.2d 426, 428 (Okla. 1958). Through these rulings, the Baker Hughes Plaintiffs have obtained favorable judgments on a substantial portion of their claims related to the priority of their liens over those of Union Bank on the Oklahoma Properties. Thus, for purposes of the recovery of attorneys' fees under § 176, the Baker Hughes Plaintiffs are parties for whom a judgment has been rendered.

One final statutory requirement must be satisfied – *i.e.*, attorneys' fees awarded under § 176 must be reasonable for the services performed that relate to the enforcement of the lien. *Frayer v. Crain*,163 P.2d 966, 968 (Okla. 1945); *see Jones v. Purcell Investments, LLC*, 231 P.3d 706, 713 (Okla. Civ. App. 2009) (amount of requested fees reduced because of value of lien at issue). By agreement of the parties, that issue will be addressed at a subsequent hearing at which time the Baker Hughes Plaintiffs will be permitted to prove up their reasonable fees.[3]

Accordingly, the Court holds that the Baker Hughes Plaintiffs, as prevailing parties in an action to enforce a lien under Oklahoma law, are entitled to recover their reasonable attorneys' fees under 42 OKLA. STAT. § 176.

### C.    Whether any of the advances made by Union Bank to Cornerstone were not obligatory under Oklahoma law.

As noted in the Trial Opinion, under Oklahoma law, a mechanics'/materialmens' lien takes priority over a prior recorded mortgage for advances made after the inception of the mechanics'/materialmens' lien to the extent the advances are discretionary rather than obligatory under the terms of the loan agreement. *Liberty Nat'l Bank & Trust Co. v. Kaibab Indus.*, 591 P.2d 692, 694 (Okla. 1979); *Local Fed. Sav. & Loan Ass'n v. Davidson & Case Lumber Co.*, 255 P.2d

---

[3] As noted in fn 13 of the Trial Opinion, the parties agreed to address issues surrounding the reasonableness of the fees and whether those fees represent a secured claim (as opposed to an unsecured claim) in a subsequent hearing.

248, 253 (Okla. 1953) (for discretionary advances "materialmen who furnished material, after the recording of the mortgage, but before the money is paid, have a prior lien to that of the mortgagee"); *First Nat'l Bank & Trust Co. of Ardmore v. Worthle*, 714 P.2d 1044, 1047 (Okla. Civ. App. 1985). Advances are obligatory when the mortgage secures a set line of credit or provides for stated amounts of advances upon the occurrence of certain conditions. *Liberty Nat'l Bank*, 591 P.2d at 694; *Worthle*, 714 P.2d at 1047. Thus, any Plaintiff whose Oklahoma M/M Lien incepted prior to any discretionary advance made by Union Bank under the Credit Agreement will take priority over Union Bank to the extent of such discretionary advance.

Following the close of the Plaintiffs' cases in chief, Union Bank made an oral motion under FED. R. CIV. P. 52(c) (the "Rule 52(c) Motion") for judgment against the Plaintiffs on this discretionary advance issue. Because the Plaintiffs conceded that only the Weatherford Plaintiffs have any liens that pre-date an advance made under the Credit Agreement, the Court granted the Rule 52(c) Motion as to all of the Plaintiffs except the Weatherford Plaintiffs by oral ruling announced on the record at trial. Audiotape: Trial conducted 8/10/10 at 2:58:05 - 2:59:39 (on file with Court). And, for the reasons set forth in the Trial Opinion, the Court granted the remainder of the Rule 52(c) Motion in favor of Union Bank, having concluded that the Weatherford Plaintiffs failed to prove their claim.

However, the Court will proceed to analyze all of the evidence offered at trial on the discretionary advance issue in order to facilitate appellate review of its decision. In other words, if the Court's primary ruling in the Trial Opinion granting Union Bank's Rule 52(c) Motion regarding the discretionary advance issue was in error, did the extrinsic evidence offered at trial establish that Union Bank made any discretionary advances to Cornerstone?

As relevant here, two of the Weatherford Plaintiffs' liens, for work on the Panda #5-1H well and the Wallabee #25-1H well, incept before certain advances made by Union Bank. *Id.* at 32-33 ¶¶ 66, 69 (inception dates of December 18, 2008 and October 20, 2008, respectively). The parties have stipulated that from October 2008 through December 2008, Union Bank made five advances under the Credit Agreement. Joint Pre-trial Order, at 15. Of those advances, the Weatherford Plaintiffs specifically challenge the $5 million advance made on December 24, 2008 as discretionary based on three alleged unwaived defaults by Cornerstone under the Credit Agreement that existed when the advance was made. *See* Weatherford Post-trial Brief, at 2-3; Joint Pre-trial Order, at 15 ($5 million advance dated December 24, 2008). Specifically, the Weatherford Plaintiffs contend that the December 24, 2008 advance was discretionary because of the following alleged defaults that were not waived by Union Bank as of December 24, 2008: (i) the attachment of certain of the Plaintiffs' liens; (ii) Cornerstone's failure to file required documentation to perfect Union Bank's mortgage; and (iii) Cornerstone's continued failure to maintain the required current ratio. Weatherford Post-trial Brief, at 3. Each alleged default, allegedly causing the December 24, 2008 advance to be discretionary, will be separately addressed.

The Weatherford Plaintiffs first contend that the attachment of their lien on the Panda #5-1H well on December 18, 2008 constituted a default under the Credit Agreement that Union Bank had not waived when the December 24, 2008 advance was made. *See* Weatherford Pls. Ex. 13, at 26 (definition of "Permitted Liens"), 62 § 4.17 (warranty of absence of liens except for permitted liens); 72 § 6.01 (list of permitted liens). In this regard, the Weatherford Plaintiffs contend that, under 42 OKLA. STAT. § 144, Union Bank is charged with constructive notice of its lien as of the date of its inception, notwithstanding the fact that the Weatherford Plaintiffs did not file their required lien

affidavit until June 12, 2009. *See* Joint Pre-trial Order, at 32 ¶ 63 and Weatherford Pls. Ex. 41, at 2.

Union Bank responds that while the Oklahoma lien statutes establish that an M/M lien incepts on the first date that labor or materials were provided, § 144 does not provide that such a lien attaches on that date, since constructive notice cannot be imparted until a claimant complies with the provisions of the applicable statutes, which includes the filing of a lien affidavit. Union Bank Post-trial Response, at 5 (citing 42 OKLA. STAT. § 144).

Although neither side has cited an Oklahoma case directly on point, and the Court has located none, the Court agrees with Union Bank. The provisions of § 144 are cast in the context of establishing dates to measure lien priority between M/M lienholders and other claimants to the property at issue such as purchasers and encumbrancers, rather than to alter or affect substantive rights between parties to an underlying agreement to which the M/M lien claimant is neither a party nor an intended beneficiary. *See* 42 OKLA. STAT. § 144. The Weatherford Plaintiffs reliance on this alleged breach to characterize a subsequent advance as discretionary aptly illustrates the concerns of the *Home Lumber* court as to whether M/M lien claimants even have standing to assert such claims. *See Home Lumber Co. v. Kopfmann*, 535 N.W.2d 302, 305 (Minn. 1995) and discussion contained in the Trial Opinion, at pp. 42-43.

Further, regardless of the date that the Weatherford Plaintiffs' lien attached, it is unclear from the provisions of the Credit Agreement and the evidence in the record as to when the lien became an un-permitted lien, and thus constituted a default under the Credit Agreement. Section 6.01 of the Credit Agreement provides that Cornerstone could validly permit certain liens to exist, including:

> Liens in favor of vendors, carriers, warehousemen, repairmen, mechanics, workmen, materialmen, construction, or similar Liens arising by operation of law in the ordinary

course of business in respect of obligations that are not yet due or that are being contested in good faith by appropriate proceedings, provided that such reserve as may be required by GAAP shall have been made therefor[.]

Weatherford Pls. Ex. 13, at 72 § 6.01(e).

Under this provision, even assuming that the Weatherford Plaintiffs' lien attached for purposes of determining a breach of the Credit Agreement on December 18, 2008, the lien was expressly permitted under the Credit Agreement for as long as the conditions specified above were met. *Id.* Because the Weatherford Plaintiffs have offered no evidence of the dates that any of their billings became overdue[4] or that any appropriate reserve had not been made for any contested billings, the Weatherford Plaintiffs have failed to carry their burden of proof to show that attachment of their lien on December 18, 2008 triggered a default under the Credit Agreement sufficient to render Union Bank's December 24, 2008 advance discretionary.

Next, the Weatherford Plaintiffs assert that Cornerstone was in default on December 24, 2008 because the failure to specifically identify Oklahoma Blanket Leases and Oklahoma After-acquired Properties "failed to create the Lien on the property purported to be the subject of such agreement" as required by the Credit Agreement. Weatherford Post-trial Brief, at 3 (citing Weatherford Pls. Ex. 13, at 81 § 7.01(m)). This contention is wrong both factually and legally. The Court held in the Summary Judgment Opinion and Order that the Oklahoma Mortgage is not ambiguous as a matter of law and satisfies the Oklahoma Statute of Frauds. *See* Summary Judgment Opinion and Order, at 9-17. Accordingly, while the failure to provide specific property descriptions for the Oklahoma

---

[4] The Court notes, however, that the Weatherford Plaintiffs' invoice related to the Panda #5-1H well for the billing period December 20, 2008 to January 1, 2009 was issued on February 26, 2009 on net 30 day billing terms, such that the invoice would only have come due well after the date of Union Bank's December 24, 2008 advance. *See* Weatherford Pls. Ex. 41, at 22-23.

Blanket Leases and the Oklahoma After-acquired Properties in the Oklahoma Mortgage left Union Bank's lien on those properties junior to the Plaintiffs' M/M Liens, Union Bank's mortgage lien was properly perfected and is fully enforceable against Cornerstone. In other words, the problem with the absence of specific property descriptions in the Oklahoma Mortgage was one of notice to the subsequent M/M Lien claimants, not perfection as between Union Bank and Cornerstone. Further, Union Bank provided testimony through its corporate representative that Union Bank was not aware of any default under this provision, particularly from October 2008 through December 2008. Audiotape: Trial conducted 8/10/10 at 5:10:53 - 5:12:03 (on file with Court) (testimony of Michael Jerry Bourgeois). Accordingly, the Court concludes that the Weatherford Plaintiffs have failed to carry their burden of proof to show that the Debtor was in default under § 7.01(m) of the Credit Agreement.

Lastly, the Weatherford Plaintiffs contend that the Debtor was in continuing default during December 2008 because of its failure to maintain the required current ratio under the Credit Agreement. As evidence of this default, the Weatherford Plaintiffs point first to Union Bank's waiver of the Debtor's default on the current ratio covenant as of September 30, 2008. *See* Weatherford Pls. Ex. 34, at CS-07529. Because natural gas prices only continued to fall from September 2008 through the end of the year, the Weatherford Plaintiffs assert that it "is impossible to conceive" that the Debtor was ever again in compliance with the current ratio covenant. Weatherford Post-trial Brief, at 3 (citing Weatherford Pls. Ex. 107, at ¶ 14).

Section 6.16 of the Credit Agreement required the Debtor to maintain a ratio, as of the last day of each fiscal quarter, of current assets to current liabilities of no less than 1.00 to 1.00. Weatherford Pls. Ex. 13, at 78 § 6.16. The Credit Agreement defines the scope of both current assets

and current liabilities for this determination. *Id*. Based upon the trial record, however, the Court concludes that the Weatherford Plaintiffs have failed to carry their burden of proof on this alleged default for the following reasons.

First, the Weatherford Plaintiffs produced no evidence at trial about the level of the Debtor's current liabilities during the last quarter of 2008, a necessary component of computing the current ratio as defined by the Credit Agreement. *See* Weatherford Ex. 13, at 78 § 6.16. Second, under the express terms of the Credit Agreement, the Debtor was only required to be in compliance with the current ratio requirement "as of the last day of each fiscal quarter...." *Id.* The Fourth Amendment to the Credit Agreement shows that Union Bank waived the current ratio default existing as of September 30, 2008, the last day of the third quarter of 2008. Accordingly, the next pertinent date under § 6.16 for measurement of the current ratio was December 31, 2008, the last day of the fourth quarter, while, as noted above, the date of the challenged advance was December 24, 2008. Thus, under the express terms of the Credit Agreement, the Debtor could not have been in default again under § 6.16 until *after* the advance had already been made. *See* Weatherford Ex. 13, at 78 § 6.16. And, because the reporting package for Cornerstone's loan compliance for the fourth quarter of 2008 was not due to Union Bank until 120 days after the close of the year, the earliest date that Union Bank could have become aware of such default was well after the December 24, 2008 advance. *See* Audiotape: Trial conducted 8/10/10 at 5:13:28 - 5:13:50 (on file with Court) (testimony of Michael Jerry Bourgeois).

Finally, the Court notes that the evidence at trial, through the testimony of Union Bank's corporate representative, established that Union Bank was not aware of any uncured and/or unwaived default under the Credit Agreement in the time period relevant to the advances at issue (from October

2008 to December 2008). *See* Audiotape: Trial conducted 8/10/10 from 5:4:32 - 5:21:27 (on file with Court) (testimony of Michael Jerry Bourgeois). Thus, even if the Court had denied the Rule 52(c) Motion and fully considered this evidence, in light of the Weatherford Plaintiffs' failure to carry their burden of proof on each of the alleged defaults, the Court would still have concluded that the advances that Union Bank made under the Credit Agreement were obligatory rather than discretionary.

## II.  CONCLUSION

*Ladder* is not the controlling precedent here. The Court concludes that the *Ladder* court's narrow holding should not be extended beyond the specific facts at issue there.

The Baker Hughes Plaintiffs, as prevailing parties in an action to enforce a lien under Oklahoma law, are entitled to recover their reasonable attorneys' fees under 42 OKLA. STAT. § 176. Issues surrounding the reasonableness of those fees, and whether those fees represent a secured claim against Cornerstone, will be determined in a further hearing by agreement of the parties.

After considering all of the evidence at trial, the Court concludes that the Weatherford Plaintiffs failed to carry their burden of proof that any advance made by Union Bank under the Credit Agreement was discretionary.

### End of Supplemental Opinion ###